**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

JOYCE MARIE MOORE, et al.                    * CIVIL ACTION

VERSUS                                       * NO. 65-15556

TANGIPAHOA PARISH SCHOOL BOARD, et al.       * SEC. "B"(1)


### ORDER AND REASONS

Before the Court is Plaintiffs' Motion for Further Relief and
Evidentiary Hearing In re: Alden Foster (Rec. Doc. No. 534).  After
review of the pleadings and applicable law and for the reasons that
follow,

**IT IS ORDERED** that Alden Foster shall be hired as the head
football coach at Amite High School.


### *BACKGROUND*

The matter before this Court, *Joyce Marie Moore, et. al. v.
Tangipahoa Parish School Board, et. al.*, is a forty-three year old
school desegregation case, attempting seeking to rid the Tangipahoa
School System of the vestiges of *de jure* school segregation.
Despite the age of this case, myriad issues remain ripe for review.
However, the scope of this order solely addresses the Tangipahoa
Parish School Board's decision not to hire Mr. Alden Foster as head
coach of the Amite High School football team.

1

## A.  40-60 Ratio

As part of this Court's initial injunctive ruling in the 1960s in *Joyce Marie Moore, et. al. v. Tangipahoa Parish School Board, et. al.*, the Court ordered the Tangipahoa School Board ("the Board") to make affirmative attempts to desegregate its public schools and make all good faith efforts to eradicate the vestiges of *de jure* segregation.  As part of its affirmative duty to make good faith efforts to desegregate its schools and eradicate the vestiges of de jure segregation therein, the parties convened, obtaining assistance and recommendation of professors from Tulane University, New York University and the University of Oklahoma, and agreed upon the set of "Objective Criteria" to be used in hiring job applicants after the Board reached a 40-60 ratio of African-American and Caucasian employees.[1]

On May 15, 1975, a partial settlement agreement was reached between the Tangipahoa Parish School System and Plaintiffs.  The agreement indicated that qualified African-American educators would be employed and assigned so as to achieve a systemwide faculty staff ratio of 40% African-American and 60% Caucasian (40-60 ratio).  This 40-60 ratio required the School Board to make special efforts to increase the number of African-American teachers

---

[1] The 40-60 ratio represents a systemwide faculty-staff ratio of 40% of African-American to 60% Caucasian.

employed at the high school level.  The parties agreed that as
vacancies arise in the categories of: high school principals,
agricultural teachers, band directors, vocal music teachers,
coaches, athletic directors, and central office administrators, the
school system would be required to appoint African-Americans to
fill such vacancies so that the 40-60 ratio could be achieved.

On June 19, 1975, the Court approved the settlement agreement
with respect to the above specific categories.[2]  The June 19, 1975
order of the Court mandated, "[a]s vacancies arise in the [select
categories listed in the text] the school system will appoint black
educators to fill them so that the 40-60 ratio is achieved . . ."
With regard to the hiring of African-American coaches before the
40-60 ratio is achieved, the Court issued an order on August 12,
1976, stating the following: "[f]irst it will be noted that this
provision of the order (which merely reflected the parties'
agreement) does not make the matter of filling the two positions
with black educators discretionary with the school board. . . The
clause is **mandatory**.  It says in effect, that only black coaches
will be hired until the 40-60 ratio is achieved within each of the
categories." (emphasis added)

On July 5, 1977, Judge Rubin signed a court order holding the
School System in contempt for its failure to meet the criteria for

---

[2]Judge Rubin signed the June 19, 1975 Court order approving
of the settlement terms.

3

the hiring of coaches.[3]   In that order the school system was
ordered to meet the 40-60 ratio of coaches prior to the 1977-78
school year.   In paragraph 4 of the order, the Court stated that:
"4) after the ratio has been achieved, any coaching vacancy that
causes the ratio of black coaches to fall below 40% shall be filled
by a coach of the Black race."

