UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

M.C. MOORE, ET AL.                                    CIVIL ACTION

VERSUS                                                NO. 65-15556

TANGIPAHOA PARISH SCHOOL BOARD, ET AL.                SECTION "B"(1)

ORDER AND REASONS

Before the Court is the Tangipahoa Parish School Board's ("the Board") "Motion for Unitary Status: Facilities." Rec. Doc. 1455. Plaintiffs timely filed an opposition memorandum. Rec. Doc. 1456. The Board then requested (Rec. Doc. 1459), and was granted (Rec. Doc. 1461), leave to file a reply memorandum (Rec. Doc. 1462). For the reasons discussed below,

**IT IS ORDERED** that the motion for unitary status in the area of facilities (Rec. Doc. 1455) is **provisionally GRANTED**.

I.  APPLICABLE LAW

In school desegregation cases, "the court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman v. Pitts*, 503 U.S. 467, 489 (1992) (citing *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977) ("the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution")). "'[L]ocal autonomy of school districts is a vital national

1

tradition'" and "[r]eturning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *Freeman*, 503 U.S. at 490 (quoting *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 410 (1977)). Before a school may achieve full unitary status, it must be free from racial discrimination in several areas, commonly referred to as the "*Green* factors": student assignment, faculty assignment, staff assignment, extracurricular activities, transportation, and facilities. *Green v. Cty. Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 435 (1968); *see also Freeman*, 503 U.S. at 486.[1] If a school district has achieved partial unitary status in one or more of these areas, the court "has the discretion to order an incremental or partial withdrawal of its supervision and control." *Freeman*, 503 U.S. at 489-90. This is because "remedies must be narrowly structured to address the scope of a violation and . . . consequently, once the need for close supervision of a particular facet of a school desegregation plan ceases, a court must not continue to supervise that particular facet." *Flax v. Potts*, 915 F.2d 155, 159 (5th Cir. 1990).

> Among the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following: whether there has been full and satisfactory

---

[1] This Court has previously granted unitary status in the areas of extracurricular activities (Rec. Doc. 1014) and transportation, with the exception of transportation required for implementation of majority-to-minority and magnet transfers as provided by the Court's Order at record document 876 (Rec. Doc. 907). The Court also granted provisional unitary status in the area of staff assignment. Rec. Doc. 1278.

2

> compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

*Freeman*, 503 U.S. at 491; *see also Bd. of Educ. of Okla. City Pub. Sch. Indep. Sch. Dist. No. 89, Okla. Cty., Okla. v. Dowell*, 498 U.S. 237, 248 (1991) ("Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that 'necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination . . . .'") (citations omitted). Further, "[a] district court in [the Fifth Circuit] does not dismiss a school desegregation case until at least three years after it has declared the system unitary." *Flax*, 915 F.2d at 158 (citing *Youngblood v. Bd. of Pub. Instruction of Bay Cty., Fla.*, 448 F.2d 770, 771 (5th Cir. 1971)).

As to facilities, "the first remedial responsibility of school authorities is to eliminate invidious racial distinctions," for example, "with regard to the maintenance of buildings and the distribution of equipment." *Swann v. Charlotte-Mecklenburg Bd. of*

3

*Ed.*, 402 U.S. 1, 18 (1971). "Courts consider 'facilities' synonymous with 'school buildings,' so they assess this factor by comparing the quality of different, racially identifiable schools within the district in question." *United States v. Jefferson Cty. Sch. Dist.*, 63 F. Supp. 3d 1346, 1353 (N.D. Fla. 2014) (citing *Thomas Cty. Branch of N.A.A.C.P. v. City of Thomasville Sch. Dist.*, 299 F. Supp. 2d 1340, 1364 (M.D. Ga. 2004), *aff'd in part, vacated in part, rev'd in part sub nom. Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325 (11th Cir. 2005); *Valley v. Rapides Par. Sch. Bd.*, 646 F.2d 925, 932, *on reh'g,* 653 F.2d 941 (5th Cir. 1981)).

## II. COMPLIANCE WITH COURT ORDERS

The Tangipahoa Parish School System ("the System") consists of thirty-one schools. Rec. Doc. 1455-1 at 1. With regard to those facilities, this Court has issued several specific orders. For example, on March 4, 2010, the Court ordered the Board to construct O. W. Dillon Elementary School. Rec. Doc. 876 at 2 (the "2010 Order"). On June 4, 2013, the Board approved a certificate of substantial completion of the school. Rec. Doc. 1455-3 at 2.

