# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| M.C. MOORE, ET AL. | CIVIL ACTION |
| VERSUS | NO. 65-15556 |
| TANGIPAHOA PARISH SCHOOL BOARD, ET AL. | SECTION "B"(1) |

## ORDER AND REASONS

Before the Court is "Plaintiffs' Motion to Reconsider and/or to Alter and/or Amend Order Pursuant to Rule 59(e)." Rec. Doc. 1502. The Tangipahoa Parish School Board filed an opposition. Rec. Doc. 1504. Plaintiffs' instant motion relates to previously-filed objections to a recommendation from the Court Compliance Officer (CCO). Rec. Doc. 1494. For the reasons discussed below,

**IT IS ORDERED** that the motion (Rec. Doc. 1502) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Objections (Rec. Doc. 1494) are **OVERRULED** and the CCO's Recommendation (Rec. Doc. 1494-1) is **AFFIRMED**.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

An election held in Tangipahoa Parish on November 18, 2017, included three taxes that would have raised funds for the Tangipahoa Parish School District. *See* Rec. Doc. 1494-1 at 2-3. None of the taxes passed. *See* Rec. Doc. 1494 at 11. On October 10, 2017, prior to the election being held, Plaintiffs raised concerns about the impending tax election in a formal complaint to the CCO. *See* Rec. Doc. 1494-2. In their complaint, Plaintiffs argued that

1

prior court orders required the School District to formally submit the proposed tax ballot measures for analysis and approval prior to the election. *See id.* at 6-7 (referring to Rec. Docs. 325, 612). The School Board responded, arguing that (1) the proposed taxes were not governed by the prior court orders, (2) Plaintiffs were adequately notified of the Board's plans to put the tax measures on the ballot, and (3) that the tax measures were consistent with the Board's obligations to desegregate the school system. *See* Rec. Doc. 1494-4. Plaintiffs then filed a reply that responded to the Board's arguments. *See* Rec. Doc. 1494-10.

At issue in Plaintiffs' instant objections is the application of a pair of orders issued in 1977 and 2007 to the three taxes that were on the ballot in November 2017.[1] *See* Rec. Docs. 325, 612. The 1977 Order requires the Board to submit for review and approval "a planning study and analysis" "at least 90 days prior to any bond election or submission of bids on any capital improvement other than routine maintenance . . . ." Rec. Doc. 325 at 4. The 2007 Order adds and modifies these obligations by requiring that "[a]ny expenditure over $125,000.00 must go through the analysis procedure outlined in the [1977] court order and must be presented to the plaintiff and the compliance officer . . . at least 180 days prior to the election." Rec. Doc. 612 at 1.

---

[1] The 1977 Order is also filed in the record at Record Document Number 522-1.

On November 3, 2017, the CCO issued a recommendation that prior court orders regulating Board expenditures do not require the Board to "provide notice that it intends to call a property tax election." Rec. Doc. 1494-1 at 6. The CCO reasoned that the notice provisions in the prior court orders only apply to a subset of Board expenditures, not the collection of tax revenue via a parish-wide tax. *See id.* Twenty-one days later, on November 24, 2017, Plaintiffs filed objections to the CCO's recommendation. *See* Rec. Doc. 1494. The objections were dismissed as moot because the election occurred—and the taxes failed to pass—six days before Plaintiffs filed their objections. *See* Rec. Doc. 1496. Plaintiffs then filed the instant motion to reconsider, arguing that the objections are not moot because the Board might seek to pass a similar tax measure in the future. Rec. Doc. 1502-1 at 2. The Board timely filed an opposition. Rec. Doc. 1504.

**LAW AND ANALYSIS**

Plaintiffs seek reconsideration under Federal Rule of Civil Procedure 59(e). *See* Rec. Doc. 1502 at 2. "Rule 59(e) serves the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). "A Rule 59(e) motion . . . is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised

3

before" the order was issued.[2] *Id.* at 478-79. As a result, the "extraordinary remedy" available under Rule 59(e) "should be used sparingly." *Id.* at 479. This is one of those rare situations in which reconsideration is appropriate because Plaintiffs' objections fall within a narrow exception to mootness doctrine.

