JOYCE MARIE MOORE, ET AL.                    CIVIL ACTION

VERSUS                                       NO. 65-15556

TANGIPAHOA PARISH SCHOOL BOARD               SECTION "B"(1)

## ORDER AND REASONS

Defendant Tangipahoa Parish School Board (the "Board") filed a "Motion for Unconditional Unitary Status and Judgment of Dismissal as to Staff Assignment and/or Alternatively, Motion for Relief from Staff Hiring Procedures." Rec. Doc. 1568. Plaintiffs did not file an opposition. For the reasons discussed below,

**IT IS ORDERED** that the motion is **DENIED without prejudice to reurge in six (6) months provided there are no compliance issues during that time**.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Board filed its original motion for unitary status in the area of staff assignment on March 13, 2015. Rec. Doc. 1241. On June 22, 2015, this Court determined that the Board materially complied with pertinent consent decrees and met established desegregation standards. Rec. Doc. 1278 at 3. We found that the Board had "progressively worked in good faith to attain the 40-60 diversity goal set forth in Rec. Doc. No. 866 with respect to staff assignments for a three year period in that area." Id. (citations and footnote omitted). Accordingly, this Court provisionally

granted the motion, subject to compliance reviews during the ensuing twelve months. Id. This Court further provided that we would consider an unconditional grant of unitary status "if no major compliance issues ar[o]se during the applicable review period." Id. at 4 (citations omitted).

On June 28, 2016, the Board filed its second motion for an unconditional grant of unitary status. Rec. Doc. 1410. The Court ordered the Board to submit supplemental briefing regarding staff assignment complaints filed during the one-year review period, and the Board timely complied with that request. Rec. Docs. 1419, 1422. On August 30, 2016 the Court entered an Order and Reasons dismissing the Board's motion for unitary status without prejudice. Rec. Doc. 1425. We recognized that administrative personnel were not assigned in a manner that tended to show that any school was intended only for black or white students, and that the Board met this Court's diversity goal from 2013 through 2016. Id. at 5 (citing Rec. Docs. 1410-1, 1412-5, 1412-6), Id. at 6 (citing Rec. Doc. 1410-6). Further, the Board produced evidence that its personnel policies supported non-discriminatory hiring practices and that there was a system for filing discrimination complaints. Id. at 6-7 (citing Rec. Doc. 1410-2). However, the Court remained concerned about whether complaints filed within the twelve-month provisional review period revealed any substantial violations of this Court's desegregation orders. Rec. Doc. 1425 at

7. Supplemental information provided by the Board did not eliminate these concerns because the Board failed to submit documentation to support its claim that three as yet unresolved grievances would result in findings of no violation. Id. The Court was unwilling to grant unitary status without such supporting documentation and dismissed the motion without prejudice, further stating that any subsequent motion for unconditional unitary status needed to include supportive factual documentation. Id. at 9-10.

On February 17, 2017, the Board filed a third motion for unconditional unitary status, arguing that the three previously unresolved grievances had been decided in its favor or decisions in its favor were supported by proper documentation. Rec. Doc. 1450. Although plaintiffs did not file an opposition to the motion, they did file an objection to the CCO's recommendation concerning a grievance filed by Mildred Johnson and a separate motion requesting relief from the Board's interim appointment procedures. Rec. Docs. 1463, 1464. On July 21, 2017 the Court issued an Order and Reasons dismissing without prejudice the Board's third motion for unitary status. Rec. Doc. 1471. The Court found that the Board had shown compliance in two of the three grievances filed during the twelve-month review period, but the third complaint, filed by C.S., suggested a major compliance issue. Id. at 12. Additionally, the Court overruled plaintiffs' objection regarding Johnson's application and affirmed the CCO's recommendation. Id. at 22. The

Court further ordered the parties to submit supplemental briefing to the CCO to help the CCO and ultimately the Court determine whether the Board's use of interim staff appointments violates applicable laws and orders in the area of staff assignment, including the provisional grant of unitary status. Id. at 24-25.