In paragraph 9 of the order the court stated:

9) Notwithstanding anything to the contrary in the

court's May 12, 1977 order, compliance with the

40-60 ratio shall be achieved in all coaching

positions without regard to whether they are

high school positions or otherwise.   After compliance

has been achieved, then effective for the 1978-79

school year, there shall be two groups of coaching

positions, high school and others, and a 40-60 ratio

shall be achieved in each, but no coach shall be

discharged or relieved of coaching responsibility in

either group to accomplish that result; it shall be

attained by filling positions that occur in normal

attrition.

In 1977, the Court instated a compliance officer to ensure
compliance with the desegregation orders of the Court.   The Court

---

[3]An April 1, 1977 order details three Caucasian applicants
were hired as head football coaches after entry of the June 19,
1975 order.

4

directed Defendant School Board "to designate one individual who shall be personally responsible to the Court for ensuring compliance with the responsibilities detailed in the June 19, 1975 order of the court . . . . The compliance officer specified . . . shall not only be responsible for ensuring compliance with the June 19, 1975 Order, but shall be responsible for ensuring compliance with all orders and mandates issued by the court in this matter. . . ."

On June 19, 1979, Judge Collins issued an order, which stated the following:

"The Employment Criteria for Administrators, Supervisors, and Teachers are revised and approved by the defendant School Board on April 17, 1979, and submitted by letter from Defendants' counsel dated May 10, 1979, are approved for use.  In those employment categories where previous court ordered ratios have been achieved, defendants are free to use the criteria in its employment decisions without regard to the racial ratios."

"Approval of the criteria, however, is without prejudice to Plaintiffs' right to raise in subsequent proceedings issues of discriminatory impact of the criteria.  The School shall retain the rating forms of job applicants and shall maintain records to

show each applicant's name, race address and
position sought."

Until the 40-60 ratio was achieved in the employment
categories where it was required, the court mandated that qualified
African-Americans be hired.  But once the 40-60 ratio was achieved,
the School system could then use the objective criteria as the
basis for its selection of job applicants.

When Alden Foster, a qualified football coach, applied for the
position of Amite High School Head Football Coach in 2007, he was
rejected for the position; instead, the position was awarded to
Caucasian, Mr. Mark Vining, at the Tangipahoa Parish School Board
meeting of January 23, 2007.  On February 13, 2007, Compliance
Officer, Arlene Guerin, notified Louis Joseph, Superintendent of
the Board, that she would commence an investigation regarding the
hiring of the Amite High School Head Football Coach.  On May 15,
2007, Ms. Guerin notified Board counsel that she had completed her
initial investigation.  She found that the Tangipahoa School System
had not met the previously agreed upon 40-60 ratio.

Plaintiffs contend that the failure to hire Alden Foster, a
recent "Coach of the Year" from adjoining St. Helena Parish, and a
graduate of Amite High School, who holds a Masters Degree in
Secondary Education, demonstrates continued racial discrimination.
The only head football coach hired in Tangipahoa Parish after the
court's mandate to desegregate the school system occurred decades

6

ago when this court issued an order directing the removal of a Caucasian Coach hired in violation of the Court's orders, fined School Board members individually, and ordered the School Board to hire an African-American head football coach.  The court-ordered African-American coach has been the only African-American head football coach hired in the past four decades of this case.[4]  The record establishes that Tangipahoa Parish School Officials initially responded to the Court's school desegregation orders by eliminating all African-American football coaches from the system. There is no question that this Court regarded their actions as reflective of a dual system.  The Court responded with an extensive order and held school officials in contempt for their failure to appoint an African-American head football coach.  There have been no other African-American head football coaches hired since this Court's order.  When the Defendant was hiring only Caucasian head football coaches in 1977, the Court ordered the removal of the Caucasian coach hired at Hammond High School and the appointment of an African-American person.

Prior to filing proceedings before this court, the Plaintiffs requested the designated Compliance Officer to investigate the matter of Alden Foster, an African-American applicant for the head football coach position at Amite High School.  The Compliance

---

[4]The Compliance Officer has testified that the only African-American head football coach ever hired by the Board was the one that this Court ordered the Board to hire.