The 2010 Order also required Court approval for all repairs to existing facilities exceeding $125,000. Rec. Doc. 876 at 25. It appears that the Board substantially complied with this Order. *See* Rec. Doc. 1455-37 at 2-4 (summarizing all facilities-related

motions and orders filed into the record between June 18, 2010 and August 31, 2016).[2]

Further, the 2010 Order required the System to "take affirmative steps to eliminate any remaining vestiges of prior *de jure* segregation at its historically and/or racially identifiable black schools . . . ." Rec. Doc. 876 at 24. The Court then specifically listed fourteen (14) schools that were identifiable as "black." *Id.* at 25. Of course, the names of some of those schools have changed, so the Board supplied the Court with a list of those schools with their current names. Rec. Doc. 1455-1 at 7.[3] The Board maintains that "it has complied with this requirement based on its fulfilment of its constitutional obligations to maintain all of its schools in an equitable and nondiscriminatory manner." *Id.* The Court systematically compared the facilities below, using photographs supplied by the Board.

The 2010 Order also recognized that the System reviewed the facilities needs at the schools previously identifiable as black and agreed to implement a plan to address those needs. Rec. Doc.

---

[2] From this summary, it appears that only one of the Board's motions was denied by the Court. *See* Rec. Doc. 1151 (denying without prejudice a motion to expand the visitor section of the football stadium at Sumner High School because the parties failed to submit updated reports).

[3] The Board did not explicitly state that the current Woodland Park Elementary School encompasses both the former Woodland Park Elementary School *and* Woodland Park Early Learning Center, but the Court will assume that it does (*see* Rec. Doc. 1455-1 at n.28), such that the current list of schools previously named by this Court as identifiable as black consists of only thirteen, not fourteen, schools. The Board's list contains the names of fourteen schools, but Amite Westside Middle School appears twice on that list. Rec. Doc. 1455-1 at 7.

5

876 at 25 (citing Rec. Doc. 876-3 at 11). However, the funding for those projects depended on certain tax revenue or bonds. Rec. Doc. 876-3 at 13-14. Ultimately, these taxes were not made available to the Board. Rec. Doc. 935-1 at 1. Thus, the Court ordered that

> those provisions of the court's Order (R. Doc. No. 876) that were to be funded by proceeds of the new taxes provided for in said Order, with the exception of the above-ordered new elementary schools and needed renovations and/or new construction at Kentwood High School for housing of the Career Education Center, shall be held in abatement pending further orders . . . . All other provisions of said Order not dependent upon funding from proceeds of the said new taxes shall remain in force and effect.

Rec. Doc. 956 at 2.

On August 31, 2011, this Court ordered the construction of three new schools and the renovation of a Career Education Center at Kentwood High Magnet School. Rec. Doc. 956 at 1-2. Steps were taken to comply with the Court's order to renovate the education center. Rec. Doc. 1455-36 at ¶ 4.

As to the three new schools, both the 2010 and 2011 Orders referred to their construction. Rec. Docs. 876 at 2 ("The student assignment plan is premised upon construction of three new elementary schools (the new elementary schools are listed in Attachment 'A')"); 956 at 1 (ordering the Board to "take prompt steps to construct three new schools . . . all as referenced and provided for in Attachments 'A' and 'I' to the court's Order (R. Doc. No. 876)"). However, in 2015, the parties entered into a

6

consent order superseding the student assignment provisions contained in prior Court orders. Rec. Doc. 1264. The Order specifically referenced exhibits (*see, e.g.* Rec. Doc. 1264 at 2, referencing an "interim student assignment plan attached to this Order as Exhibit 1"); even though these exhibits were not attached to the Order, they were attached to the original motion (Rec. Doc. 1260-2). The relevant exhibit provided that some of the "key elements" of the proposed modifications to Record Document 876 were the removal of Attachments "A" and "I." Rec. Doc. 1260-2 at 4-5. Thus, it would appear that the Board is no longer required to construct the three new schools. Further, the Board maintains that it is working diligently to implement the student assignment plan agreed to in the superseding consent order and that there is no longer a need to construct the new schools. Rec. Doc. 1455-1 at 23. Nonetheless, even if the Board was still required to build these schools, it argues that it does not have to wait until all construction projects are completed before moving for unitary status. *Id.* at 24 (citing *Anderson v. Sch. Bd. of Madison Cty.*, 517 F.3d 292, 296-97, 303 (5th Cir. 2008)).