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies,' and an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation." *Kingdomware Techs. Inc. v. U.S.*, 136 S. Ct. 1969, 1975 (2016). A controversy is moot when "no court is . . . capable of granting the relief [plaintiff] seeks." *Id.* A court cannot normally grant injunctive or declaratory relief when the complained-of act has already ended. *See id.* at 1975-76. This would seem to foreclose Plaintiffs' efforts here because the election has already occurred and the objected-to taxes failed to pass.

But Plaintiffs allude to an exception to mootness doctrine in their instant motion. Rec. Doc. 1502-1 at 2. A controversy is not moot when it "is capable of repetition, yet evading review," which means that "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2)

---

[2] Plaintiffs' motion is properly analyzed under Federal Rule of Civil Procedure 59(e) because it was filed within twenty-eight days after Plaintiffs' objections were dismissed as moot. *See Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 400 (5th Cir. 2003); Fed. R. Civ. P. 6(a)(1)(C).

4

there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* at 1976 (citing *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). The Supreme Court has "held that a period of two years is too short to complete judicial review of the lawfulness of" an agency's decision to award a contract. *Id.*

Moreover, the exception is readily applied when the controversy involves the regulation of elections because elections occur with relatively short notice and it is difficult for courts to order relief after the election has occurred. *See, e.g.*, *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 461-64 (2007); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661-62 (5th Cir. 2006). Prompt resolution of election-related controversies is valuable because, for example, clarifying "[t]he construction of [a] statute [regulating an election], an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held." *Storer v. Brown*, 415 U.S. 724, 738 n.8 (1974); *see also Wis. Right to Life*, 551 U.S. at 461-64; *Morial v. Judiciary Comm'n*, 565 F.2d 295, 297 n.3 (5th Cir. 1977); *Ctr. for Individual Freedom*, 449 F.3d at 661-62; *Kucinich v. Tex. Democratic Party*, 563 F.3d 161, 164-65 (5th Cir. 2009); *cf. Wilson v. Birnberg*, 667 F.3d 591, 596-97 (5th Cir. 2012).

The instant dispute about whether the Board was required to submit planning studies and analyses for the three proposed tax measures 180 days before the election falls within the "capable of repetition, yet evading review" exception to the mootness doctrine. At most, the Board is required to seek approval of these tax measures six months prior to the election. *See* Rec. Doc. 612 at 1. Given that the Supreme Court has held a two year period to be too short for complete review, a six month period is also too short. *See Kingdomware Techs.*, 136 S. Ct. at 1976.

The second requirement of the test is also met because there is a "reasonable likelihood" that the same parties will be involved in a similar dispute in the future. The notification and approval requirements at issue here are specific to this case. *See* Rec. Docs. 325, 612. And given that the Board will likely need to raise additional funds to complete its obligations under the desegregation orders, it is reasonable to expect that the Board will put forward similar tax measures in the future. *See, e.g.*, Rec. Docs. 927, 935, 956, 1117, 1264 at 12-13. Therefore, under the "capable of repetition, yet evading review" exception, Plaintiffs' objections to the CCO's recommendation are not moot.

With the question of mootness resolved, it is time to turn to the substance of Plaintiffs' objections to the CCO's

recommendation.[3] A district court reviews a special master's findings of fact and conclusions of law de novo. *See* Fed. R. Civ. P. 53(f)(3)-(4). The CCO concluded that the tax proposals on the ballot in November 2017 did not implicate the analysis and approval provisions in Record Documents 325 and 612 because "the proposals at issue provide for the collection of property taxes, not the expenditure of funds." Rec. Doc. 1494-1 (emphasis omitted). Plaintiffs argue that the analysis and approval provisions are applicable because two of the tax proposals will raise funds to be used for maintenance and construction of yet-to-be determined school facilities, activities that could have an impact on the Board's obligation to desegregate the school system. *See* Rec. Doc. 1494 at 8-11.