In his 2016-2017 report, the CCO discussed the Board's use of interim appointments stating that it was not an optimal approach, but he believed there were limited circumstances that warranted interim placements. Rec. Doc. 1484 at 23-24. However, the CCO also expressed concern that the Board appeared to have adopted a broad view of when the interim process may be used that was not authorized by the Court's staff hiring order. Id. The CCO also identified a problem with advertising one instead of multiple positions when multiple positions are actually available, which may serve to suppress the potential pool of qualified black applicants. Id. at 33. Because the CCO's investigation was ongoing, the Court ordered the CCO to file updated findings by the end of March 2018. Rec. Doc. 1510. The CCO then timely filed an updated report on the Board's use of interim appointments, concluding that while no single instance of interim hiring represented a compliance issue, the unfettered use of such appointments seemed to frustrate the intention of the staff hiring order. Rec. Doc. 1525 at 4-10. The CCO recommended ordering the parties, CCO, and CDIO to meet and develop a procedure for interim hiring. Id. at 15. The CCO

also faulted the Board for hiring multiple assistant principals at schools where it had only advertised one available position. Id. at 110-11. After reviewing the CCO's recommendation and the Board's objections, the parties, CCO, and CDIO were directed to develop a proposed framework for interim appointments and offer a recommendation to the Court. Rec. Doc. 1544 at 19. Furthermore, while agreeing with the CCO that the Board should have advertised every open position when there were multiple available positions, we found that the Board's error in failing to do so was made in good faith and minimally excusable in this limited instance. Id. at 22-23. The Board was warned that future claims of good faith error may not be similarly favorably viewed. Id. Consistent with aforementioned directives, the CCO submitted a proposed framework for interim staff appointments, which was adopted without objection on August 22, 2018. Docs. 1548, 1549.

Four months later December 28, 2018 the Board filed the instant fourth motion for unconditional unitary status. It claimed the absence of a major violation of consent decrees and court orders entitled full termination of judicial supervision in the area of staff assignment. Rec. Doc. 1568. In the alternative, the Board moves to terminate the hiring procedures relative to staff assignment, claiming existence of clear and convincing evidence of material compliance. Id. at 4. Plaintiffs have not filed an objection.

## THE PARTIES' CONTENTIONS

The Board argues that because plaintiffs' issues related to the Mildred Johnson grievance and the procedure for interim appointments have been resolved, the staff assignment issue is now in a posture for final consideration for full and unconditional unitary status. Rec. Doc. 1568-1 at 10. The Board states that it has continued its good faith compliance with the staff employment procedure and progress in meeting the 40-60 diversity goal for staff as first laid out in Order 866, which was also previously recognized by the Court in the 2015 provisional grant of unitary status. Id. at 11. The Board notes that its implemented employment process includes "a broad recruiting practice, utilization of the bi-racial Interview Committee, all required notices to the CCO and Plaintiffs' counsel, and, where applicable, the Superintendent's recommendation letter." Id. Additionally, the Board asserts that it has met and/or exceeded the diversity goal for staff to the extent practicable, as well as for principal and assistant principals.[1] Id. The Board also states that it has acted in good faith and without violation of the Court's orders with regard to interim appointments. Id. at 12. The Board asserts that

---

[1] "In school year 2015-2016, the Board employed 43% black/57% white in the positions subject to Order 866. In the past three (3) years since the Court's original findings, the Board has employed in those positions: 2016-2017 – 37% black/63% white; 2017-2018 – 43% black/57% white; and 2018-2019 – 42% black/58% white. Further, in the categories of principal and assistant principal (i.e., school-level administrators), the Board has met and exceeded the 40% goal for six (6) years." Rec. Doc. 1568-1 at 11-12.

Superintendent Melissa Stilley assessed the practice of utilizing interim appointments upon assuming her role in June 2018 and decided to discontinue the practice except under exigent circumstances. Id. at 13. Since that time, the Board avers that a number of vacancies have occurred and Superintendent Stilley has not appointed interims and has instead instituted the employment process and positions have remained vacant until filled in accordance with Order 866. Id. The Board further notes that if an emergency situation necessitating appointment of an interim arises, Superintendent Stilley will be guided by the framework adopted by the Court. Id. The Board also asserts that it has demonstrated good faith compliance with the Court's orders regarding the advertisement of multiple positions. Id. at 14. The Board states that after the Court's order regarding the advertisement issue (Rec. Doc. 1544), on December 14, 2018 the Administration conferenced with the affected assistant principals and advised them that pursuant to the order, their respective positions will be vacated at the conclusion of their contract term in June 2019. Id. The Board asserts that the Administration will select new assistant principals through the interview process by June 2019. Id. Since the Court's order, the Board avers that the Administration has advertised for more than one of a position type and identified that multiple positions were being filled. Id. at 15. Finally, the Board notes that since the Court's last order,

all of Mildred Johnson's grievances have been resolved in favor of the Board. Id. The Board states that the CCO issued a Report and Recommendations on August 6, 2018 that found the Board had not violated any court order as to Johnson's 2014 and 2018 grievances and neither Johnson nor Plaintiffs sought review of this finding. Id.