7

Officer recommended that Alden Foster be hired as head football coach due to the subjective nature of the objective criteria used and the premature commencement of the use of the criteria as the 40-60 ratio had never been achieved.

Since this series of orders and occurrences, Defendant Board has presented no credible evidence that the 40-60 ratio was achieved in the category of high school coaches.  As such, the Board prematurely commenced the use of the objective criteria in its hiring practices.   Defendant's conclusory summaries of compliance with the 40-60 ratio do not represent adequate documentation and evidence that said ratio has been met; the underlying evidence informing such summaries is required, yet absent from the record.  As a result of the Board's failure to substantiate its claim that it met the 40-60 ratio, it should have followed court orders to hire qualified African-American applicants, such as Mr. Foster, until the 40-60 ratio was met.  The court orders noted above were violated when the Board failed to hire Alden Foster, a highly qualified African-American applicant for the Amite High School head football coaching position.


**B. Objective Criteria**

The Objective Criteria used by the board for hiring purposes is scored as follows with a maximum of 100 points:

10 points     Past Performance (An evaluation by previous

8

|            | employer or if a student teacher, the final |
|------------|---------------------------------------------|
|            | college past performance form)              |
| 10 points  | Educational and Professional Background     |
| 20 points  | Communication Skills (Determined by         |
|            | evaluating an essay written by applicant)   |
| 10 points  | Teaching Experience                         |
| 25 points  | Personal Interview                          |
| 10 points  | Transcript                                  |
| 6 points   | N.T.E. scores                               |
| 9 points   | Major and Minor Fields                      |

At least 55 points from the total 100 points, Past Performance, Personal Interview and the Communication sections are all subjective factors.  These factors are subject to interpretation and can be manipulated.  The actual scoring mechanism for some portions of the exam are complicated and cumbersome and do not seem to have sound basis for their use.  For instance, the procedure for evaluating an applicant's past performance report involves a reference from a past employer in which he evaluates the applicant, but unbeknownst to this past employer, the Board subsequently assigns a point value to various categories.  Such a requirement proves obscure and unnecessarily muddles the process.  Credible evidence was received from Mr. Foster's prior employment evaluator indicates that had he been aware of this scoring rubric, Mr. Foster would have received higher evaluations.  The Board did not present

9

clear and convincing evidence to refute this.

The total points accumulated for sixteen items are divided by sixteen in order to arrive at an average of the applicant's past performance. If the applicant's average score is between 0-.9, he will receive an "unsatisfactory" score and will be awarded 0 points in this category. If the applicant's average score is between 1.0-3.9, he or she will receive the "needs improvement" score and will be awarded 1 point in this category. If the applicant's average score is between 4.0-7.9 he or she will receive a "satisfactory" score and will be awarded 4 points in this category. If the applicant's score is between 8.0 and 9.9, he or she will receive an "above average" score and will be awarded 8 points in the category and if he or she scores a 10 he or she will receive an "outstanding" score and be awarded 10 points.

An applicant's average may only be 3 points less than his or her fellow applicant, but he or she could be given a score as much as 6 points less (i.e. if an applicant scores a 7.9 he or she will only get 4 points; whereas if an applicant scores a 10 he or she will get 10 points). This difference between 7.9 and 10 points is less than 3 points however in the points to be awarded the difference is 6 points.

Board witnesses at the hearing could not explain the basis for some of the scoring at issue. For instance, Foster's handwriting style score was highly subjective, and subject to questionable

10

interpretation and utility.  The Compliance Officer recommended that the criteria should be reevaluated to remove as much potential bias from this selection process as possible and the scoring of some sections should be revised.