In their two-page response, Plaintiffs maintain that "the court has never vacated R. Doc. 876; nor has the court ever held a hearing to vacate compliance." Rec. Doc. 1456 at 1. They therefore conclude that "[n]on-compliance with the order directly

7

related to facilities in this desegregation case precludes a finding of unitary status." *Id.*

Based on a comprehensive review of the record and supporting documents, this Court finds that the Board has complied with the 2010 and 2011 Orders to the extent that they were not altered by subsequent Orders, namely Record Documents 956 and 1264. Plaintiffs fail to explain how the Board has failed to comply with Record Document 876, as modified by those subsequent Orders.

### III. COMPARING THE FACILITIES

The Board specifically argues that the schools are not imbalanced based on race, because every student attends a school in an attendance zone set by a consent order for student assignment. *See* Rec. Doc. 1264. Thus, because no student is assigned to any school based on race, except for those students granted majority-to-minority transfers, and the student body of every school consists of both black and non-black students, the Board maintains that no imbalance exists. Rec. Doc. 1455-1 at 8.

Further, the Board insists that no school can be identified as "white" or "black" based on the physical condition of the school's facilities. Rec. Doc. 1455-1 at 8. To support this contention, the Board hired an independent photographer to

photograph each of the thirty-one schools in the System between October and December of 2016. *Id.*[4]

The Court reviewed all of these photographs, paying special attention to classrooms, computer labs, outdoor play areas, and gymnasiums, and attempted to compare those schools that were not previously identifiable as black with those that were.[5] Based on

---

[4] *See also* Rec. Docs. 1455-4 (declaration of Wendy Shelton, the photographer); 1455-5 (photographs of Champ Cooper Elementary and Jr. High); 1455-6 (photographs of Martha Vineyard Elementary School); 1455-7 (photographs of Ponchatoula High School); 1455-8 (photographs of D.C. Reeves Elementary School); 1455-9 (photographs of Tucker Elementary School); 1455-10 (photographs of Ponchatoula Junior High School); 1455-11 (photographs of Perrin Early Learning Center); 1455-12 (photographs of Woodland Park Magnet School, named by the Board in its memorandum as Woodland Park Elementary School and which was racially identifiable as black according to this Court's 2010 Order); 1455-13 (photographs of Greenville Park Leadership Academy, named by the Board as Greenville Park Junior High School and which was previously identifiable as black); 1455-14 (photographs of Hammond Eastside Magnet School, named by the Board as Hammond Eastside Elementary School and which was previously identifiable as black); 1455-15 (photographs of Hammond High Magnet School, previously identifiable as black); 1455-16 (photographs of Natalbany Middle School); 1455-17 (photographs of Midway Elementary School); 1455-18 (photographs of Nesom Memorial School); 1455-19 (photographs of Independence Middle Magnet School, previously identifiable as black); 1455-20 (photographs of Independence Leadership Academy, previously identifiable as black); 1455-21 (photographs of Independence High School); 1455-22 (photographs of Hammond Westside Montessori School, named by the Board as Hammond Westside Elementary School and which was previously identifiable as black); 1455-23 (photographs of Amite Westside Middle School, previously identifiable as black); 1455-24 (photographs of Roseland Elementary Montessori School, named by the Board as Roseland Montessori Magnet School and which was previously identifiable as black); 1455-25 (photographs of Amite High Magnet School, named by the Board as Amite High School and which was previously identifiable as black); 1455-26 (photographs of Amite Elementary Magnet School, named by the Board as Amite Elementary School and which was previously identifiable as black); 1455-27 (photographs of Loranger High School); 1455-28 (photographs of Loranger Middle School); 1455-29 (photographs of Loranger Elementary School); 1455-30 (photographs of O.W. Dillon Leadership Academy, named by the Board as O.W. Dillon Elementary School and which was previously identifiable as black); 1455-31 (photographs of Kentwood High Magnet School, named by the Board as Kentwood High School and which was previously identifiable as black); 1455-32 (photographs of Spring Creek Elementary School); 1455-33 (photographs of Sumner Middle School); 1455-34 (photographs of Sumner High School); 1455-35 (photographs of Chesbrough Elementary School).