The first step in reviewing the CCO's recommendation is to lay out and examine the text of the orders at issue. In 1977, the parties entered into a stipulation that, *inter alia*, created a framework for analysis and review of capital improvement expenditures. *See* Rec. Doc. 325 at 4. The 1977 Order states the following:

> Recognizing that the law requires that *selection of sites for schools to be constructed in the future, the selection of schools to be enlarged or altered, and all*

---

[3] The Court can evaluate Plaintiffs' objection based on the briefing before the CCO, as envisioned by the complaint process established in this case. *See* Rec. Doc. 956 at 4 ("The court may either resolve the disagreement [with the CCO's recommendation] on its own motion or may direct the party in disagreement to file an appropriate motion."); *see also* Rec. Doc. 612 at 1 (allowing for judicial review of Plaintiffs' objections); Fed. R. Civ. P. 53(f).

> *other future construction programs* must effectuate the development and continuation of a unitary school system serving the educational needs of the parish without regard to race, the school board, at least 90 days prior to any *bond election or submission of bids on any capital improvement other than routine maintenance*, shall submit to plaintiffs and the court a planning study and analysis by which the plaintiffs and the court can objectively review whether *the proposed construction* is consistent with the school board's affirmative duty to ensure that *the proposed construction or improvements* assist in bringing about a unitary system and prevents reoccurrence of the dual system. For the purposes of this section, it shall be presumed, subject to rebuttal, that any proposed capital expenditure in excess of $30,000 is for other than routine maintenance.

*Id.* (internal citations omitted) (emphasis added).

In 2007, the Court issued an order amending the 1977 Order. *See* Rec. Doc. 612. The 2007 Order was "issued to assist [the] parties' efforts and ongoing affirmative duty to ensure that *proposed capital expenditures* bring about a unitary system and prevent reoccurrence of a dual school system." *Id.* at 2 (emphasis added). It retained the "provisions of [the 1977 Order] . . . regarding capital improvements and bond elections . . ." with three amendments. *See* Rec. Doc. 612. First, it increased the routine maintenance exemption from $30,000.00 to $125,000.00. *See id.* at 1. Second, it explained that expenditures up to $125,000.00 for "general maintenance of existing buildings," such as "[u]pkeep of existing building[s]," "[r]eplacing outdated appliances and fixtures," and "[e]nsuring compliance with state and local building codes[,]" could be made "without court approval[,] but

8

with a letter to plaintiff's counsel and/or Compliance Officer advising of *the specific expenditure* . . . ." *Id.* (emphasis added). Third, it clarified the following:

> *Any expenditure over $125,000.00* must go through the analysis procedure outlined in the [1977] court order and must be presented to the plaintiff and the compliance officer at least 120 days *prior to the expenditure of the funds*. If a public vote is required, the analysis must be presented at least 180 days prior to the election. The plaintiffs have 90 days to respond to the proposal submitted by the school system. The parties will be required to meet within 60 days of [] receiving the *request for expenditure* to determine if the matter can be resolved.

*Id.* (emphasis added). The 2007 Order also includes a catch-all provision stating that, "[r]egardless of the amount to be spent, if the expenditure will have a significant impact on the continued enforcement of the court order and the desegregation of the school system, the school system will be obligated to notify the plaintiffs, the compliance officer, and the Court." *Id.* at 2.

Review of the 1977 and 2007 Orders indicates that the CCO was correct when he concluded that both are primarily concerned with the Board's expenditures and only secondarily regulate how the Board raises the requisite funds to make those expenditures. *See* Rec. Doc. 1494-1 at 6. With one exception, the Board's obligations are defined by the size of the anticipated expenditures and the deadlines for notice and analysis are determined by the timing of the expenditures. *See* Rec. Docs. 325, 612. The exception merits

further discussion because it appears to have contributed to the instant disagreement.