Alternatively, the Board argues it has met or exceeded the 40-60 diversity goal for school level administrators set forth by Order 866 in all categories other than central office supervisory personnel for six (6) years. It therefore seeks relief from hiring procedures with respect to those positions. Id. at 16. The Board avers that the fact that it has not met the hiring goal in the central office does not mean it is not entitled to relief from 866 hiring because Fifth Circuit precedent prohibits arbitrary racial quotas, and the Board has, to the extent practicable, met the Court's 40-60 diversity goal. Id. at 17. Furthermore, the Board argues that the Court's Order 866, by its own terms, terminates when the Board meets the staffing goal contained therein, which it has, to the extent practicable. Therefore, the Board states that although it has continued to follow the hiring procedures in good faith, it is entitled to relief from Order 866 hiring procedures with respect to school level administrative positions. Id.

Additionally, the Board states that the three (3) pending objections to the CCO's staff hiring Reports and Recommendations

should not prevent it from obtaining unitary status in staff assignment. Id. at 17-18. The Board asserts that it cannot prevent a disgruntled employee or applicant from filing a grievance, but the mere filing of a grievance does not demonstrate that it is not in compliance with desegregation obligations. Id. at 18. The Board states that applicants who feel wronged have remedies beyond filing a grievance, such as by filing their own lawsuit alleging discrimination. Id. at 19. Furthermore, the Board notes that no grievance since Order 866 was entered has resulted in a finding that the Board discriminated against an applicant on the basis of race. Id.

## LAW AND ANALYSIS

District courts may declare unitary status incrementally as "remedies must be narrowly structured to address the scope of a violation." *Flax v. Potts*, 915 F.2d 155, 158-59 (5th Cir. 1990). "[C]onsequently, once the need for close supervision of a particular facet of a school desegregation plan ceases, a court must not continue to supervise that particular facet." *Id*. In deciding a motion for unitary status, the ultimate inquiry for the court is "'whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.'" *Freeman v. Pitts*, 503 U.S. 467, 492 (1992). It is well established that defendants bear the burden of

proof on their compliance with remedial orders. *See id*. at 494. In
exercising its discretion, the district court must consider the
following factors:

> (1) whether there has been full and satisfactory
> compliance with the remedial order in those aspects
> of the system where supervision is to be withdrawn;

> (2) whether retention of judicial control is necessary or
> practicable to achieve compliance with the remedial
> order in other facets of the school system; and

> (3) whether the school district has demonstrated its good
> faith commitment to the whole of the court's remedial
> order and to those provisions of law and the
> constitution that were the predicate for judicial
> intervention in the first instance.

See *id*. at 491.

This Court's prior order modifying the desegregation plan
provided that "the school district may move the court for a
declaration of unitary status when compliance is achieved with
applicable legal requirements pertaining to the nondiscriminatory
assignment of administrative personnel." Rec. Doc. 876 at 20. The
primary legal requirements in this area are that: (1) "a school
must show that . . . staff who work directly with children are
assigned in such a manner that the racial composition of the
faculty and staff would not indicate that the school is intended

for either African-American or white students;" and (2)
"discrimination on the basis of race, color or national origin in
the hiring, assignment, promotion, pay, demotion or dismissal of
. . . administrative staff is prohibited." *Anderson v. Sch. Bd. of
Madison Cty.*, 517 F.3d 292, 303 (5th Cir. 2008) (internal quotation
marks omitted) (citing *Singleton v. Jackson Mun. Separate Sch.
Dist.*, 419 F.2d 1211, 1217-18 (5th Cir. 1969) (en banc), rev'd in
part sub. nom., *Carter v. West Feliciana Parish Sch. Bd.*, 396 U.S.
290, (1970); *Fort Bend Ind. Sch. Dist. V. Stafford*, 651 F.2d 1133,
1138 (5th Cir. 1981)). Accordingly, this Court granted the Board's
motion for relief and ordered that when vacancies occur for
principals, central office administrators, or other supervisory
positions, "the school system shall hire or appoint a qualified
Black person who has submitted an application to fill them to
achieve a diversity goal of 40 percent Black and 60 percent white
in each category . . ." Rec. Doc. 866 at 2; see also Rec. Doc.
853.