The Board argues it has encountered problems over the years in obtaining applications from minority applicants, specifically African-Americans.  It further contends that there is no significant difference between the number of applicants hired from within the school district and outside of same, where the criteria for hiring was used, The Board contends the difference along racial lines is negligible and thereby indicative of no disparate impact. Conversely, the Board's admission that it has been difficult to attract minority teacher applicants could also indicate that use of the questioned criteria for over 29 years has over that time adversely and increasingly impacted minority recruitment and hiring, as reflected here.

On May 23, 2007, Plaintiffs filed Plaintiffs' Motion for Further Relief and Evidentiary Hearing In re: Alden Foster (Rec. Doc. No. 534).  Plaintiffs allege that the Board illegally discriminated against Alden Foster, a teacher and football coach employed by the St. Helena Parish School System and an applicant for a teaching and head football coaching position at Amite High School.  With this motion, Plaintiffs seek to enjoin the Board and affirmatively require it to hire Alden T. Foster as a teacher and

head football coach at Amite High School.

Plaintiffs' motion regarding Alden Foster was specifically authorized by the court in its order allowing limited conditional use of the objective criteria.  The court specifically reserved Plaintiffs' right to raise issues regarding discriminatory application and/or discriminatory impact of the criteria.  These issues represent the content of the Alden Foster motion.

Plaintiffs assert that the absence of an African-American head football coach and the complete failure of school officials to appoint such a coach represents yet another vestige of the dual system.  Defendant School Board fails to justify its hiring decision here with clear and convincing evidence.  Plaintiffs also allege that the Board's longstanding usage of the court-approved Objective Criteria had a discriminatory impact on Mr. Foster.

The Board asserts that based on this Court's previous ruling defining membership in Plaintiffs' class, Mr. Foster cannot be a member of said class because it is comprised of African-American school children and their parents. *Joyce Marie Moore, et al v. Tangipahoa Parish School Board,* 594 F.2d 489, 491 (5th Cir. 1989). Because Mr. Foster is not a member of Plaintiffs' class and Plaintiffs' counsel of record do not represent Mr. Foster, Mr. Foster lacks standing to assert an employment discrimination claim in the above-captioned matter.  The Board also argues that Mr. Foster failed to state an employment discrimination cause of action

under which injunctive relief could legally be granted.


### DISCUSSION

**A. STANDING**

Defendant Board claims that no standing exists that would permit the adjudication of Alden Foster's claim.  Defendant asserts that in *Joyce Marie Moore, et al v. Tangipahoa Parish School Board*, 625 F.2d 33 (5th Cir. 1980) ("Moore II"), the Fifth Circuit addressed the identical issue.  Defendant further avers that the underlying relief Plaintiffs seek to address is substantively distinct from *Joyce Marie Moore, et al v. Tangipahoa Parish School Board*, 594 F.2d 489 (5th Cir. 1979)("Moore I") where Plaintiffs had standing to protest school desegregation reductions in force, an employment consequence common in school desegregation cases, and the Board's alleged discriminatory conduct toward teachers it already employed.

In *Moore II*, Elizabeth Moulds, a Caucasian female teacher, unsuccessfully applied on three separate occasions for a principal position in Tangipahoa Parish.  The Board rejected Ms. Moulds and hired a Caucasian male using the objective criteria for the district.  The Fifth Circuit affirmed the district court ruling in *Moore II*, that Ms. Moulds lacked standing to file a motion pursuant to Fed. R. Civ. P. 71 seeking to enforce the January 27, 1977 order against the school board "because the order was issued to eliminate

the racially biased method of selecting principals and to achieve the ultimate goal of the suit, a unitary system." 625 F.2d at 34. Fed. R. Civ. P. 71 states, "[w]hen an order is made in favor of a person who is not a party to the action that person may enforce obedience to the order by the same process as if a party . . ." While Rule 71 allows non-parties to enforce orders made in their favor, it cannot be adopted by one to enforce an order in an action where he or she has no standing.   The Fifth Circuit further explained that "[a] party has standing only if the interest she seeks to vindicate is arguably within the zone of interests to be protected or regulated by the . . . constitutional guarantee in question." *Id.*