[5] For example, the computer labs and libraries at Hammond High Magnet School, previously identifiable as black, and Ponchatoula High School appear similar. *See* Rec. Docs. 1455-15 at 7-9; 1455-7 at 8. Plus, both schools have stadiums

(Rec. Docs. 1455-15 at 14; 1455-7 at 13) and theaters (Rec. Docs. 1455-15 at 15; 1455-7 at 16). However, it appears that, at the time the pictures were taken, Hammond High Magnet Schools was re-doing their gymnasium floor. Rec. Doc. 1455-15 at 13. Amite High Magnet School, previously identifiable as black, and Independence High School both have computer labs and libraries. Rec. Docs. 1455-25 at 7-8; 1455-21 at 7-8. Their cafeterias appear comparable in size (Rec. Docs. 1455-25 at 10; 1455-21 at 10), their gymnasiums appear comparable in quality (Rec. Docs. 1455-25 at 15; 1455-21 at 13), and their science labs equipped with comparable materials (Rec. Docs. 1455-25 at 20; 1455-21 at 18). Kentwood High Magnet School, previously identifiable as black, and Loranger High School have classrooms of similar sizes (Rec. Docs. 1455-31 at 5-6; 1455-27 at 5-6), computer labs (Rec. Docs. 1455-31 at 7; 1455-27 at 7), cafeterias (Rec. Docs. 1455-31 at 10; 1455-27 at 10), and gymnasiums (Rec. Docs. 1455-31 at 13; 1455-27 at 14) of similar quality. Independence Middle Magnet School, previously identifiable as black, and Natalbany Middle School have classrooms with similar equipment (Rec. Docs. 1455-19 at 4; 1455-16 at 5), computer labs of similar quality (Rec. Docs. 1455-19 at 6; 1455-16 at 7, 9), and comparable gymnasiums (Rec. Docs. 1455-19 at 10; 1455-16 at 13). Independence Leadership Academy, previously identifiable as black, and Loranger Middle School have similar buildings (Rec. Docs. 1455-20 at 3; 1455-28 at 3), computer labs (Rec. Docs. 1455-20 at 7; 1455-28 at 6), and bathrooms (Rec. Docs. 1455-20 at 11-12; 1455-28 at 7-8). Amite Westside Middle School, previously identifiable as black, and Sumner Middle School, have classrooms of a similar size and with similar equipment (Rec. Docs. 1455-23 at 5; 1455-33 at 5), similar computer labs (Rec. Docs. 1455-23 at 7; 1455-33 at 7), similar libraries (Rec. Docs. 1455-23 at 8-9; 1455-33 at 8-9), and though the former appears to be an older building, it has a better gymnasium (Rec. Docs. 1455-23 at 14; 1455-33 at 12). Greenville Park Leadership Academy, previously identifiable as black, and Ponchatoula Junior High School have similar computer labs (Rec. Docs. 1455-13 at 7; 1455-10 at 6) and gymnasiums (Rec. Docs. 1455-13 at 13; 1455-10 at 12). Roseland Elementary Montessori School, previously identifiable as black, and Martha Vinyard Elementary School have comparable computer labs (Rec. Docs. 1455-24 at 7; 1455-6 at 6). Hammond Westside Montessori School, previously identifiable as black, and D.C. Reeves Elementary School have similar computer labs (Rec. Docs. 1455-22 at 7; 1455-8 at 7), libraries (Rec. Docs. 1455-22 at 9; 1455-8 at 8), cafeterias (Rec. Docs. 1455-22 at 10; 1455-8 at 10), and outdoor play areas (Rec. Docs. 1455-22 at 13; 1455-8 at 13). Hammond Eastside Magnet School, previously identifiable as black, and Midway Elementary School have comparable buildings (Rec. Docs. 1455-14 at 2; 1455-17 at 3), libraries (Rec. Docs. 1455-14 at 8; 1455-17 at 8), cafeterias (Rec. Docs. 1455-14 at 10; 1455-17 at 10), bathrooms (Rec. Docs. 1455-14 at 11-12; 1455-17 at 11-12), and outdoor play areas (Rec. Docs. 1455-14 at 15; 1455-17 at 13). Woodland Park Magnet School, previously identifiable as black, and Loranger Elementary School have comparable buildings (Rec. Docs. 1455-12 at 3; 1455-29 at 2), classrooms (Rec. Docs. 1455-12 at 5-6; 1455-29 at 4-5), computer labs (Rec. Docs. 1455-12 at 7; 1455-29 at 6), libraries (Rec. Docs. 1455-12 at 8-9; 1455-29 at 7-8), cafeterias (Rec. Docs. 1455-12 at 10; 1455-29 at 9), bathrooms (Rec. Docs. 1455-12 at 12-13; 1455-29 at 10-11), and outdoor play areas (Rec. Docs. 1455-12 at 14; 1455-29 at 12). Amite Elementary Magnet School, previously identifiable as black, and Spring Creek Elementary School have similar buildings (Rec. Docs. 1455-26 at 3; 1455-32 at 3), computer labs (Rec. Docs. 1455-26 at 7; 1455-32 at 7), cafeterias (Rec. Docs. 1455-26 at 10-11; 1455-32 at 10-11), bathrooms (Rec. Docs. 1455-26 at 13-14; 1455-32 at 12-13), and outdoor play areas (Rec. Docs. 1455-26 at 15; 1455-32 at 15). O.W. Dillon Leadership Academy, previously identifiable as black, and Chesbrough Elementary School have similar libraries (Rec. Docs. 1455-30 at 10; 1455-35 at 7-8), cafeterias (Rec. Docs. 1455-30 at 11; 1455-35 at 9),