The exception involves situations where the notice and analysis requirements are triggered by an election. The 1977 Order declares that, when the Board is required to submit "a planning study and analysis" for review, those materials are due "at least 90 days prior to any bond election or submission of bids on any capital improvement other than routine maintenance . . . ." Rec. Doc. 325 at 4. The 2007 Order modifies this requirement slightly by requiring that, "[i]f a public vote is required [for the expenditure], the analysis must be presented at least 180 days prior to the election." Rec. Doc. 612 at 1. Therefore, Plaintiffs are correct that the Board is sometimes obligated to prepare a planning study and analysis before putting certain fundraising measures to a vote.

But the full picture of the 1977 and 2007 Orders suggest that this obligation is limited to situations in which the outcome of the election will commit the Board to certain expenditures on specific projects. If that were not the case, and the Board were required to complete a planning study and analysis before putting even general fundraising to a vote, the remaining provisions of the Court's orders would appear largely irrelevant. If all potential expenditures are analyzed and approved before raising the funds to pay for said expenditures, then the need to later

submit individual expenditures for approval would be a potentially superfluous layer of review.

On the other hand, the interpretation advanced in the CCO's recommendation is reasonable because it ensures that expenditures are subject to judicial review at least once, but not more than necessary. When a public vote will commit the board to certain expenditures on specific capital improvements, the planning study and analysis are required before the election. But when a public vote simply authorizes the collection of additional funds that might be, but are not required to be, used for capital expenditures, the planning study and analysis is not required until the funds are actually be spent.

This distinction also reasonably reflects the fact that a planning study and analysis is less useful when the exact uses of the funds have not been identified. This is all the more true when, as here, the funds will be collected over the course of decades because the school district's needs will almost certainly change over time. None of this is to say that Plaintiffs cannot challenge the Board's fundraising efforts on other grounds, such as the structure and design of the tax itself. The current analysis just means that the Board is not required to submit a planning study and analysis for review before putting every fundraising initiative to a public vote. Moreover, nothing discussed here diminishes the Board's "obligat[ion] to notify the plaintiffs, the

compliance officer, and the Court" "if [an] expenditure will have a significant impact on the continued enforcement of the court order and the desegregation of the school system . . . ." Rec. Doc. 612 at 2.

The foregoing analysis is also consistent with the court's and the parties' previous interpretation of the Board's obligations under the 1977 Order. In May 2007, the Board filed a motion seeking approval for three revenue raising measures that the Board sought to put to a public vote in July 2007. *See* Rec. Doc. 531. The proposed measures were as follows: (1) "a 1% sales and use tax" "to pay the costs of constructing and improving public school buildings and facilities therein and acquiring land, equipment and furnishings therefor[;]" (2) a bond issue to pay for the construction of a new middle school; and (3) a millage to "giv[e] additional support to the public elementary schools in the district by providing funds for operating, maintaining and equipping visual and performing arts for all elementary children and for accelerated curriculum programs and paying salaries and benefits of teachers and other public school personnel . . . ." Rec. Doc. 531-1 at 4-5.

After additional briefing and a hearing before the Court, "the parties agreed" that the bond issue to build a new middle school would be enjoined pending the requisite planning study and analysis, but that "the other two elections regarding a parish-

wide sales tax and an assessment . . . concerning an accelerated curriculum program would proceed, subject to court approval of expenditures should the tax proposals be approved." Rec. Doc. 567 at 1. The parties' stipulation was subsequently memorialized in an order by the Court. *See* Rec. Doc. 566. It was only after the Court approved the parties' resolution of their dispute about the tax elections that the Court issued the 2007 Order further clarifying the Board's obligations with respect to expenditures. *See* Rec. Doc. 612.

Since 2007, when the parties reached agreement on the distinction between specific and general fundraising efforts, the Board has repeatedly sought approval for specific expenditures (*see, e.g.*, Rec. Docs. 716, 717, 800, 832, 835, 890, 908, 940, 970, 999, 1016, 1074) and very rarely sought approval for tax elections (*see* Rec. Docs. 857, 871, 1002). The circumstances surrounding the Board's previous motion for approval of a tax election is readily distinguishable from the presently objected-to tax election. In 2009, the Board sought approval to hold a tax election to fund the expansion of a magnet program at Hammond Junior High School. *See* Rec. Doc. 857. The Court initially denied the motion "due to [its] concern over approving said election prior to approving a desegregation order concerning the magnet programs." Rec. Doc. 866 at 1.