    A. Compliance with Legal Requirements

    When provisional unitary status was declared in the area of
staff assignment in 2015, the record seemingly showed that the
Board had materially complied with its desegregation obligations
in this area. Rec. Doc. 1278. When we considered the issue in 2016,
we again found that the Board appeared to be in substantial
compliance with its legal requirements based on: a) staff

demographics showing that school site administrative personnel have not been assigned in a manner that tends to show any school is intended only for Black or white students; b) demographic data demonstrating that overall, and in two out of three categories (excluding central office staff), the Board continues to meet the diversity goal; and c) the fact that the Board demonstrated its personnel policies continue to support non-discriminatory hiring practices and that it has a system in place for filing complaints or grievances concerning discriminatory hiring, assignment, promotion, pay, demotion or dismissal of staff members. Rec. Doc. 1425 at 5-7. The Board again provides demographic data seeming to show its partial compliance with the diversity goal overall and in two of the three categories, again excluding central office staff, and states that it continues to implement Order 866's hiring procedures. *See* Rec. Docs. 1568-3, 1568-4 at 33.

The provisional grant of unitary status was declared in 2015 even though the central office staff had not yet reached the 40/60 goal. However, in the years prior to the 2015 grant of provisional unitary status there had been steady improvement in the central office's statistics each year (09-10: 14/86, 10-11: 21/79, 11-12: 21/79, 12-13: 21/79, 13-14: 29/71, 14-15: 31/69). That improvement continued when the Board reurged its motion for unitary status in 2016 (15-16: 33/67). However, improvement did not continue in the next three years leading up to the instant motion (16-17: 15/85,

17-18: 24/73, 18-19: 27/73). Instead, it seems the demographics slipped after the 2015-2016 year and are now at roughly the same levels as, if not slightly lower than, the three years leading up to the 2015 grant of provisional unitary status, with a noticeable dip in the 2016-2017 school year (15/85) back to approximately 2009-2010 levels (14/86). Although the numbers began climbing again after the 2016-2017-year dip, they still have not reached the improvements attained during the 2015-2016 year (33/67), which is the closest the Board has gotten to the 40/60 goal. *See* Rec. Docs. 1241-3 at 26, 1410-1 at 6, 1568-4 at 33. The foregoing trend is remarkable evidence of noncompliance that needs to be addressed by the Board, working with the new administration and all stakeholders.

Additionally, we must also consider further issues that have arisen in the area of staff assignment since our last Order on unitary status was issued, including new complaints that have come before the Court on this issue.

B. Interim staff appointments

When this Court dismissed without prejudice the Board's last motion for unconditional unitary status on July 21, 2017, we left open the question of whether the Board's use of interim staff appointments violates our orders relative to staff assignment or impacts the provisional grant of unitary status. Rec. Doc. 1471 at 24-25. However, the issue has since been resolved. In our July

13

2018 Order and Reasons reviewing the CCO's "2018 Interim Report Regarding Hiring Issues and Recommendations" (Rec. Doc. 1525) and the Board's related objections (Rec. Doc. 1527), we discussed at length the issue of interim appointments, including the CCO's finding that no single instance of interim hiring represented a compliance issue but that unfettered use of such appointments could frustrate the spirit of our order. Therefore, the parties were directed to confer and submit a proposed framework for future interim appointments. Rec. Doc. 1544. We subsequently adopted the proposed framework submitted by the parties on August 22, 2018, and it remains in place. Rec. Doc. 1549. In her affidavit, Superintendent Stilley attests that upon assuming her role in 2018 and conducting her own assessment, she determined that the practice of interim staff appointments was not in the best interests of the school district and decided to discontinue it except under exigent circumstances. Rec. Doc. 1568-5 at 3. She further attests that were such an exigent circumstance to arise, she would follow the procedures laid out in the adopted framework. Id. To demonstrate her commitment to this approach, Superintendent Stilley states that since June 2018, a number of vacancies have occurred, yet no interim appointments have been made to fill these vacancies. Id. Rather, she points out that the 866 employment process has been instituted and the positions have remained vacant until filled in accordance with that process. Id.  We see no reason to doubt

14

Superintendent Stilley's statements and commend her remarkable efforts to achieve unconditional unitary status. Thanks to her actions, we are not aware of any complaints filed that would indicate a potential violation of orders regarding interim staff appointments. Because no compliance issues arose in interim staff appointments before the Court adopted the proposed framework and given Superintendent Stilley's decisive actions to discontinue the practice except under exigent circumstances, which have as of yet not arisen, the Court finds no violations by the Board or evidence of non-compliance that would impact our provisional grant of unitary status in that particular area.