Mr. Foster's claim is precisely within the zone of interests which this Court's orders seek to protect.   In order to comply with the Court's objective of achieving a unitary school system, the Board was required to hire qualified African-American applicants until a 40-60 ratio could be met.   Although not a party to the matter, Alden Foster represents a qualified African-American applicant whom the Court ordered that the Board hire in order to reach a 40-60 ratio that would then trigger the use of the objective criteria in hiring.   Fed. R. Civ. P. 71 explicitly permits non-parties, such as Alden Foster, to enforce orders made in their favor so long as standing exists.   Unlike the interests of Ms. Moulds, a Caucasian female applicant in *Moore II*, an African-

14

American applicant seeking a teaching position within the Tangipahoa School System represents the non-party zone of interests protected by the series of orders issued by the court, which would lead to the 40-60 ratio set by court and parties as desirable and necessary achieving a unitary school system. Therefore, Mr. Foster has standing to file the motion before the Court.

Defendant asserts that *Moore II* stands for the premise that an individual employee's employment discrimination, whether political or racial in nature, cannot properly be maintained as part of the above-captioned proceeding because said claim should be properly alleged in separate litigation. This proves to be an over extension of what the *Moore II* represents. In *Moore II,* the Fifth Circuit affirmed the district court ruling that Ms. Mould's interest in freedom from politically-inspired employment decision did not implicate the same constitutional guarantees which require the establishment and maintenance of a racially neutral, unitary school system. This holding distinguishes the fact pattern before the Court from that of *Moore II*, and provides further support for the finding that Mr. Foster does enjoy standing to enforce this action.

Defendant also relies on *Moore I* as the basis for its assertion that Mr. Foster's allegations should be brought under a separate lawsuit because in the present circumstances there was no school segregation reduction in force or no discriminatory

treatment in an effort to make Mr. Foster resign from an employment position he already had in Tangipahoa Parish.   In *Moore I*, The Fifth Circuit explicitly states, "[o]n this appeal we are concerned solely with the claims of eight black teachers that they were discharged, demoted, or discriminated against by the defendant school board in a manner denying them their constitutional and Jefferson County/Singleton III rights." 594 F.2d at 491.   While *Moore I* does not provide support for the Alden Foster's claims as an applicant, it most certainly does not bar the claims of new applicants. *Moore I* simply addresses the claims of eight teachers who were discriminated against by the Board while in positions they already held in Tangipahoa.   The limited scope of this particular appeal does not limit the myriad future actions permitted under Fed. R. Civ. P. 71 that may be invoked to enforce the court's orders and primary objective of ensuring a unitary school system exists.

As additional support for the assertion that Mr. Foster's allegations should be brought under a separate suit, Defendant erroneously relies upon *U.S. v. Coffeeville Consolidated School District*, 513 F.2d 244, (5th Cir. 1975).   In *U.S. v. Coffeeville*, teachers' interest in continued employment within the system was at issue, and the school district was ordered to develop and implement an objective criteria to ensure the requisite reduction in the work force would not be discriminatory. *Id.* at 249. However, in the case

16

at bar the obligation of the Board extends beyond simply guarding against discrimination in the work force.  The Court ordered the Board to hire qualified African-American applicants until the 40-60 ratio could be obtained, and then to use the objective criteria to hiring, a form of prospective relief.  For these reasons, Defendant's challenge of Alden Foster's standing fails.


**B. TITLE VII**

On November 15, 2007, this Court issued an order directing parties to file memoranda briefing whether under *Tolbert v. U.S.*, 916 F.2d 245 (5th Cir. 1990) individuals are required to exhaust administrative remedies before pursuing judicial relief when making Title VII claims.  In *Tolbert v. U.S.*, a federal employee waged an employment discrimination claim against a federal agency employer. The Fifth Circuit held that a claimant who chose to pursue administrative review of federal agency's denial of his or her claim was required to exhaust that remedy before filing civil action in federal court. *Id*.   In *Love v. Pullman*, the Fifth Circuit asserted, "[a] person claiming to be aggrieved by a violation of Title VII of the Civil Rights Act of 1964, may not maintain a suit for redress in federal district court until he has first unsuccessfully pursued certain avenues for administrative relief. 404 U.S. 522, 523 (1972).