this review, the Court agrees with the Board's assertion that the physical facilities at schools previously identifiable as black are largely comparable to the physical facilities at other schools in the System. Plus, the Board provided a summary of declarations from the principals of each school, which indicates that almost all of the schools have computers, smart boards in all classrooms, and access to the internet. Rec. Doc. 1455-37 at 5-6.[6] Further, the schools previously identifiable as black are operating within their capacity as of March of 2017. *Id.* at 11-13. The Board also explains that temporary or modular buildings are not used in a discriminatory way throughout the district. Rec. Doc. 1455-1 at 11-12. Rather, only six of the thirty-one schools do not use such buildings, and five of those are majority black schools. *Id.* at 12 (citations omitted). Of the seven schools with ten or more modular buildings, six are majority non-black. *Id.* (citations omitted).

The Board explains that it has invested in facilities at majority black schools during the last several years, including a new gymnasium and renovated stadium and fieldhouse at Amite High School, new athletic fieldhouse and performing arts building at Kentwood High School, and a new gymnasium at Hammond High School.

---

bathrooms (Rec. Docs. 1455-30 at 12-13; 1455-35 at 10-11), outdoor play areas (Rec. Docs. 1455-30 at 15; 1455-35 at 12-13), and gymnasiums (Rec. Docs. 1455-30 at 14; 1455-35 at 14).

[6] Interestingly, the only school that does not have smart boards in every classroom and is operating beyond functional capacity is Ponchatoula High School, which was not previously identifiable as black. *See* Rec. Doc. 1455-37 at 6, 13.

Rec. Doc. 1455-1 at 13 (citations omitted). Plus, the Board has adopted a policy of nondiscrimination and various policies governing purchasing, construction, management, safety, repairs, long range planning, facility planning, and architects. Rec. Doc. 1455-44 at 2-17.

As to expenditures, since 2010, the System has spent $9,536,204 in capital project funds on the four majority black high schools, or $2,384,051 per school and $4,191 per pupil, and $4,408,810 on the three majority non-black schools, or $1,469,603 per school and $1,737 per pupil. Rec. Doc. 1455-37 at 9. It spent $4,932,628 on the twelve majority black elementary and middle schools, or $411,052 per school and $760 per pupil, and $4,846,136 at the twelve majority non-black elementary and middle schools, or $403,845 per school and $718 per pupil. *Id.* Thus, over six years, approximately 61% of the funds were spent at majority black schools. *Id.*

During the same period, the System spent $4,337,960 in maintenance expenditures at the four majority black high schools, or $1,084,490 per school and $1,729 per pupil, and $4,083,835 at the three majority non-black schools, or $1,361,278 per school and $1,144 per pupil. Rec. Doc. 1455-37 at 10. It spent $7,110,218 at the twelve majority black elementary and middle schools, or $592,518 per school and $1,082 per pupil, and $5,577,800 at the twelve majority non-black elementary and middle schools, or