The Board had previously proposed a desegregation plan for its magnet programs (*see* Rec. Doc. 738), but it was not approved until 2010 (*see* Rec. Doc. 876). Upon subsequent motion, the Court ultimately approved holding the election and levying the tax for one year. *See* Rec. Doc. 873. In 2012, the Board filed an unopposed motion to collect the tax for an additional year; the motion was granted. *See* Rec. Docs. 1002, 1003. This one example related to the magnet program tax does not alter the Court's understanding of the 1977 and 2007 Orders because the 2009 request was prompted by the fact that the underlying program was uncertain; the relevant desegregation plan was pending before the Court when the election was scheduled to occur. That is not the situation now, as the objected-to taxes were to be used for a variety of purposes pursuant to the standing desegregation orders.

Therefore, over a decade ago, the parties agreed that there is a distinction between fundraising proposals that commit the board to certain expenditures on specific projects and proposals that raise general revenue to be used for a variety of projects. *See* Rec. Docs. 566, 567. The parties also agreed that the former require a planning study and analysis, but that the latter do not. *See* Rec. Docs. 566, 567. The parties reached this agreement even though the sales and use tax from 2007 was dedicated to the construction and maintenance of school facilities and the millage proposed in 2007 was for new curriculum programs and salaries. *See*

14

Rec. Doc. 531-1 at 4-5. This decade-old agreement among the parties supports the CCO's recommendation that the Board's obligations generally depend on whether the Board is making an expenditure or raising general funds to be spent later.

The final step in reviewing the CCO's recommendation is to compare the objected-to tax proposals to the notice and analysis requirements to ensure that the Board complied with its legal obligations in this instance. Three parishwide millages were on the November 2017 ballot, one to "giv[e] additional support for the payment of teacher and support employees' salaries and benefits[,]" the second to "giv[e] additional support for the maintenance of school facilities[,]" and the third to "give additional support for the constructing of, new or improving, renovating and/or remodeling existing classrooms and related facilities, in order to reduce the number of modular buildings[.]" Rec. Doc. 1484-3 at 1. None of the millages committed the Board to certain expenditures on specific projects. All of the millages would have raised funds that the Board could have used for a variety of projects. Subject to the 1977 and 2007 Orders, some expenditures of the funds raised would have been subject to planning study, analysis, and court approval. In fact, the similarities between the millages placed on the November 2017 ballot and the tax and millage on the 2007 ballot are striking—in

both instances the measures were designed to raise money to generally improve school facilities and the quality of education.

It is also important to note that the Board provided ample notice of its intent to place these millages on the November 2017 ballot. The Board published a notice of its intent to put the proposed millages to a public vote on August 15, 2017, a full three months before the vote was scheduled to occur. *See* Rec. Doc. 1484-3. That notice was discussed in and attached to the CCO's annual report, which was filed into the record of the above-captioned matter on September 5, 2017. *See* Rec. Docs. 1484 at 10, 1484-3. Plaintiffs, though objecting to the form and timing of notice, acknowledge that they knew about the millage proposal no later than August 16, 2017.[4] *See* Rec. Doc. 1494-10 at 10-14. Because the proposed millages would have raised money to fund a variety of expenditures, not a certain project, the Board was not required to present a planning study and analysis for review. The Board's

---

[4] The CCO states that on August 11, 2017, he provided advance notice to Plaintiffs' counsel that the millage proposal would be discussed at the Board's meeting on August 15, 2017. *See* Rec. Doc. 1494-1 at 3. The Board states that it gave notice of its *intent* to place the millage proposal on the ballot to Plaintiffs' counsel in June 2017. *See* Rec. Doc. 1494-4 at 3-4.

provision of notice to the parties, CCO, and the Court was sufficient. If the millages had passed, the 1977 and 2007 Orders would have governed expenditure of the funds raised from the millages.

New Orleans, Louisiana, this 30th day of March, 2018.

_____
SENIOR UNITED STATES DISTRICT JUDGE