C. Advertisements for multiple positions

In our order considering the issue of interim staff appointments, we also discussed the issue raised by the CCO of advertisements that list a single open position when multiple positions are available. Rec. Doc. 1544. We held that "the best reading of the staff hiring order requires that every open position be identified in the required advertisements so that potential applicants know how many people will be hired." Id. at 22. We found the Board's error in not doing so for assistant principal positions had been made in good faith and was minimally excusable in this limited instance, although we warned that we may view good-faith error claims less favorably in the future. Id. at 23. Going forward, we held that the Board should accurately state how many

people will be hired when advertising for a job. And if the need to hire additional staff arises, then the Board should either amend the advertisement and reopen the application period or initiate a separate hiring process for the new openings. Id. at 24. We also ordered the Board to reinitiate the hiring process at the end of the 2018-2019 contracts for the three assistant principal positions at issue pursuant to the staff hiring order.

The Board now informs the Court that it has since advised the affected assistant principals that their respective positions will be vacated at the conclusion of their contract terms in June 2019; and has scheduled to advertise for each of the positions in April 2019, interview applicants in May 2019, and select new assistant principals by June 2019. Rec. Doc. 1568-1 at 14. To further demonstrate its compliance with Court directives, the Board also states that since the issue was raised by the CCO, the Administration as advertised and identified that two positions were being filled. Id. at 15. The Court is not aware of any complaints that have been filed regarding unadvertised positions since our Order in July 2018. Furthermore, the Board has demonstrated that it complied with the orders concerning the identified assistant principal positions and has continued to follow the Court's orders for new vacancies that arise. Accordingly, the advertisement of multiple open positions does not present a compliance issue.

D. Objections to CCO's Reports and Recommendations

There were three pending objections to the CCO's reports and recommendations concerning staff assignment at the time the Board filed the instant motion, which have since been resolved by the Court. Additionally, the Board informs the Court that the CCO has issued his Report and Recommendations of Mildred Johnson's grievances, resolving them in the Board's favor, and no party objected to his findings within the applicable 21-day objection period. Rec. Doc. 1568-1 at 15. We will consider each of these in turn.

Regarding the first complaint, we overruled plaintiffs' objection to the CCO's Report and Recommendations of Osa Betts' complaint. Rec. Doc. 1571. We affirmed the CCO's finding that the Board followed standing Orders and Decrees when it hired Gary Porter, a qualified black applicant, instead of Osa Betts, another qualified black applicant, as Director of Student Services. Id. at 1. We agreed that Order 866 "does not apply to staff hiring challenges by a black applicant who complains of the hiring of another black applicant" and therefore found no lack of compliance by the Board. Id. at 2-3. Accordingly, the Osa Betts complaint does not demonstrate a compliance issue.

Regarding the second complaint, we overruled the Board's objection to the CCO's Report and Recommendations of Deane Foster's complaint. Rec. Doc. 1572. We affirmed the CCO's finding that the

Board failed to comply with Order 866 when it hired Dr. Huguet, a
non-black applicant, as Assistant Principal of Hammond Westside
Montessori School (HWMS) instead of Deane Foster, a qualified black
applicant. Id. at 7-8. Specifically, we noted that Dr. Huguet's
doctorate degree did not make him "more qualified" for the position
than Ms. Foster, who holds two masters degrees, and therefore
offering Dr. Huguet the position over Ms. Foster was a violation
of Order 866. Id. We further noted that discussions of the Board's
subjective state of mind were not relevant to a determination of
whether the procedures set out under Order 866 for staff hiring
had been complied with. Id. at 7. Accordingly, the Deane Foster
complaint indicates a major compliance issue for the Board.