Plaintiffs state that no Title VII matters are pending before

17

this court that require the exhaustion of administrative remedies. Instead, Plaintiffs have presented an employment discrimination claim arising out of violation of the orders of this court.  The case of *Tolbert v. United States* does not apply to these circumstances, which involve a 42 U.S.C. § 1983 school desegregation class action enforcing rights of African-American children and their parents and the subsequent enforcement of orders emanating therefrom.  Because Alden Foster's interests are within the zone of interests protected by the orders of this court, the employment discrimination issue invokes the required enforcement of the Court's previous order.

Moreover, Defendant's argument that the Court should not grant Plaintiffs' request for relief regarding Alden Foster because Foster filed a Title VII complaint with EEOC is defeated by Congressional intent of Title VII.  In *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1720 (1975), the United States Supreme Court asserted:

> "the aggrieved individual clearly is not limited
> to Title VII in his search for relief. '[T]he
> legislative history of Title VII manifests a
> congressional intent to allow an individual to
> pursue independently his rights under both Title VII
> and other applicable state and federal statutes.'
> *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 48,

94 S.Ct., 1011, 1019 (1974).  In particular, Congress
noted 'that the remedies available to the individual
under Title VII are co-extensive with the indiv(i)dual's
right to sue under the provisions of the Civil Rights
Act of 1866, 42 U.S.C. § 1981, and that the two
procedures augment each other and are not mutually
exclusive.'" H.R.Rep. No. 92-238, p.19 (1971), *U.S.
Code Cong. & Admin. News,* 1972, pp. 2137, 2154.
*See also* S.Rep.No. 92-415, p.24 (1971). Later, in
considering the Equal Employment Opportunity Act of
1972, the Senate rejected an amendment that would have
deprived a claimant of any right to sue under §1981.
118 Cong. Rec. 3371-3373 (1972).

Title VII does not preempt or stay actions to obtain relief
available from employment discrimination under other civil rights
laws, including 42 U.S.C. §§ 1981 and 1983 as applied under the
Fourteenth Amendment.

   While the law necessitates the exhaustion of administrative
remedies in order to maintain a suit for redress in federal
district court in Title VII actions, such an exhaustion is
rightfully inapplicable to Alden Foster's claim.  As previously
noted, the claims of Alden Foster consist of a motion filed to
benefit a non-party whose interest are within the zone of protected

interests of the court's orders.  Although Defendant implores the Court to require a separate Title VII action addressing Alden Foster's claims, Plaintiffs' Motion for Further Relief and Evidentiary Hearing in re: Alden Foster (Rec. Doc. No. 534) was properly filed under Fed. R. Civ. P. 71.  It does not represent a new or separate lawsuit seeking redress as a result of a Title VII violation.  As such, no legal support exists that would require the exhaustion of administrative remedies of a Fed. R. Civ. P. 71 motion.

## C. Authority of the Court to Provide Proper Remedy to Post Desegregation Discrimination

In *Brown v. Board of Ed. Of Topeka, Shawnee County, Kan.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("*Brown I*") and *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed 1083 ("*Brown II*"), the Supreme Court denounced the existence of a segregated dual school system.  In order to purge the vestiges of segregated dual school systems, school boards are "charged with the affirmative duty to take whatever steps necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Swann v. Charlotte-Mecklenburg Bd. Of Ed.*, 402 U.S. 1, 26, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Graham v. Evangeline Parish School Board,* 223 F.R.D. 407, 412 (W.D.La. 2004). This obligation requires the court to review school board actions

to ensure that each one " will further rather than delay conversion to a unitary, nonracial nondiscriminatory school system." *Monroe v. Board of Comm'rs of Jackson*, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733.