$464,816 per school and $814 per pupil. *Id.* Thus, over six years, approximately 54% of the total maintenance funds expended were spent at majority black schools. *Id.*

In response, Plaintiffs allege with some record support that "school board leaders and the board president and superintendent have publicly sabotaged public opinion against compliance with R. Doc. 876." Rec. Doc. 1456 at 2. "Their public comments give support for the idea that the community may reject taxes, hold out, get unitary status, and then build schools and facilities wherever they wish, without regard for desegregation." *Id.*

The Board filed notice of its intent to move for unitary status in February of 2015. *See* Rec. Doc. 1239 at 31 ("The School Board has begun the appropriate expert evaluation of all District facilities for compliance with unitary standards and will take steps to obtain a declaration of unitary status in the area of facilities after the filing of this Action Plan"). In that time, Plaintiffs have shown instances where a Board member has evidenced bad faith intentions at compliance with lawful orders and rules.

While dedicated to the desegregation of the Tangipahoa System, we cannot justify indefinite oversight over facilities when there is little relevant evidence of ongoing discrimination. The Board majority appears in compliance with standing desegregation orders, and we are unaware of any reason to allow for indefinite judicial control over facilities as a necessary tool here

for compliance in other areas; the Board's actions in this context, minimally yet sufficiently, demonstrated a commitment to desegregation. *See Taylor v. Ouachita Par. Sch. Bd.*, No. 66-12171, 2012 WL 4471643, at *8, n.4 (W.D. La. Sept. 27, 2012) (granting unitary status in several areas, including facilities, because, even though "[t]he physical campuses differ in construction, age, and design . . . the facilities provide adequate space for their educational use and are all well maintained. Additionally, the School Board . . . has been able to ensure that classrooms are equally equipped with 'smartboards' and other forms of technology" and "[a]lthough there was some disparity in the amount spent on the schools, the disparity is based upon the natural growth in student populations, not based on any discriminatory reason"); *Williams v. Kimbrough*, No. 65-11329, 2010 WL 1790516, at *5 (W.D. La. May 3, 2010) (granting unitary status in the area of facilities where the elementary school facilities were not new, but were "well-maintained, grade-appropriate facilities"); *United States v. Franklin Par. Sch. Bd.*, No. 70-15632, 2013 WL 4017093, at *5 (W.D. La. Aug. 6, 2013) (declaring the system unitary in the area of facilities where the schools provided reasonably similar accommodations, had comparable libraries, had the same or similar technology, used the same procedures for acquiring and repairing equipment and requesting maintenance, and were given an equitable amount of funds for maintenance, renovations, and technology).

## IV. CONCLUSION

For the reasons outlined above,

**IT IS ORDERED** that the motion for unitary status in the area of facilities (Rec. Doc. 1455) is **provisionally GRANTED**. Out of concern over mixed signals from some Board members that were the subject of a prior hearing involving at least one of those members, the good faith intentions and practices of the Board have unfortunately been called into question by one's inappropriate self-aggrandizing remarks.[7] Therefore, we will provisionally grant unitary status in the area of facilities, subject to retention of jurisdiction and to further compliance review(s) on a semi-annual basis during the next **twenty-four months**. On an appropriate motion, the Court will consider an unconditional grant of such status if no major compliance issues arise during the applicable review period. *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 226 (5th Cir. 1983) (noting that the district court followed the Fifth Circuit's procedure "to assure that a determination of unitary status is not prematurely reached" when it retained jurisdiction for three years, during which time the school district had to file operational reports, and would hold a hearing at the end of three years to allow the plaintiffs to show why dismissal should be

---

[7] Unprofessional and unethical remarks by attorneys, including those who are parties to litigation, may constitute violations of rules governing attorney conduct. *See, e.g.,* LA. RULES OF PROF'L CONDUCT 3.5(d), 4.1-4.4, and 8.4(d).

delayed); *Tasby v. Woolery*, 869 F. Supp. 454, 477-78 (N.D. Tex. 1994). The CCO is authorized to take reasonable measures to enforce compliance with this and related orders as he deems necessary.

**IT IS FURTHER ORDERED** that Plaintiffs' request for an evidentiary hearing is **DISMISSED AS MOOT.**

New Orleans, Louisiana, this 20th day of July, 2017.

_____
SENIOR UNITED STATES DISTRICT JUDGE