Regarding the third complaint, we overruled the Board's
objection to the CCO's Report and Recommendations of Schellia
Robertson's complaint. Rec. Doc. 1573. We affirmed the CCO's
finding that the Board was not in compliance with Order 866 when
it refused to hire Dr. Robertson, a qualified black applicant, for
the Instructional Technology Facilitator position, and then hired
a non-black applicant while utilizing a process other than the one
specified by the Order. Id. at 2-5. We held that the Technology
Facilitator position fell under the ambit of Order 866, and
therefore the Board should have convened an interview committee to
fill the position and complied with the Order's other requirements.
Id. at 7. Instead, the Board created a written screening test with

a 70% cutoff to administer to applicants, for which there is no evidence of reliability or validity; and failed to disclose the test and threshold as a job requisite to applicants. Id. at 8. We found that the non-black applicant who was hired for the position was not "more qualified" than Dr. Robertson, nor were any of the other candidates. Id. at 9. Therefore, Schellia Robertson's complaint demonstrates a major compliance issue for the Board as well.

Regarding Mildred Johnson's grievances, the CCO's Report and Recommendation found the Board showed reasonable grounds for not selecting Ms. Johnson for the Hammond High Magnet School (HHMS) principal position in 2014 and 2018; and accordingly had been compliant with Order 866. Rec. Doc. 1568-2. As the Board notes, no objection to the CCO's report has come before the Court. Therefore, Johnson's grievances do not present a compliance issue.

E. Unconditional Unitary Status

As listed above, in deciding a motion for unitary status, the Court considers three factors: whether there has been full and satisfactory compliance with the remedial order, whether retention of judicial control is necessary to achieve compliance in other facets of the school system, and whether the school has demonstrated its good faith commitment. *Freeman v. Pitts*, 503 U.S. 467, 491 (1992).

Of the three complaints that came before the Court, Deane Foster and Schellia Robertson's complaints present major compliance issues. In both cases, the Board's actions were found noncompliant with Order 866. The latter complaints indicate that despite the progress the Board has made under the new administration, the Board has not yet arrived at the point of full and satisfactory compliance with remedial orders designed to achieve unitary status. When we granted provisional unitary status in 2015, we stated that it was "subject to further compliance review(s)" over the next year. Rec. Doc. 1278 at 3. Furthermore, we did not hold that unconditional unitary status would automatically be conferred upon the completion of the review period, but rather that we would "consider . . . grant of such status." Id. at 4. Although it has now been longer than a year since our original grant of provisional unitary status, various factors led to the extension of this period, including requiring additional information from the parties on complaints that were filed as well as new issues that were brought to the court's attention (such as the interim staff appointment process and advertisements). Therefore, because there has not been full and satisfactory compliance in staff assignments, we find judicial supervision is still required.

The Board's claim that "no grievance since Order 866 was entered has ever resulted in a finding that the Board discriminated

against any applicant on the basis of race" misstates the actual question before the Court. Rec. Doc. 1568-1 at 19. The issue for the Court to consider is whether the Board has fully and satisfactorily complied with this Court's remedial orders. As discussed above, multiple grievances have resulted in findings that the Board has not complied with Order 866. The cumulative effect of noncompliance with court orders at issue evidence significant and ongoing concerns, negating unconditional unitary status at this time. After careful consideration of each complaint, the Court found the Board's actions did not comply with directives for staff hiring. Until the Board shows reasonable consistent compliance practices in this area, there will be further oversight for a reasonable period. The Board and new administration should also focus attention upon sufficiently improving its central office staffing to at least pre-June 2016 levels, as noted earlier. Further regressions will impact compliance determinations.

    F. Relief from 866 Hiring Procedures

In the alternative, the Board seeks relief from the 866 hiring procedures because of its long-standing good faith compliance with the 40-60 diversity goal. Rec. Doc. 1568-1 at 16. At a minimum, the Board seeks relief with respect to school level administrative positions because it has exceeded the hiring goal in those positions for six years. Id. at 17. However, granting relief from

the 866-hiring procedure at this stage would render meaningless the decision not to grant unconditional unitary status due to the fact that the Board has not fully and satisfactorily complied with Order 866. The Order directs the Board to "hire or appoint a qualified Black person who has submitted an application to fill them to achieve a diversity goal of 40 percent Black and 60 percent white" in the identified categories. Rec. Doc. 866 at 2. The complaints discussed earlier demonstrate that the Board has not consistently complied with directives to hire a qualified Black applicant for these positions. Therefore, the Court cannot grant relief from 866-hiring procedures until the Board has demonstrated that it is fully and satisfactorily complying with Order 866.

**CONCLUSION**

For the reasons outlined above,

**IT IS ORDERED** that the instant motion is **DENIED without prejudice** to reurge in six (6) months with supportive data and information consistent with this opinion.

New Orleans, Louisiana, this 30th day of April 2019

SENIOR UNITED STATES DISTRICT JUDGE