The present matter involves a forty-three year old school § 1983 school desegregation case, in which the Defendant has not complied with the Court's orders that seek to create a unitary school system.  Desegregation decrees and the judicial supervision of compliance therewith proves forward looking and intrusive. *See Bd. Of Educ. Of Oklahoma v. Dowell*, 498 U.S. 237, 248-249 (1991); *see also* Brian J. Sutherland, *Killing Jim Crow and the Undead Nondelegation Doctrine with Privately Enforceable Federal Regulations*, 29 Sea. U. L. Rev. 917, 936 n. 155 (2006).  Section 1983 claims warrant the use of prospective injunctive relief to remedy an existing controversy, prevent its recurrence, or end a continuing violation of federal law.  *See State Board of Chiropractic Examiners v. Stjernholm*, 935 P.2d 959 (Colo. 1997); *see also Nicolas v. Rhode Island*, 160 F.Supp. 2d 229 (D.R.I. 2001), order *aff'd*, 37 Fed. Appx. 3 (1st Cir. 2002).  As such, the Court has ordered that qualified African-Americans be hired until a 40-60 ratio is achieved.  In this matter, Defendant Board has failed to comply with the court's order affirming the consent decree binding parties to reach a 40-60 ratio.  Consequently, the appropriate remedy to address the non-compliance with hiring requirements is to

enforce the requirement of the Board to hire the qualified African-American applicant, Mr. Foster, which will necessarily result in the termination of the Caucasian coach head football coach hired by the Board.   As part of the antidote to the societal afflictions caused by segregation and discrimination, "innocent persons" may be called upon to "share the burden". *Id., quoting Franks v. Bowman Transportation Co.,* 424 U.S. 747, 777, 96. S.Ct. 1251, 1270, 47 L.Ed.2d 444 (1976). "Race-conscious remedial action may be necessary" to eliminate the vestiges of prior discrimination. *Wygant v. Jackson Bd. Of Educ.*, 476 U.S. 267, 280-281, 106 S.Ct 1842, 1850, 90 L.Ed.2d 260, 277 (1986).   In the case at bar, the Court must enforce its prior orders requiring the hiring of qualified African-Americans until a 40-60 ratio is achieved before permitting the use of the objective criteria.   As such, the remedial action of terminating Mr. Mark Vining, the Caucasian coach hired instead of Mr. Alden Foster, is necessary in order to enforce compliance with the prospective relief previously granted.[5]

Defendant's unilateral acts in violation of court order cannot undermine this Court's determination requiring the hiring of Alden Foster and the termination of the present Head Football Coach.

---

[5]   In addition to desegregation, prospective relief is generally used in court-ordered affirmative action programs favoring minorities with respect to new hires and promotions. Michael Pritchett, *No Retrenchment in Affirmative Action: The Tension Between Civil Rights Laws and Layoffs*, 50 Missouri L. Rev. 663, 675 (1985).

Defendant cannot circumvent the Court's ability to provide prospective remedies by simply re-characterizing said relief as reverse-discrimination through its unilateral decision to hire a Caucasian Head Football Coach instead of adhering to the prospective remedies set forth by the Court. Hiring Alden Foster as Head Football Coach demonstrates necessary and overdue compliance with the court's previous orders and prescribed prospective remedy.

**D. Disparate Impact of the Criteria on Alden Foster**

The court specifically reserved Plaintiffs' right to raise issues regarding discriminatory application and/or discriminatory impact of the criteria. Plaintiffs have done so by filing a motion for injunctive relief. Notwithstanding the improper use of the objective criteria, this criteria was resulted in a disparate impact on Alden Foster.

In traditional disparate impact claims, a plaintiff may establish a prima facie case of disparate treatment by proving that he or she is a member of a protected classification and was qualified for an available employment opportunity that he or she did not receive. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981). A disparate impact claim does not require

a demonstration of racial animus or intent.  Under a Title VII[6]
disparate treatment analysis, a plaintiff may establish a prima
facie case using statistics alone if statistics show "gross
disparity" in the treatment of workers based on discriminatory
factors, such as race.  *Page v. U.S. Industries*, Inc., 726 F.2d
1038, 1046 (5th Cir. 1984).  Using such evidence, a plaintiff must
show: (1) membership in a minority group; (2) an application for an
open job or promotion for which he or she was qualified; (3)
rejection; and (4) the employer promoted or hired a non-minority
for the job or continued to seek non-minority applicants for the
position applied for by the plaintiff.  *Id.* However, if the
statistical disparity shown by the plaintiff's evidence is
insufficient alone to establish a prima facie case of disparate
treatment, a plaintiff "may get over this hurdle by combining
statistics with historical, individual or circumstantial evidence."
*Id.*  In order to rebut a prima facie case of disparate treatment,
defendant must discredit plaintiff's evidence or provide a
nondiscriminatory explanation for apparently discriminatory result.
*Id.*

   In the case at bar, Defendant asserts that the lack of
African-American coaches resulted from the decline in the number of

---

[6]As previously stated, this action does not stem from Title
VII.  However, the Title VII disparate treatment or disparate
impact analysis assists in informing this Court's evaluation of
the actions taken by the Board.

24

qualified black applicants for teaching positions. However, Defendant's rebuttal misses the bull's eye as it fails to address the precise issue before the court regarding disparate impact, which is how the use of the Objective Criteria resulted in disparate impact. Simply pointing to the decline in the number of applicants does not address the relevant question of the disparate impact caused by the use of Objective Criteria.

In *Griggs v. Duke Power Co.*, the Supreme Court concluded that if an employer could not show that its facially neutral policy was job-related and consistent with business necessity, its practice would be prohibited. 401 U.S. 424 (1971); Joseph A. Seiner, *Disentangling Disparate Impact and Disparate Treatment: Adapting the Canadian Approach,* 25 Yale L. & Pol'y Rev. 95, 100 (2006). While *Griggs* invoked Title VII and the case before the court is a §1983 school desegregation case, the disparate impact theory used in *Griggs* provides further support for the Plaintiffs' right previously reserved by this Court to raise issues regarding disparate impact. Defendant cannot demonstrate how using certain aspects of the objective criteria, such as handwriting evaluation, proves to be a "business necessity" or even relevant to a football coaching position. Moreover, the objective criteria, a facially neutral policy, used has resulted in a disparate impact in hiring African-American football coaches, as illustrated through the claim raised by a qualified applicant, Mr. Alden Foster. In fact, an

25

African-American has not been hired for a head football coaching position since last ordered by this Court decades ago.  Due to the failure the Board to take the necessary actions to comply with court order, this Court must take action to guard against disparate impact in hiring and to assist with the creation a unitary system.

## CONCLUSION

The use of racial classifications are justified by the compelling state purpose to create a unitary school system.[7]  Forty-three years after this case was filed, the interest of achieving this goal has not dissipated.  Rather, achieving a unitary school system remains a preeminent community concern.  This record contains more than just a mere citation to prior societal discrimination.  Rather, the record contains convincing evidence of prior discrimination by the Board, which necessitated the series of orders of the court to address the vestiges of de jure segregation.  *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct. 1842 (1986).  The passage of time does not discharge the Board of its duty to comply with court orders or pardon it from its duty to ensure that the vestiges of the dual school system resulting from de jure segregation are eradicated.  This Court

---

[7]The prospective remedies of Affirmative Action may be upheld as long as they are supported by a compelling state purpose.

cannot continue to allow the Tangipahoa School Board's interpretation of "all deliberate speed" to further eschew the attainment of a unitary school system.

Accordingly, **IT IS ORDERED** that Alden Foster shall be hired as the head football coach at Amite High School.

New Orleans, Louisiana, this 30th day of April, 2008.

IVAN L. R. LEMELLE

UNITED STATES DISTRICT JUDGE

27