```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF LOUISIANA

 3

 4   JOYCE MARIE MOORE, et al.     *     65-CV-15556
                                  *
 5   versus                       *     Section B
                                  *
 6   TANGIPAHOA PARISH SCHOOL BOARD, *   February 11, 2020
       et al.                      *
 7   * * * * * * * * * * * * * * * *

 8

 9                     PROCEEDINGS BEFORE
                 THE HONORABLE IVAN L.R. LEMELLE
10                 UNITED STATES DISTRICT JUDGE

11
     Appearances:
12

13   For the Plaintiffs:        J.K. Haynes Legal Defense Fund
                                 BY:  NELSON D. TAYLOR SR., ESQ.
14                               1822 N. Acadian Thruway West
                                 Baton Rouge, Louisiana 70802
15

16   For the Plaintiffs:        Law Office of Cassandra Butler
                                 BY:  CASSANDRA BUTLER, ESQ.
17                               146 Highway 40 W
                                 Post Office Box 407
18                               Independence, Louisiana 70443

19
     For the Plaintiffs:        GIDEON TILLMAN CARTER III, ESQ.
20                               4962 Florida Boulevard
                                 Baton Rouge, Louisiana 70806
21

22   For the Defendants:        Cashe Coudrain & Bass
                                 BY:  ASHLEY E. BASS, ESQ.
23                               106 South Magnolia Street
                                 Post Office Drawer 1509
24                               Hammond, Louisiana 70404

25
```

1    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, Room B-275
2                                    New Orleans, Louisiana 70130
                                     (504) 589-7778
3

4

5    Proceedings recorded by mechanical stenography using
     computer-aided transcription software.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>**INDEX**</u>

2                                                      <u>Page</u>

3  Oral Argument

4        Ashley E. Bass, Esq.                          5

5        Gideon Tillman Carter III, Esq.              20

6        Cassandra Butler, Esq.                       21

7        Nelson D. Taylor Sr., Esq.                   31

8        Ashley E. Bass, Esq.                         46

9
   Ruling of the Court                                52
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(February 11, 2020)**

1
2
3    **THE COURT:**  Court is in session.  Be seated, please.
4          Ms. County, let's call it.
5    **THE DEPUTY CLERK:**  Civil Action 65-15556, *Joyce Marie*
6    *Moore, et al. v. Tangipahoa Parish School Board, et al.*
7    **THE COURT:**  Counsel, make your appearances, please.
8    **MS. BASS:**  Ashley Bass on behalf of the Tangipahoa
9    Parish School System.
10   **MR. CARTER:**  Gideon T. Carter III for the plaintiff
11   class.
12   **MS. BUTLER:**  Cassandra Butler for plaintiffs.
13   Your Honor, Mr. Taylor is present.  He is on his way back from
14   the restroom.
15   **THE COURT:**  All right.  As you all know, we are here
16   today to receive counsel's final presentation, essentially oral
17   argument.  In that regard, I have some questions that I wanted
18   to have addressed by counsel at the beginning of your
19   presentations, and you are able then to move on to anything
20   else that you feel necessary.  In that regard, we will proceed
21   with the proponents for the plan at issue, followed by
22   opponents to it, and rebuttal provided to the proponents.
23          In that regard, I wanted to get to the
24   proponents' resubmitted or revised plan pursuant to some
25   questions that I had, thoughts that I had on the original plan.

09:37   1    Ms. Bass, are you going to handle this for proponents?

2              **MS. BASS:**  Yes, sir.

3              **THE COURT:**  Here's the two basic questions:  First of

4    all, it's styled as a motion for -- let me get the exact

5    verbiage.  It's styled as a final agreement for the dismissal

6    of this litigation following acknowledgment by the Court upon

7    substantial compliance by the school board with its terms and

8    provisions.  That's as relates to the remaining issues dealing

9    with facilities, student assignment, faculty, employment

10   issues, staffing issues.

11             I know that the proposal that you have given to

12   the Court speaks in terms of vacating some prior plans or

13   decrees except for two that's noted dealing with some recent, I

14   think, staffing issues.  Do I take that to mean that the

15   proposal would no longer require the school system to comply

16   with those parts of plans and decrees that set certain

17   measurements; for instance, the ratio of black/white students

18   at schools along with the goals for black teacher employment?

19   Speak to me first about those issues.

20             **MS. BASS:**  Now?  Okay.

21             **THE COURT:**  I say that because, as you know, at the

22   very first hearing that we had on the original plan, I

23   mentioned that there needs to be some recognition of how this

24   particular agreement -- which has now been revised in response

25   to my thoughts about modifications, about *Green* factors, as you

09:40   1    know.  *Green* pretty much set in place, I'll call it, the road

2    map that *Brown v. Board of Education* required in the

3    desegregation of public schools.  *Green* came with the *Green*

4    factors in that regard as interpretations of that down the

5    line, in recent times as well, concerning student ratios,

6    employment goals.

7              Talk to me about how this plan achieves that;

8    and perhaps even more so, why is it a better method of

9    achieving unitary status on remaining issues than what we

10   already have.  I know it's a compounded question, but my main

11   concern is over the ratios, employment goals.  Talk to me about

12   that.

13        **MS. BASS:**  So when we were negotiating this agreement

14   with Mr. Carter, we talk extensively about each *Green* factor,

15   and as to teacher assignment --

16        **THE COURT:**  Is your mic on?

17              I'm not picking her up that well.

18              Go ahead.

19        **MS. BASS:**  Is that better?

20        **THE COURT:**  Not really.

21        **MS. BASS:**  I can speak louder.

22        **THE COURT:**  You should have a little light on the bar

23   microphone.  The bar microphone is that linear one, not that

24   one.

25        **MS. BASS:**  There's a light on.

09:41

1    **THE COURT:**  All right.  Go ahead.  Speak up.

2    **MS. BASS:**  It's red.

3    **THE COURT:**  All right.  Go ahead.

4         So when we were discussing teacher assignment,

5    of course, you look back at the original order and how we came

6    up with that.  We had the goals of 60/40, but we knew that

7    those were goals.  It's really not achievable.  So what our

8    plan was then and what our plan will continue to be is to try

9    to do the best we can to the extent practicable -- I think that

10   is the standard -- to hire as many black teachers as possible.

11   I think, as the Court knows, over the past many, many years,

12   that is what we have done.

13        This agreement calls for us to continue to do

14   all of the recruitment efforts.  We will have the mentoring

15   programs, the incentives for some teachers in certain schools,

16   so there's a lot out there.  In addition, we have this teacher

17   certification in-house, which we have not had before.  Those

18   are things that we will continue with.  There was -- oh, and

19   the contracts.  Before this year we were not able to execute

20   contracts at a job fair and now we can.  These are things that

21   make a big difference in recruiting.  So the reason this plan

22   is actually better is because we have added things into it that

23   weren't in the original Court order.

24        **THE COURT:**  I know you also have been authorized

25   by -- I guess it's the state or BESEE board to have an in-house

09:43

1    certification process, which is again another factor in not

2    only teacher hiring, but also teacher retention.

3            **MS. BASS:**  Yes, sir.

4            **THE COURT:**  We have heard evidence about that

5    already.  My thought at asking you these questions about goals,

6    percentages is really, one, to flesh out to what extent, if

7    any, the plan is going to continue the process that we have in

8    place that seeks to improve upon unitary status for those

9    areas.

10           Under the present plan/decrees, as you know, for

11   instance, in the area of employment, because of the legal

12   requirement that the vestiges of prior discrimination based on

13   race be removed to the extent practicable, the question

14   becomes, then, if you vacate that part of a prior decree that

15   said that if a black and white applicant are equally qualified,

16   then to achieve the legal requirements that I just mentioned,

17   the black applicant is given some sort of preference, how is

18   that going to fit into this particular plan if I vacate that

19   type of an order?

20           **MS. BASS:**  I think we have talked about teachers.  As

21   to teachers, we are continuing to do what we did before and

22   actually do more.  As to staff, I think what Mr. Carter and I

23   envisioned was this time period that we are going to be

24   hopefully not under Court orders but still under monitoring, we

25   will continue to do what we are doing.

As the Court knows -- and it's been in prior
reports from the court compliance officer -- in staff we are
actually doing better than we had before.  So what we put in
place for this new agreement is a grievance procedure that's
more in line with that.  In particular, if a black applicant
does not get the job, then there is an appeals process that
involves the superintendent and that job will be held open.

It's the goal of the system to not just keep
what we have already and have, I think, for maybe six years,
maybe longer, as to the 50/50 almost in ratios for
administration, but is to continue along that vein.  I think
it's also built in we have a reporting requirement and we will
have a fairness hearing.  Yes, I think it's a better plan for
the staff.  In addition, it does give some reporting
requirements.  Ms. Stilley will have a process in place to pick
the best candidate, and I think that she has been doing that.

**THE COURT:**  In regard to student ratios, how is this
plan going to improve upon existing plans/decrees to achieve
unitary status in terms of student assignments?

**MS. BASS:**  If Your Honor looks at the way the
original plan was, 876, in that plan our goal was to have 18
schools desegregated and about 8,000 students.  In the plan
that we have in place now, which is staying in place, we
actually have 22, maybe more schools -- let me check.  I had
that exactly written down.

09:47

1          We have 20 out of 32 schools in desegregated

2 schools, and we have over 13,000 students in desegregated

3 schools.  So the plan that is in place now and will continue is

4 working.  We will still have the transfers in place.  That

5 doesn't really change.  We will just continue on that vein,

6 hoping to have more funding coming into the schools so we can

7 increase our magnet programs.  That's always something we are

8 striving to do.

9       **THE COURT:**  Your opponents say that I should not

10 place blind trust in your expressed good intentions.  What's

11 your response to that?

12       **MS. BASS:**  Your Honor, I think the proof is in the

13 pudding.  I think that we have been proving this for over a

14 year certainly with Ms. Stilley, but even more than that.  This

15 is a buildup.  We have been in staffing and in hiring and

16 actually in student assignment in good faith, coming in leaps

17 and bounds forward, and that is reflected in the court

18 compliance officer's reports yearly.

19          In light of that, there has never been to my

20 knowledge -- and I think I'm right about this, but certainly

21 not in the last six years -- any opposition to a court

22 compliance officer's report since Mr. Massey became involved.

23 I don't think there was even when Ms. Guerin did.  I think we

24 have shown and in his most recent reports he shows that we are

25 in good faith in all of these areas that you are asking about.

I don't think it's just blind faith.  I think we have shown
that.

In addition, this plan makes us have a reporting
requirement, and the CDIO and the CCO will be involved in all
of those meetings and in the reporting.  All of that will be
fleshed out.  You will have reports.  You will have access to
the court compliance officer, who will have them.

Then we will have a fairness hearing at the end
where we have to show that even without Court supervision, we
have continued to do the right thing and even made more
strides.  We have also shown that in things that were in the
original Court order regarding discipline and even this family
advocacy center.  Those are things we are doing outside of the
box just like the teacher certification in-house.

**THE COURT:**  In mentioning the CDIO, the chief
desegregation implementation officer, you have changed the
title of that to something else.

**MS. BASS:**  Yes, Your Honor.

**THE COURT:**  If I vacate prior orders without some
specification in this plan regarding the appointment of a CDIO,
which would now be what, the --

**MS. BASS:**  CEO.

**THE COURT:**  CEO?

**MS. BASS:**  Yes, sir.

**THE COURT:**  Even though there's some new duties and

09:50

1   some old duties that the plan expressly keeps -- and based on

2   the testimony of our present CDIO, we went through some of

3   those examples.  His key objection, it seems, to the plan

4   appears to be the role of the CEO in the critical area of

5   employment and employment practices and processes.

6            In that regard, the plan talks about how he is

7   to have, with the superintendent and her executive team,

8   certain briefings, etc., on implementation issues.  One of the

9   duties that's not expressly mentioned in the plan that he

10  pointed out in his testimony and affidavit that he gave before

11  the hearings was the absence of any reference to his

12  involvement in the screening of applicants for hire or, say,

13  even promotion.

14           In that regard, the CCO -- we love acronyms.

15  The court compliance officer's report that you just referenced

16  and your opponents have referenced, too, acknowledges the

17  contributions made by the current CDIO in that regard: staffing

18  issues, grievance issues, and resolution agreements.  How does

19  this plan continue the CEO's role in that regard?

20           **MS. BASS:**  So it doesn't continue his role in the

21  hiring as he would absolutely have to serve on every committee.

22  Ms. Stilley will have a process in place regarding hiring

23  committees and how she wants those to move forward.  What his

24  role will be -- and I think it's outlined in his job

25  description -- is that he will be involved in the monthly

09:52
1    meetings and even weekly meetings with Ms. Stilley regarding
2    everything that's going on in the system.  He will have
3    complete access to that, and he will be able to report that out
4    to the CCO, if necessary, but certainly also have input into
5    every hire, every discipline issue, all of those things.
6              So you're correct, Your Honor, that it doesn't
7    continue the process that we have in place now, so he does not
8    necessarily have to be involved in every hiring committee, but
9    it certainly gives him a way to stay involved.  Actually, I
10   think Ms. Stilley testified that he would actually be more
11   involved in the day-to-day processes regarding what's going on
12   and have input into that.
13        **THE COURT:**  I heard that.  Am I to interpret, then,
14   that to whatever extent his current role involves the initial
15   screening of applicants -- like committees and doing interviews
16   or what have you -- and ultimately making a recommendation, if
17   he is no longer doing that sort of function, is his function --
18   by what you have described and what I heard from the
19   superintendent in her testimony, is it a role in reviewing any
20   grievances that arise out of some committee's decision
21   regarding hiring or promotion?
22        **MS. BASS:**  Well, Your Honor, I don't think it's
23   necessarily that he wouldn't be.  I think he would be giving
24   input to Ms. Stilley on those things.  I don't think it's a
25   fixed process at this point.  I think that's something they

09:53

1    will work through.  Actually, we had a meeting recently with

2    the CEO, CCO, Ms. Stilley, and myself regarding those kind of

3    issues and them working through those processes.

4              I think what Ms. Stilley envisions for the CEO

5    is that the areas where she feels like he can be most

6    beneficial moving forward is actually in equity issues and in

7    discipline issues and in mentoring issues.  Those kind of

8    things, where we are trying to move way forward with discipline

9    and those kind of things, he is an integral part of that and

10   will be.

11        **THE COURT:**  I know that among the various reactions

12   of the public to existing plans and operations, one of the,

13   I'll say, common themes throughout the public's perceptions of

14   the operations of the school system has had an underlying issue

15   concerning student discipline.  I understand that, and I

16   understand the evidence of how that's being addressed and

17   corrected, certain measures; giving the examples, for instance,

18   of a reduction in truancy, among other things, that has an

19   impact on whether or not a student is going to be a discipline

20   issue later on.

21             When we have a gray area in the plan such as the

22   role of the new CEO, formerly CDIO, I tried to convey that

23   message in the last couple of hearings about gray areas that

24   need to be expanded upon in perhaps some more detail without

25   unduly tying the hands of the system.  I don't want to get

09:55

1   involved in the day-to-day operations of the system.  That's

2   not my role.  My role here is to get involved to the point that

3   its operations are geared towards achieving, among other

4   things, unitary status in the open areas that I have already

5   mentioned.

6           I'm thinking that in line with what you are

7   saying, if I'm understanding it correctly and the

8   superintendent's testimony in that regards, it seems as if

9   there might be a need for more specificity concerning the role

10  of the CEO in regard to not necessarily initial screening of

11  candidates for employment or promotion, but at least in the

12  ultimate consideration of any grievances out of some

13  committee's decision.  It seems as if that's what you-all are

14  envisioning without saying it, but I think there may be some

15  need for further clarification.

16          Let's go on to another aspect of what you are

17  asking here.  I mentioned overall that you look upon this and

18  you entitled it as a final agreement.  Your joint motion speaks

19  of a request for entry of an order declaring Tangipahoa Parish

20  School System unitary and acknowledgment of the final

21  agreement, Rec. Doc. 1615 at 1615-2.  The agreement and the

22  motion, but perhaps particularly the agreement talks about the

23  process leading to some things that the administration would

24  like to achieve regarding open unitary status issues and how it

25  would propose doing it.

09:58

1          This sounds like a process or a new plan.  All
2    right.  It sounds like basically a modification of existing
3    plans.  I, for one, would have some reluctance at simply doing
4    a blanket dissolution or vacating of existing plans.  I could
5    see components of existing plans that would not be inconsistent
6    with the plan that you propose, but I think there needs some
7    more specificity in that regard, to give you an example of one.
8          I look upon this that as opposed to vacating
9    prior injunctions, decrees, existing plans as basically either
10   an extraction of things that could fit into this plan as a
11   modification or, even to the extent that it's not inconsistent
12   with this Court's responsibilities, a suspension as opposed to
13   vacating of certain components of existing plans or decrees.
14         Your own agreement calls for the Court to still
15   have a monitoring function, calls for the CCO, the court
16   compliance officer, to have a serious responsibility, the CDIO
17   or CEO, and for ultimately a review process for the Court to
18   consider at a fairness hearing whether or not final unitary
19   status should be declared.
20         I don't view it as a declaration of final
21   unitary status as opposed to a provisional declaration, sort of
22   like we have done before in the area of student assignments, to
23   give the parties an opportunity to work things through to
24   achieve that unitary status, final unitary status.  Am I wrong
25   in that interpretation?

10:00

1    **MS. BASS:** I don't think that you are wrong in your

2    interpretation, Your Honor. I think maybe Mr. Carter can

3    address it with us. What we came up with in our negotiations

4    was that we would like the Court to declare us unitary, but

5    with a period of three years and at the end -- so that the

6    Court orders would be vacated so we can show the Court and the

7    public that we are capable of doing the right thing for three

8    years. At the end of those three years, we would have this

9    fairness hearing where the case would be dismissed. That is

10   what we envisioned.

11           **THE COURT:** How is that different from what I have

12   done already?

13           **MS. BASS:** "Done already" like what you are just

14   talking about?

15           **THE COURT:** I have declared unitary status with a

16   proviso for a review after, what, I think a year or two, and I

17   might have extended it.

18           **MS. BASS:** I think for facilities it was two years,

19   and then that two years was up in July. We didn't move for

20   that because we were in the process of all of this --

21           **THE COURT:** Right.

22           **MS. BASS:** -- and I think the same for staff

23   assignment.

24           **THE COURT:** Right.

25           **MS. BASS:** We don't have provisional unitary status

10:01

1  in teacher assignment or student assignment because we are

2  under our new plan.

3           **THE COURT:**  Right.

4       **MS. BASS:**  I think we are saying the same thing.

5           **THE COURT:**  I turn it over to you now.  I'm done with

6  my questions for now.

7       **MS. BASS:**  I think that we are saying the same thing,

8  but that is what we envisioned.  I'm certainly open to

9  Mr. Carter giving us any comments.

10          With that said, Your Honor, we have heard a lot

11  of testimony here.  We have been through a lot of

12  documentation.  We have been through a lot of evidence, and we

13  have been through a lot of time.  This agreement did not come

14  overnight.  As I said earlier, it actually came over many, many

15  years, but more importantly last January -- so over a year --

16  we started really negotiating how we could come to this

17  agreement.  With much gnashing of teeth by both sides, this is

18  what we came up with.  We think that it does the best for both

19  sides.

20          In particular, we have talked about and

21  Your Honor mentioned what we have to show to be unitary, have

22  we fully and satisfactorily complied in good faith with the

23  Court's order.  I think that based on reporting and on

24  Your Honor's own rulings that we have shown that in the areas

25  we are still not completely unitary in.

10:03

1    In facilities, your ruling was that we were in
2    good faith, our facilities were comparable, all of them, and we
3    went through a long exercise in that.  The same in staff; we
4    have shown for many, many years that we have been in
5    compliance.  Actually, the original Court order says that once
6    you have achieved these goals, you don't even have to continue
7    that process.  We have continued it and not stopped doing that
8    process.  So in those ways we feel like that is showing our
9    good faith and that we are actually in compliance and should be
10   unitary in those areas already.
11           I think what the Court wanted was for us to come
12   up with a plan that would solve the whole thing, and that's why
13   we did this.  We have demonstrated our good faith efforts in
14   all those ways.  In addition, we have added to that, as we
15   talked about, the family advocacy, doing more for teacher
16   certifications, doing more in every way, doing more for
17   staffing, doing more for student assignment, and actually
18   achieving and exceeding the goals in student assignment, which
19   we think will continue with this agreement.
20           As Your Honor said at our last hearing, at some
21   point this case does have to end.  We think we are in a
22   position at this time -- and with consent of counsel.
23   Mr. Carter was appointed by you, as was I, to negotiate this
24   agreement, and that's what we have been doing.  That's where we
25   are.  We certainly have been in compliance on most areas, if

10:04

1   not all areas, to the extent practicable on teachers, exceeding

2   the other goals.

3           So, yes, we are asking that you declare us

4   unitary but with the continued monitoring, and at the end of

5   this we will have a fairness hearing.  During that time there

6   are grievance procedures in place.  I think Ms. Guerin even

7   talked about that at our first hearing.  Yes, that's what we

8   are asking for, and we think we will have fully complied in a

9   way that that should be granted.  I would like to reserve some

10  time for rebuttal.

11          THE COURT:  All right.  That's fine.  Thank you.

12          Mr. Carter, do you want to be heard on any

13  aspect of this or my questions?

14          MR. CARTER:  Your Honor, I will make a few comments.

15          Your Honor, we have been working on this, I

16  think I can say, since you made the appointment back in, I

17  think it was, 2015 designating Ashley and I as settlement

18  counsel.  In formulating this final agreement, we did take into

19  account Document 876 and what happened in court in the trial

20  back in, I think it was, 2009 and 2010.  We also considered the

21  Court's most recent rulings, late 2018, early 2019 regarding

22  facilities, student assignment, and I believe teacher

23  assignment and hiring.  All of that was considered in

24  formulating this agreement.

25          Even though the agreement does anticipate that

10:06

1   the Court will give the system unitary status, the system does

2   realize that going forward they still have a responsibility.

3   As I've told them since my very beginnings in this case,

4   "Gideon Carter cannot declare you unitary; only the judge can,

5   only the Court can, and only after a hearing."  So even though

6   this agreement may be approved by the Court, the system

7   understands and we have had extensive conversations about them

8   continuing to have the burden of proof before this Court would

9   rule on any sort of designation of unitary status.  All of

10  these factors have been considered.

11              **THE COURT:**  Thank you.

12                   Let's hear from opponents.

13          **MS. BUTLER:**  Good morning, Your Honor.

14              **THE COURT:**  Good morning, Ms. Butler.

15          **MS. BUTLER:**  May it please the Court.  I would like

16  to reserve some time for Mr. Taylor, so I will try and be real

17  brief.

18              **THE COURT:**  All right.

19          **MS. BUTLER:**  Based on the questions that the Court

20  asked, you pretty much addressed, Your Honor, the main things

21  that I wanted to bring out in terms of our objection, the crux

22  of which is if the Court grants unitary status, protections

23  that are in place by the orders and injunctions would be lost

24  according to the proposed order that has been submitted by

25  defendants.

 1          I'm not saying that the Court would write an

 2   order exactly as they submitted it, but that is in fact the

 3   objective, and that's the problem that I have, Your Honor.

 4          The final agreement is --

 5          **THE COURT:**  On that point --

 6          **MS. BUTLER:**  Yes, sir.

 7          **THE COURT:**  Unless you're still on that point.  Are

 8   you going to something else?  Let me stick to that first point

 9   concerning existing decrees, injunctions, existing plans,

10   whether it's 876 or anything since or after, or before even.

11          If the Court were to suspend its existing

12   decrees, orders, and injunctions, but extract from them certain

13   aspects dealing with the areas that I questioned your opposing

14   counsel on just now, what impact would that have on improving

15   perhaps the process for unitary status?  Given what we see in

16   not only the report, but you have pointed out certain aspects

17   of, for instance, other evidence that you believe this Court

18   should consider like the CCO's recent report, who acknowledges

19   basically the good faith of all the parties involved: your

20   side, their side, everybody.  It acknowledges the work of

21   certain individuals like the CDIO.  It acknowledges the school

22   system's improvement in certain areas like staff assignments,

23   its plan for facilities, its plan for improving the hiring of

24   black teachers, which we touched upon earlier.

25          What's your response on, one, the question of

10:10

1   good faith?  Because that's important for the Court to

2   consider.  Are those examples evidence of good faith?  I seem

3   to have gathered in one of the memos that your side submitted

4   that, yes, it appears to be some improvement, but your side

5   feels as if there needs to be more time to see the overall

6   impact of those improvements on unitary status.  Isn't that

7   what this plan is asking me to do?

8           **MS. BUTLER:**  It is, but it required -- well, I

9   shouldn't say "required."  They are also asking you to take out

10  the protections in place.  So if you say that you are going to

11  extract from the orders and leave some things in place that

12  says, for instance, in the hiring process -- right now, as it

13  is under the existing order, we have a clear path.  The new

14  plan or the final agreement, as it is called, basically says

15  that Ms. Stilley is going to make the final decision.

16              We don't have a committee.  The committee makes

17  a recommendation to her, but she would make the final decision.

18  We don't have to go through whether the black applicant was the

19  best qualified, evenly qualified, any of the above.  The remedy

20  for the person who is not selected is then to go back to the

21  very same person who made the decision; not to say that there

22  is anything wrong with that, but that defeats the whole

23  purpose, Your Honor.

24          **THE COURT:**  Wouldn't they still have to report those

25  things to the CCO?

10:12

1     **MS. BUTLER:**  Yes.

2     **THE COURT:**  If the CCO sees a problem with their

3  selection or process towards selection, then wouldn't the plan

4  allow me, as the ultimate monitor, to review that decision?

5     **MS. BUTLER:**  So then we have an additional step.  The

6  initial review is by Ms. Stilley, and at that point the

7  position stays open.  If it does not go the way the applicant

8  chooses, then they go the other route, which takes additional

9  time.

10     Your Honor, I would contend that that adds more

11  burden to the applicant than necessarily should be added.

12  Granted they will be heard at some point, but how long down the

13  road?

14     **THE COURT:**  My biggest concern, in prior history with

15  the school system, has been the appointment of someone while

16  the grievance process is still in place to determine whether or

17  not that hiring decision complies with the objectives of the

18  unitary status orders.  That, according to the CCO's report at

19  least, has changed.  Admittedly, I have sustained the CCO's

20  objections to certainly hiring decisions, but at least it came

21  into a position where it clears up that earlier problem.

22     Look, I think the worst thing that we could do

23  to anyone -- whether it's a student, a teacher, a staff person,

24  or what have you -- is to say, "Okay.  You have got this

25  job" -- at least the system, "You have got this job," but yet

10:13

1  the Court comes in and says, "Oh, no.  Wait a minute.  This

2  doesn't comply with our unitary status orders."  We then have

3  to either remove that person or create, as you say, another

4  step, another process in getting the error corrected.

5        MS. BUTLER:  Under the agreement as I understand it,

6  Your Honor -- and I could be incorrect -- that process that

7  you're describing is not part of that plan directly.  My

8  understanding is the person --

9        THE COURT:  You mean the plan being proposed?

10        MS. BUTLER:  Correct.

11        THE COURT:  Right, right, right.  Well, that's

12  perhaps one of those gray areas that I spoke about earlier even

13  though Ms. Bass -- and Ms. Stilley, according to her

14  testimony -- was to abide by those goals.  It seems to me as if

15  maybe further specificity in that regard might be helpful.

16        MS. BUTLER:  I think the other part of your question,

17  Your Honor, was perception of good faith.  I cannot, with all

18  honesty, say that it's good faith or bad faith.  I can say that

19  based on -- as Ms. Bass indicated, there was no objection to

20  the compliance officer's report, and he indicated that the

21  complaints in his last report are pretty much the same as they

22  were the year before in terms of numbers, in terms of the

23  nature of complaints.  Some things were down; but by far and

24  large, there was not a whole lot of change.

25        THE COURT:  Should the Court be concerned with the

10:15

1    number of the complaints or those complaints that have been

2    sustained or overruled?  Many of the complaints, according to

3    the CCO's report, did not even deal with issues that this Court

4    has jurisdiction over, and that in many instances the fact that

5    we had an increase perhaps in complaints may come from again --

6    the CCO's report that your side has relied upon in part says

7    that it's perhaps because of the transparency now and the

8    confidence that the public has in the current administration.

9    **MS. BUTLER:**  When I read that, Your Honor, I took it

10    to understand he said that the numbers had increased

11    significantly, but the ones that were valid were pretty much

12    the same; and that because of the involvement of the CDIO and

13    the compliance officer, some of them were resolved in-house

14    because they were able to address them on the front end.

15    Perhaps my perception is a little bit different from where I

16    sit, but what that tells me is we still have the same issues,

17    Your Honor.

18    **THE COURT:**  Well, I could see the valid points you

19    made concerning an interpretation of the CCO's report, and I

20    don't disagree with it.  But at the same time, I don't think

21    that I should make a decision on the number of complaints that

22    someone might have against the system as opposed to those

23    complaints that really pertain to unitary status issues as well

24    as to what extent, if any, the system is addressing those that

25    do pertain to unitary status.

10:17

1          I don't see where the evidence of bad faith
2   comes in with who is operating this system right now.  I hate
3   to say it's just one person because, as you know, it takes a
4   whole bunch of other people, too, including the board, her
5   bosses.  Right?
6          **MS. BUTLER:**  Correct.
7          **THE COURT:**  The real question in my mind is to what
8   extent, if any, a decision is made by the superintendent, let's
9   say, dealing with facilities -- because to me facilities and
10  student discipline issues are the two biggest concerns that I
11  see throughout the public's perceptions of its school system,
12  dealing with facilities and student assignments, particularly
13  as it relates to the unitary status issues, communities that
14  may be predominantly black or white or what have you, and its
15  relationship between that and unitary status.
16          The CCO's report talked a lot about individuals
17  who have advanced this plan and advanced the whole process
18  towards unitary status.  It mentions a former president of the
19  board, Ms. Domiano.  It references the CDIO in the grievance
20  process.  It references Ms. Stilley and her new directions in
21  all those areas, as well as her staff in all those areas.  It
22  references some community advisors.
23          The biggest concern, if I was playing devil's
24  advocate up here, would be if she proposes something that
25  advances all of these goals and the school board says, "No, we

10:19    1    are not doing that," for instance, her facilities program.  Her

2    facilities program is a very bold program and, frankly, from

3    hearing from the representative from that company, CSRS --

4         **MS. BUTLER:**  Mr. Rutledge.

5         **THE COURT:**  Uh-huh.  He seems to be very experienced

6    in this area.  Even though, as you point out, the contract may

7    exclude or may not have them getting involved in the unitary

8    status issues, he is very mindful of and he says that his

9    company is committed to working to be in compliance with that.

10    If that's found to be error later on, I will be in it on all

11    fours like I have been sometimes before.

12         At the same time, if they come up with a plan

13    that calls for an electoral vote to finance that plan, and the

14    superintendent and the board does everything practicable to get

15    that financing done and it's rejected again by the voters -- as

16    they have already done, what, twice, I believe.

17         **MR. TAYLOR:**  Three times.

18         **THE COURT:**  Is that not then an indication that the

19    system has done all that's practicable to achieve unitary

20    status in the area, say, of facilities -- because that's where

21    most of the money is going, facilities, on a vote, I imagine,

22    and teacher pay raises.

23         **MS. BUTLER:**  It would depend, Your Honor.

24         **THE COURT:**  Is that not jeopardizing your clients'

25    interest in maintaining that more could be done?  If more can't

10:21

1  be done without financing, then where does it put us?

2         MS. BUTLER:  In a bad place.

3         THE COURT:  Yes.

4         MS. BUTLER:  I think, Your Honor, based on the

5  history that we have, unfortunately, the fact that the board

6  puts forth a referendum for a tax election is not the only

7  thing we have to look at.  We know in the past we have had

8  board members going to community meetings saying, "Well, gee,

9  guys, we are doing great without putting any money into the

10  school.  We are a C school, and we don't have to get taxes."

11  So if I put forth a tax proposal, I have to in good faith at

12  least go out to the public and say, "We need the taxes."

13         THE COURT:  Well, if that was a majority of the board

14  doing that, you would have a good point to argue bad faith.  As

15  I recall, that was a minority of the board that was sufficient

16  enough to, evidently, with other groups --

17         MS. BUTLER:  But he was the president of the board at

18  the time, Judge.

19         THE COURT:  In fact, other groups that necessarily

20  aren't aligned with the board members who are opposing the tax,

21  who are more aligned with your side.  I recall that after 876

22  and that order.

23             Again, as you say, we are in a bad place if the

24  majority of the board and the administration has done

25  everything practicable to achieve unitary status and their

10:23

1    efforts in that regard is rejected by the voters.  It's a bad

2    place, as you put it, and I agree with you.  Again, if you look

3    at the law in that regard, it uses that exact language, "as

4    much as practicable."

5              We talked years back about the so-called atomic

6    bomb and saying, "Okay.  We are going to revamp this whole

7    financing structure," but in looking at the authority for doing

8    that and the Court saying, "Okay.  Citizens of Tangipahoa

9    Parish, you are going to pay this tax," I didn't have that

10   authority.  I wish I did, and that way all the focus of

11   attention would have been upon me as opposed to the people who

12   are trying to run a school system and those who are trying to

13   help, plaintiffs and defendants as well.

14        **MS. BUTLER:**  I can go out on a limb and say if the

15   board in good faith went out --

16        **THE COURT:**  If I had the authority to do it, you know

17   I would do it.  I said it before.  I called it the atomic bomb.

18   Guess what?  My friends next door and the one or two friends I

19   might have in D.C., they said, "Judge, you have no authority to

20   do that," no legal authority.  Anyway, I know I digressed you

21   from your argument.  I'm sorry.

22        **MS. BUTLER:**  You did, but that's okay, Judge.  Thank

23   you.

24              The only thing I would add to our discussion,

25   Judge, is if the heart of our opposition is, in fact, the fact

10:25

1    that you would vacate the orders and injunctions, and you

2    indicate that to the extent that you accept some part of the

3    plan and can commingle the two that our protections are still

4    in place, so that until or unless the Court declares the school

5    board unitary then we have the processes in place to address

6    any concerns that arise, then I think that however we go

7    forward with those protections in place is what we are looking

8    for, Judge.

9              Ultimately, I think everybody in this room wants

10   our school system to do better.  Our children deserve it.  Our

11   community deserves it.  We have been fighting this battle for a

12   long, long time, Your Honor.  So we are not opposed to anything

13   that's going to work, but it has to be reasonable, and we can't

14   give up the whole bank just to get one or two pieces of the

15   pie.

16             I'll leave Mr. Taylor with the remaining time.

17        **THE COURT:**  Thank you.

18             Mr. Taylor, I know you are experiencing some

19   physical issues.  Do you want to pull that microphone before

20   you and you can sit down and give your argument?

21        **MR. TAYLOR:**  I can, Judge.  That would be very

22   helpful, Your Honor.

23             Where is the microphone?

24        **THE DEPUTY CLERK:**  I don't see one on the table.

25        **THE COURT:**  It was there.

10:26

1          **MR. TAYLOR:**  I think I can walk around, if I can get

2     over there.

3          **THE COURT:**  It's on.  I hear it.

4          **MR. TAYLOR:**  Since I've gotten up, it would be easier

5     to stand right here, if I could.

6               Judge, I enrolled in this case in 1974.  Since

7     that time, I have filed over a hundred civil rights cases

8     before this Court.  I have lived in that parish.  I have

9     pastored churches there.  I know the people there.  My

10    opposition to this plan that's being presented is not based

11    upon there's nothing good in it.

12              As a matter of fact, I think parts of it -- for

13    example, certification of teachers, family advocacy -- there's

14    nothing inconsistent with what's there.  The Court orders do

15    not stop this school system from functioning.  It does not stop

16    it from being innovative.  It just stops it from doing

17    discriminatory things.  I have no problem with some of the

18    things there.  The idea that the plan is based upon, you know,

19    "be great," that doesn't say anything to me as to what they are

20    really going to do with facilities, what they are really going

21    to do with the things that they have to deal with with the

22    *Green* factors.

23              For example, we have been through this facility

24    stuff before.  There have not been just two taxes that have

25    been repudiated by the public, there are three, and so we are

10:28   1   now going to the fourth.

2               The idea that Mr. Rutledge talked about -- and

3   he is experienced, but I want to know, as an attorney for the

4   plaintiff, what are you going to do.

5               **THE COURT:**  Did you support any of those taxes?

6               **MR. TAYLOR:**  Any of those what?

7               **THE COURT:**  Any of those tax proposals?

8               **MR. TAYLOR:**  Tax proposals?  I didn't oppose them.  I

9   didn't oppose anything.

10              **THE COURT:**  How can we best address the community's

11  concerns over the best use of its taxes, particularly for

12  financing the school system's capital as well as operational

13  needs, and in the light of what I said earlier, advancing the

14  goal for unitary status?

15              **MR. TAYLOR:**  Judge, I asked Superintendent Stilley a

16  couple of questions.

17              If I may disagree with the Court about what the

18  law is, you are correct, as a judge in federal court, you don't

19  have the authority to set a tax, but you do have the authority

20  to order the school board to set a tax.

21              If they have a plan, I just want to see the

22  plan.  If they have a plan that would bring us to where we need

23  to be -- and certainly there's no question.  You have temporary

24  buildings that have to be removed.  You have increased students

25  coming into the system.  As a matter of fact, you have half

10:30

1    of -- I think we have been through this before, discussed it

2    before, either I did it with you or with a judge in the

3    Middle District, lay judge in the Middle District.  You have

4    got people coming all across the zone into Tangipahoa Parish.

5    Here's the problem.

6         **THE COURT:**  You recall the Court did approve and

7    direct the system to propose taxes.

8         **MR. TAYLOR:**  Uh-huh.

9         **THE COURT:**  So if we do that again, my question still

10   is:  How can we best help the citizens of the Tangipahoa Parish

11   School System understand the needs of the system for this new

12   tax?

13        **MR. TAYLOR:**  Judge, I don't know whether you can ever

14   get somebody to understand the need for taxes.  I never

15   understood it.

16        **THE COURT:**  I don't like the taxes I pay, but I

17   somehow vote for elections when I think it's got a good

18   purpose.

19        **MR. TAYLOR:**  Here's the problem, Judge.  *Brown v.*

20   *Board of Education* just upset everything.  What happened is

21   that this system for years built an infrastructure.  They had

22   black bonding districts and white.  They built an

23   infrastructure that created what you see today, the remnants of

24   that segregated school system.  The citizens did that.  It

25   wasn't just the school board.  The school board are elected

10:31

1    representatives.  The citizens of that parish did that.

2              What we have today is what the citizens and

3    their representatives have put in place.  What they have put in

4    place is a system where you have a bunch of temporary buildings

5    that maintain segregation.  You have all of these things in

6    place.  Now, you are saying, well, the citizens decided that

7    they don't want to vote to remove what the citizens have

8    historically done.  I think the Court does have authority and

9    there is authority for it.

10             THE COURT:  You make a point in your opposition memo

11   about that issue of facilities and temporary buildings or

12   portable units or whatever they are called.  This plan that

13   they have with the consulting firm, the architectural firm that

14   we had the gentleman testify to, he described in that regard

15   that they are hiring or have hired a demographer because the

16   school board feels as if, with increasing populations, there's

17   going to be an increasing need to handle increasing student

18   populations, and that that's going to require new facilities, a

19   better retention for teachers by giving them pay raises.

20   There's a bunch of things that's all inherent in that.

21             Your objection to their facilities proposal for

22   unitary or provisional unitary status is that it sounds good,

23   it looks good -- and I may be paraphrasing your argument -- but

24   we don't know yet what its impact might be or how it would

25   look.

10:33

1          MR. TAYLOR:  Yes, sir.

2          THE COURT:  Even more importantly than that is really

3    will citizens buy into it by saying, with whatever concerns

4    they have over pocketbook issues, "We have to decide whether or

5    not we are going to approve of this plan by financing it."

6          MR. TAYLOR:  Judge, at this point, 50 years before

7    this Court, I think it's time to end this case.  I don't have

8    any problem with ending it.  I don't have any problem with new

9    facilities and doing everything that needs to be done.  What I

10   have a problem with is that the responsibility of this Court is

11   to see to it not only do you eliminate the vestiges of the dual

12   system, you make sure that you don't do something else to make

13   it put it back in place.  I'm simply saying that the Court does

14   not have sufficient information to reach that conclusion, to

15   give them unitary status and allow them to go build everything

16   they want to build.  We have had that problem.

17         THE COURT:  Isn't that same problem existent if the

18   Court declares unitary status, as it's done in other cases?  It

19   declares unitary status.  There's always going to be a

20   potential problem -- I won't say an actual problem, a potential

21   problem that once unitary status is declared that there may be

22   people who might want to revert back to the "good old days," as

23   they called it, not for us but for them.  In that sense, that's

24   always going to be a problem.

25              Here the question really becomes to what extent,

10:35

1   if any -- as you put it and as Ms. Butler put it, there are

2   some good aspects of this plan.  Admittedly, some of it we are

3   not certain yet what the impact is going to be because if part

4   of the plan is going to require additional revenue and it

5   doesn't come to fruition, then we are back in, as Ms. Butler

6   put it, a bad place, meaning we have to rethink all this.  What

7   do we do?

8            MR. TAYLOR:  Your Honor, I'm simply saying that this

9   Court is in the position now to give the school board the

10  latitude with their consultant to put before the -- "Here's

11  what we want to do.  We want to build a school."  That's what

12  the original plan was; we are going to build schools here,

13  build schools there.

14            THE COURT:  Right.  876.

15            MR. TAYLOR:  876.  The public threw it away.  Okay.

16  Now we are back here again.  I present to the Court that the

17  same thing -- the school board says that they are in good

18  faith.  I don't have any reason to doubt it.  Ms. Stilley says

19  she is in good faith.  Ms. Stilley testified that she doesn't

20  object to the Court ordering the school board to get their plan

21  out there.  "Here's what it's going to cost.  You have a duty

22  to do something to desegregate the system to the max.  You did

23  to the max to keep it segregated."

24            This community is not just the school board or

25  Ms. Stilley.  It's a community that has a responsibility to

10:37

1   eliminate the vestiges of the dual system.  That's a whole

2   community.  Now, they have had chance enough, and I don't know

3   of anything in the law that prevents the Court from --

4           THE COURT:  Did you just say that somebody has done

5   something to the max to keep this school system segregated?

6   Who?

7           MR. TAYLOR:  Before *Brown*, it was to the max.

8           THE COURT:  Okay.

9           MR. TAYLOR:  Things done since then have been to

10  retard the full development.  We were here in 2020 and nobody

11  denies that there's still vestiges there.  There are vestiges

12  in facilities.  When you talk about faculty, hiring of faculty,

13  this subjective stuff -- that's why the orders that are in

14  place are there, because of this subjective stuff, who is the

15  best qualified.  The best qualified moved the system from

16  40 percent black teachers to now just over 20, if it is 20.

17           The other thing, Judge, that has not been

18  brought up -- you brought two points up.

19           THE COURT:  When was the system 40 percent black

20  teachers?

21           MR. TAYLOR:  In the beginning it was 40 percent

22  black.

23           THE COURT:  That was the goal.

24           MR. TAYLOR:  No, it was 40 percent black in 1964.

25           THE COURT:  You're talking about '64, but --

10:38

1          MR. TAYLOR:  In 1970 it was 40 percent black.

2          THE COURT:  I didn't see those stats.

3          MR. TAYLOR:  That's where the 60/40 came from,

4    restoring back into the system --

5          THE COURT:  That was a goal.

6          MR. TAYLOR:  No.  That was a goal --

7          THE COURT:  You have to show me --

8          MR. TAYLOR:  The goal was to restore --

9          THE COURT:  You are going to have to show me the data

10   supporting that statement.

11         MR. TAYLOR:  Okay.  The goal was to restore back into

12   the system --

13         THE COURT:  I approved of that.

14         MR. TAYLOR:  No, you didn't --

15         THE COURT:  I approved of a 60/40 percent system.

16         MR. TAYLOR:  It was approved before you, Judge.

17         THE COURT:  I also issued orders --

18         MR. TAYLOR:  You approved it.

19         THE COURT:  -- to that effect, yeah.

20         MR. TAYLOR:  You reinstated it.

21         THE COURT:  Yeah.

22         MR. TAYLOR:  You said that's still the figure and the

23   goal.

24         THE COURT:  Yeah.

25         MR. TAYLOR:  Originally, 40 percent of the teachers

10:39

1   in the system were black.  40 percent.

2              THE COURT:  You need to show me that statistic

3   because that's an interesting part of history that I didn't see

4   in this record.

5              MR. TAYLOR:  Yes, sir.  It goes way back.  Look at

6   the old order.  60/40 was the original goal.

7              THE COURT:  Yeah, I agree.

8              MR. TAYLOR:  That was a goal of restoration.  It

9   wasn't new.

10             THE COURT:  I think we are disagreeing on semantics,

11  but go ahead.  What else?

12             MR. TAYLOR:  Judge, since I've gotten into this, you

13  hit me saying I had plenty of time.  I didn't know nothing

14  about what they were doing.  They sent me something in

15  August -- and we won't get into it because I tried to avoid

16  getting into it.  I think several times I have mentioned stuff

17  to you.

18             Be that as it may, this system, not only in

19  terms of goals for desegregation, you have academic problems on

20  the black students that are atrocious.  Nobody is talking about

21  that.  You have an order out there that says I can't talk to

22  anybody on the administrative staff.  I don't know why.  I

23  can't talk to principals.  There are people out there who have

24  information that I can't get.  I wanted a chance to get to some

25  of that.  If you look at the state statistics about what's

10:40

1    happening to black students in this system --

2            THE COURT:  The law provides a process for you to do

3    that.  Just like any legal case, a lawyer for the other side

4    cannot just willy-nilly go and talk to the other side's

5    clients.

6            MR. TAYLOR:  Judge --

7            THE COURT:  That's a rule of lawyer conduct.

8            MR. TAYLOR:  Judge --

9            THE COURT:  That's been in existence in other cases.

10           MR. TAYLOR:  Judge --

11           THE COURT:  I looked at that in terms of the

12   St. Landry Parish school deseg case, the Lafayette Parish

13   school deseg case, and all it is is reinforcing the typical

14   rules of lawyer conduct.  That's not what we are here about

15   right now.

16           MR. TAYLOR:  No, no, no.

17           THE COURT:  We are here dealing with this plan and to

18   what extent is this plan an improvement on what we have here,

19   can it be modified even further to make it better, what parts

20   of it -- as I told, at the very beginning, Ms. Bass and

21   Ms. Butler, I'm not inclined to vacate all prior orders and

22   decrees like 876.  I am inclined to consider is it possible to

23   extract certain portions of those prior orders and decrees in

24   the existing plan to make this plan something better than we

25   have right now.  That's basically my question to all of you.

10:42

1        **MR. TAYLOR:**  Judge --

2        **THE COURT:**  What can I do to either make it better or

3  what can I do to just simply say -- as you put it, you said,

4  well, maybe I should refine certain things.  Help me understand

5  what I need to do that you think, in your opinion, would help

6  either this plan to make it better or something else.

7        **MR. TAYLOR:**  Judge, I think we start from the point I

8  don't know what's wrong with the plan that we have, which has

9  been developed over negotiations over a period of time,

10  reviewed by the Court.  That's what we have in place.

11        **THE COURT:**  You're talking about 876?

12        **MR. TAYLOR:**  876 and all the other things.  When the

13  Court initially began in this case, it began with the coach,

14  and then we went from there.  One of the things the Court said

15  is that passage of time does not negate the responsibility to

16  comply with the orders of the Court.  When the Court issued

17  that superseding or overriding order that it issued, it made

18  clear that it was retaining things that were not inconsistent

19  with that.  It brought us a long way to get to this point.  Not

20  only that, Judge --

21        **THE COURT:**  Let me ask you this.  I'm not going to

22  stop you from finishing up your point.

23        **MR. TAYLOR:**  Yes, sir.

24        **THE COURT:**  Let me ask you this.  I asked Ms. Bass

25  about the ratios concerning students.  I asked Ms. Bass about

10:43

1    the goal of 60/40 for teachers.  We talked a little bit about

2    facilities.  You brought up some other things, too,

3    particularly 876 as it relates to facilities perhaps.  What am

4    I missing that I should also consider?

5            MR. TAYLOR:  Your Honor, I think you should also

6    consider getting some more information.  The court compliance

7    officer, the CCO, I just don't think you have enough

8    information about certain areas.

9            I just filed a complaint yesterday about

10   something dealing with teachers.  I don't think they understand

11   the issue.  I would really urge that, you know, with respect to

12   the current complaints that are out there -- the process was

13   not a best qualified process.  You have eliminated so many

14   black teachers out the system historically.  For a lot of

15   reasons you might not be getting black applicants, but if a

16   black applicant is qualified -- you first determine whether

17   they are qualified.  If that black applicant is qualified, you

18   hire that black applicant.

19           It's not best qualified anymore.  That's how

20   they did it in the first place.  It's not best qualified.  You

21   determine whether that black applicant is qualified.  Once you

22   determine that black applicant is qualified, you hire them

23   until we get to 60/40 unless -- and we conceded this -- unless

24   you have some super-duper, outstanding white candidate you just

25   cannot let go.

10:45

1          That's what it was supposed to be, but it's

2    become something else.  It's become best qualified just like it

3    was when the coach was denied.  "Well, you're not the best

4    qualified by the subjective standards."

5          **THE COURT:**  Well, the Court has had to step in not

6    only in the coaching situation, but in other situations to do

7    exactly what you just said, and that is to say hire and give

8    preference to that black applicant who was not hired and at

9    times when -- as you know, under threat of contempt from the

10   Court, I said this process of hiring someone, putting them in

11   the position while the grievance process is still running its

12   course and a Court review has not been made yet has to stop.

13   I've seen that stop recently, at least under this

14   administration.

15          Now, you point out that, okay, that's well and

16   good, but is that going to continue under this plan, to assure

17   that that black applicant is hired or promoted.  In that

18   regard, I ask you again:  What should I put in this plan,

19   either adopting parts of 876 or anything else, that would

20   assure that process?

21          **MR. TAYLOR:**  Judge, what you already have in your

22   existing order should be added.  Number one is the process.

23   The Court says that even when the CCO finds against you, you

24   have a right to proceed with other avenues.  That's not in that

25   order.  You can go to a court.  There are arbitration

10:47

provisions in that order.  I raised them.  Somebody disagreed
with them, but that's for a teacher to decide.  Those kinds of
things, you have avenues other than to wait for them to do
something.  I think that should be in the order.

I think the provisions that remove subjectivity
from the hiring process are just good.  I don't know if we can
keep them forever, but I don't know that enough has happened in
this system for the judge to remove all of those things
altogether.  That's why you put that order in there.

We heard what you said what you want to do.  As
a matter of fact, we have some current experiences about how
the current administration is interpreting what they are going
to do.  They are doing what they want to do now.  I simply ask
the Court to take a look at it.  Take a look at it.

I wasn't involved in this process, but if I had
been involved in this process, I would have recommended -- and
I sent Ms. Bass a note -- that we need a superintendent in
charge of minority affairs in this system to deal with the
academic problems of this system.  They have people who can do
it.  We need somebody like that.

We need a chief academic officer that will
address this atrocious performance of black students -- and not
only black students, white students as well.  It's atrocious,
Judge.  I haven't had a chance to flesh it all out to give it
to the Court, but I was going to flesh some of it out.  I

10:48

1    recommended somebody go talk to the CCO, but it's atrocious.

2                    I think at this point this Court does have
3    authority to ask the school board, "Okay.  What is it you want
4    to do?  What other schools do you want to build?"

5                    You had Mr. Rutledge up here.  They haven't
6    started doing the plan, but at some point they are going to do
7    one.  I simply want this Court to review it.  That's all.
8    That's all.  To review it.  Also, burden of proof.  What's the
9    burden of proof on all this?  You eliminated all the lawyers.

10                   The standard of proof is that they have the
11   burden to show by clear and convincing evidence -- and that's
12   not unfair; it's based on their conduct -- clear and convincing
13   evidence that what you are doing is nondiscriminatory.  Add
14   that and I'm happy.

15           **THE COURT:**  All right.  Thank you.

16                   Rebuttal.

17           **MS. BASS:**  Your Honor, Mr. Taylor made a lot of
18   comments about 876.  I think if Your Honor looks at 876 and you
19   go through the *Green* factors in 876, you would see that
20   actually we have been more than in compliance in facilities, in
21   student assignment, in staff assignment, in teachers.  We have
22   provisional unitary status and have for years in facilities and
23   in staff and have exceeded the goals.

24                   Your Honor found in facilities that we had
25   complied, we were in good faith.  That is in your orders.  That

10:50

1    was a two-year provisional, which was up last July.

2              In staff we have exceeded the goals for many

3    years.  876 says once you meet the goal of 60/40, you no longer

4    have to do this process.  It's just done.  Well, we have been

5    at 50/50 for years, and we are still doing the process.

6    Ms. Stilley is not going to change the process.  It's going to

7    continue on and she is going to make the right decisions, as

8    she has done and as -- actually, we have been 50/50 for years.

9    That is not even accurate that we have not complied with 876.

10             As to teacher assignment, the 60/40 was the

11   student ratio at the time, the student ratio at the time, and

12   that's where the 60/40 came in.  There weren't 40 percent black

13   teachers and we got rid of 20 percent.  That's just not

14   accurate information, Your Honor.

15             In fact, we have not not hired a black teacher

16   in years.  We hire every certified teacher that comes.  It is a

17   nationwide problem that we don't have enough certified

18   teachers, black or white.  It is not unique to Tangipahoa

19   Parish.  There are studies out there on it.  We are doing

20   everything we can to hire certified black teachers and

21   certified white teachers.

22       **THE COURT:**  It seems as if the problem has been --

23   and ever since I got into this case I have heard this in

24   hearings and conferences and various reports from the prior

25   court compliance officer or the current compliance officer --

10:51   1   that a major factor in all of this, other than the subjective

2   things that Mr. Taylor, I think, correctly pointed out, is

3   something very realistic; and that is that Tangipahoa Parish is

4   situated in the middle of an area where the surrounding

5   parishes offer their teachers and staff better pay, better

6   facilities, their students, etc.

7           Admittedly, sometimes you get people crossing

8   over from different parishes, going here or there for whatever

9   reason, as Mr. Taylor mentioned, but I hate to think about this

10   case as just about money because it's really about the

11   students.

12           **MS. BASS:**  Yes.

13           **THE COURT:**  I ask the same question to you as I ask

14   Mr. Taylor:  How do we convince the citizens of Tangipahoa

15   Parish that their school system is suffering because you're not

16   being competitive with your adjoining parishes, who have better

17   financing arrangements that's led to declarations of unitary

18   status?  I had a case involving the Bogalusa system that

19   finally achieved unitary status some years ago shortly after, I

20   guess you could say, I got involved in this case because of the

21   coach hiring issue.  How do you convince your citizens that

22   this need is not going to go away; it's going to increase with

23   an increasing population?

24           **MS. BASS:**  There's several ways.  First of all, the

25   scapegoat has been for years "the deseg case," "the deseg

10:53

1    case."  I actually spoke on this at the Chamber of Commerce

2    meeting a few months ago.  I think it's important for

3    Tangipahoa Parish citizens to recognize that the deseg case is

4    not our problem in the school system.  That's the convenient

5    thing to blame, but it's really not.  In fact, the deseg case

6    has made us do and has done great things for our school system,

7    and we are continuing on with that.

8                 The vestiges that he talked about and that we

9    are still in bad faith, I just don't see that as accurate.  I

10   think the way we convince our voters is that we have community

11   buy-in, and we actually are getting that now.  Ms. Stilley is

12   out all the time speaking.  I'm actually out talking about it.

13                We have this community advisory committee.

14   You've heard from a couple of them.  Ms. Guerin.  Mr. Anderson

15   was here.  John Crain, the president of Southeastern.  We have

16   our district attorney.  Mack McCraney.  Kingsley Garrison.  We

17   have all of these people who are actively engaged now, and

18   their goal is to help us get a tax passed, because we recognize

19   that that is what is needed.  That's what we have to do.  We

20   have to have community buy-in.  We have to have all of our

21   leaders out there doing this.  We have to show the public that

22   we are making progress.

23                I think that we have shown the Court, hopefully,

24   and the plaintiffs -- I know Mr. Carter agrees, as does the

25   court compliance officer -- that we have made great strides and

10:54

1   continued to for years.  This is not a short process.  We

2   didn't just pop up and say, "Hey, we have done this for a

3   while.  Help us out."  We have to have community buy-in and

4   continue to show progress in the resolution of the case, but

5   also continue to show that we are doing the right thing.

6            Mr. Taylor brought up academics and said they

7   are terrible.  The Court heard evidence the last time we were

8   here -- and there's documentation of it -- that actually as to

9   the interventions and the academic programs, black students are

10  doing better in interventions than white students.  We are

11  above the state average, and we will continue in that vein.

12  The interventions that have been put in place are actually

13  working for academics, and we are level grades far and beyond

14  what we anticipated.  So those things are actually happening

15  and have been.

16            I talk about this all the time, Judge, about

17  Tangipahoa Parish and how we have all the great stuff.  We have

18  a university.  We have a railroad.  We have a court.  We have

19  an airport.  We have a big hospital.  We have two interstates,

20  way more than our surrounding parishes.  We still can't get

21  people to move to Tangipahoa Parish.  That has gotten a lot

22  better.  It is getting better, but we have great stuff.  We

23  need our education system to be great.  We are getting retail

24  and all those things.

25            What we have put in place, which is different

10:56

1  than before, is the contracts that we can put out at the job

2  fairs.  It is getting a teacher certification in-house, which

3  other parishes don't have.  So we are making progress in those

4  areas.  And you are right, Tangipahoa Parish, it's difficult,

5  but it's come along.  It's come a long way.  So that's where we

6  are.

7                As to the number of complaints that he was

8  talking about, we are always going to have complaints.  We have

9  a big school system.  If you look at the number of complaints,

10 it is not even percentagewise on the charts.  We are not doing

11 too poorly there, Judge.  A lot of them the court compliance

12 officer says are not related to deseg and didn't have merit.

13                Lastly, as to the grievance procedure,

14 Ms. Guerin testified to this.  I know the Court has looked at

15 it.  This grievance procedure is actually better.  It does not

16 prolong the process at all and, in fact, puts things in place

17 that were not there before.  That is actually a better

18 procedure than we had in 876.

19                Again, Your Honor, if you look at 876 and you

20 look at what we have done since then, we should be unitary in

21 all areas because we have done everything practicable in all

22 six areas.

23                Anything else you wanted to ask me?

24         **THE COURT:**  I think you've covered it.  Thank you.

25         **MS. BASS:**  Thank you.

10:57

1   **THE COURT:**  "The ultimate inquiry determining whether
2   a school district is unitary is whether (1) the school district
3   has complied in good faith with desegregation orders for a
4   reasonable amount of time and (2) the school district has
5   eliminated the vestiges of prior de jure segregation to the
6   extent practicable."

7          That standard applies in assessing whether the
8   school district is unitary in the remaining areas relative to
9   employment practices, student assignment, and facilities.

10          In evaluating unitary status, "a court should
11  give particular attention to the school system's record of
12  compliance."  The record of good faith compliance must be
13  "consistent."  See the Fifth Circuit decision from 2018 in
14  *Fletcher v. Mississippi*.

15          In *Freeman v. Pitts*, a U.S. Supreme Court case
16  from 1992, the Court there stated:  "Among the factors which
17  must inform the sound discretion of the court . . . are the
18  following: whether there has been full and satisfactory
19  compliance with the decree in those aspects of the system where
20  supervision is to be withdrawn; whether retention of judicial
21  control is necessary or practicable to achieve compliance with
22  the decree in other facets of the system school; and whether
23  the school district has demonstrated, to the public and to the
24  parents and students of the once disfavored race, its good
25  faith commitment to the whole of the court's decree and to

those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance."

We all realize by now that federal courts have broad equitable powers to fashion remedial measures designed to eliminate school desegregation. *Milliken v. Bradley*, a Supreme Court opinion from 1977.

The district court must "adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action." *Freeman v. Pitts*, the Supreme Court again from 1992.

If injunctive relief is "to be enforced with fairness and precision," it must be flexible.  "Sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed or new ones have since arisen."  Again, that's a Supreme Court decision in *Pasadena City Board of Education v. Spangler* from 1976.

A school district, though, is "entitled to a rather precise statement of its obligations under a desegregation decree."

Consent decrees are contractual in nature, so parties may fairly expect such orders to be enforced as both a contract and a judicial decree.  That's the *Hawkins* case from the Supreme Court from 2004.

As a judicial decree, such injunctions are

11:00

1    "subject to the rules generally applicable to other judgments
2    and decrees," including modification.  Individuals and entities
3    subject to injunctions must have fair notice of the terms of
4    the injunction and any modifications that take place.
5                    Upon proper notice, a district court may modify
6    the terms of an injunction *sua sponte*.
7                    Even though parties might jointly agree to the
8    initial terms, the court may exercise its flexible authority to
9    modify decrees when faced with changed circumstances.  That's
10   the Supreme Court case of *Spangler* as well as this case before
11   the Fifth Circuit in 2017.
12                   The parties were on notice of a possible
13   modification at least through the Court's pronouncements at the
14   first hearing of the original plan in November 2019.  There
15   were also prior notifications and presentations of proposed
16   plans back in August of 2019 to counsel for all sides and also
17   as evidenced by the parties' own subsequent submissions in
18   response to the Court's order at Rec. Doc. 1613 and the
19   transcript of same at Rec. Doc. 1612.  The parties were not
20   "unprepared" to present and defend their respective positions
21   and have done so admirably.  Modification of the proposed plan
22   is an exercise of due and reasonable discretion, if any is to
23   be exercised.
24                   A key element, amongst others, is whether the
25   school system has shown through convincing evidence that it is

11:02

 1   acting in good faith.  The fact that contradictory evidence

 2   might exist in opposition to the proposed plan does not in and

 3   of itself compel us to credit that evidence over other more

 4   compelling and more convincing evidence instead.

 5            General opposition to the plan has focused on

 6   prior or existing complaints primarily about employment

 7   practices, although there have been others.  However, as seen

 8   later, those "complaints" were mostly resolved and involved

 9   matters unrelated to compliance or desegregation orders in this

10   case.

11            Another example of evidence in opposition to the

12   plan concerned the new role of the system's chief desegregation

13   implementation officer (CDIO), under the new plan referred to

14   as the CEO.  While acknowledging the plan's retention and

15   expansion of his duties in certain areas, the CDIO's concern

16   relates to an absence in the plan of his role in the screening

17   of applicants for employment or promotion.

18            Given the CDIO's critical involvement over

19   implementation of existing plans and any future ones and the

20   court compliance officer's recognition of laudable services by

21   the CDIO, especially in the context of hiring and promotion

22   matters, the proposed plan needs to be reconsidered and

23   modified to specifically include reference to the CDIO's duties

24   in the latter regards.  Specifically, this plan does not

25   prevent, but I believe it needs to spell out more clearly that

the CDIO's role as part of the superintendent's team that
reviews employee hiring and promotion grievances that allege a
race-based violation of a Court-approved plan should be part of
any plan, whether it's this plan or future ones.

Litigation counsel for plaintiffs at Rec.
Doc. 1609, filed on December 5, 2019, in its opposition
memorandum, concluded at page 8:  "The motion for unitary
status and approval of the proposed settlement agreement (found
at Rec. Doc. 1581 and previously filed on September 26, 2019)
should be dismissed without prejudice, subject to resubmission
after addressing the concerns expressed by the Court at the
November 20, 2019, hearing."

At that time our primary concern in that
hearing -- and made known on the open record -- dealt with the
need for evidence showing how the proposed plan promoted
unitary status.  Implicit in that regard is how the proposed
plan would better promote the latter objective than existing
plans or decrees; for example, at Rec. Doc. 866, 876, and
others.

In response to the Court's concerns from the
latter hearing, settlement counsel resubmitted the joint motion
for declaration of unitary status and acknowledgment of final
agreement on December 23, 2019, at Rec. Doc. 1615 and
specifically the agreement proposed at 1615-2 and related
memorandum and exhibits.

11:06

1          Litigation counsel for plaintiffs filed an
2   opposition to the resubmitted plan, reciting among other things
3   the long history of this case and how it came to the forefront
4   once again when the undersigned granted relief on an
5   employment-related matter and revitalized a long dormant
6   monitoring process with a series of hearings, orders,
7   injunctions, conferences, and site visits.

8          As stated during hearings on this matter,
9   emotions have run high at times on this particular case, as in
10  many cases, but perhaps more so at one that is long in standing
11  as this one.  At the same time, we cannot make our decisions
12  based upon emotions, based upon conclusions, or based upon
13  anything that may rank of what I consider to be hyperbole.

14         At the same time, I do recognize that counsel
15  for all sides as well as existing parties in this particular
16  case have acted, in my opinion, in a much improved, good faith,
17  collaborative effort.  Even when they disagree, we can all
18  agree that we can do that, but in doing so we still need to put
19  our best foot forward.  I was impressed, as I still am, by the
20  parties' ability to present their respective positions.

21         Perceptions about the lack of communications or
22  input have been just that.  In my opinion, no one has been
23  prevented from sending written suggestions, criticisms, or
24  comments about settlement efforts from this case's inception,
25  even before the Court implemented a delegational authority

11:08

1    among counsel.  There have been multiple opportunities to

2    provide improvements to existing desegregation plans and

3    decrees or injunctions, including the ones at issue.

4            I do take into consideration what has been

5    stated by both sides, both proponents of the existing plan as

6    well as opponents of the plan, in coming up with what I

7    consider to be and hope to be one that best promotes obtaining

8    unitary status in the three remaining areas.

9            Class settlement counsel and others jointly

10   propose a plan of action that suggests additional processes for

11   advancing a once contentious issue into the realm of unitary

12   status in remaining noted areas.  There have been good examples

13   shown by the opponents of the school system's bad faith in

14   prior times, particularly in the areas that I have mentioned

15   concerning employment of individuals before the grievance

16   process has run its course or even Court consideration after

17   the administrative grievance process has ended.

18           These examples can be interpreted to show bad

19   faith on a system's part, but that's history.  The evidence in

20   the record, in my opinion, at this time does not compel a

21   conclusion of bad faith.  I believe that the system has shown,

22   under the current administration, evidence of good faith.  The

23   evidence before the Court, including contemporaneous records

24   made concerning each outstanding area, supports the system's

25   explanations for all of the decisions that have been either

11:09

1   advanced and should further advance the cause of unitary status

2   under this new administration.

3           We emphasize that provisional unitary status --

4   which is basically how I interpret the motion that's presently

5   before us -- is in order at this time, subject to retention of

6   jurisdiction to enforce the terms of any plan as modified as

7   well as subject to a final fairness hearing, with all existing

8   decrees either suspended or, in part, extracted to be included

9   in this particular plan until further orders of the Court.

10          It is basically, in my interpretation, a request

11  for provisional unitary status, which this Court has done and

12  declared before, as already noted, in one of the outstanding

13  areas, and that is facilities, among others.

14          I do hope that the day will inevitably come

15  when, in the paraphrased words of the Eleventh Circuit, a

16  judgment could go forth that acknowledges the accomplishments

17  of what decades ago should have been done.  *Brown v. Board of*

18  *Education* was decided in 1954 with an instruction for

19  desegregation of the public school systems throughout the

20  country with all deliberate speed.  Here we are in 2020 talking

21  about trying to get something done in that regard that benefits

22  the entire society -- not just blacks, but the entire

23  society -- with all deliberate speed.

24          This particular challenge to a rigidly

25  maintained, de jure system of school segregation, sued to bring

11:12

1   it into compliance with the constitutional requirements of

2   equal protection under the law, in my opinion has substantially

3   accomplished those goals.  Hopefully one day I can say, as I

4   have said already in other areas -- for instance,

5   transportation and others -- that everyone has succeeded, not

6   just plaintiffs, not just defendants, but the community at

7   large in Tangipahoa Parish and beyond, as an example for what

8   people can do when they collaborate for the best interests of

9   their children.

10          If the eventual decision of this Court is

11   counted as a loss for anyone, it is also because they have won.

12   All parties -- plaintiffs, board, people of the parish and

13   beyond -- who in the end govern their own school system must be

14   aware that the door through which they leave the courthouse is

15   not locked behind them.  They will undoubtedly find that this

16   is so if they fail to maintain unitary status.

17          I said before and I repeat once again:  "We

18   can't be afraid of change.  You may feel very secure in the

19   pond that you are in, but if you never venture out of it, you

20   will never know that there is such a thing as an ocean, a sea.

21   Holding onto something that is good for you now may be the very

22   reason why you don't have something better."

23          The author of that particular statement,

24   C. JoyBell C., also made a poignant comment when she said:

25   "Connections are made with the heart, not the tongue."

11:14

1        There's been multiple fresh approaches, as
2   pointed out in the CCO's report at Rec. Doc. 1580, filed back
3   in September 2019, that would have been considered unlikely or
4   impossible only a few years ago.  Today the parties, the
5   community, the board, the staff, plaintiffs, counsel for all
6   sides, whether they realize it or not, have contributed to a
7   collaborative, good faith discussion -- sometimes contentious,
8   but thankfully most of the time, as evidenced here today, with
9   a collaborative attitude and good faith -- touching on all
10  aspects of the remaining areas in which this school system has
11  not yet been held to be unitary.
12        One of those challenges and open issues on
13  unitary status dealt with the interim student assignment plan.
14  The system is commended for changes in line with the consent
15  order where there were challenges, but overall the extensive,
16  tireless efforts of the current administration, including the
17  CDIO, yielded very successful results, in my opinion.  I'm also
18  thankful that the CCO, the court compliance officer, has been
19  engaged in discussions to achieve good faith resolution of
20  outstanding issues.
21        There's been teacher retention strategies with
22  proven successes in other areas and in this one, hopefully,
23  despite very limited financial resources.  The system still
24  struggles with teacher retention issues even though it may be
25  improving.  The system still struggles to hire teachers when

11:17

1    they are not paid as much as their contemporaries in adjoining
2    parishes.
3              The system struggles with its facilities due to
4    lack of funding.  Even at that, I'm impressed at what they have
5    been able to do.  As I already stated, it's because of the
6    creativity of its current administrators and staff that have in
7    good faith properly allocated and managed facilities.
8              There's more yet to be done.  The system has had
9    more than a year to implement the Court's order of August 22,
10   2018, relative to interim and acting staff position hirings.
11   They appear to have fully adhered to that order and overall
12   made some strong progress in staff and administrative hiring,
13   as I think everyone acknowledges.  It has reportedly achieved
14   the ratio of African American to non-African American staff and
15   administrative that exceeds 40 percent in most areas and has
16   either held steady or shown improvement for several years.
17             The system appears to be diligent and focused on
18   addressing the limited remaining issues that we have discussed,
19   not only in the prior April 2019 order at Rec. Doc. 1576,
20   pages 12 to 13, but again it has done so with very limited
21   resources and with a population that is reportedly increasing
22   overall in the parish and the incumbent needs brought about by
23   those increases.  It's an area of dwindling resources that will
24   challenge the services that this parish needs to provide to its
25   young people in education.

11:20

1         As already stated, we acknowledge that there's
2    been a significant number of complaints, some informal
3    complaints as well as on other issues that were either resolved
4    or not become formal complaints, concerning either teaching or
5    staffing issues.  However, very few of those complaints
6    squarely involved or directly implicated compliance or lack of
7    compliance with standing orders and decrees in this case.  Of
8    those that touched on the orders and decrees in the case, only
9    a very small percentage appear to have merit.
10        As plaintiff has relied upon the CCO's report
11   concerning the number of complaints, so too the Court relies on
12   that report and other documentary evidence concerning analysis
13   and a deep dive into those complaints.  I do believe that after
14   years of poor communications and systematic discouragement
15   against challenging the school system, I sense the public and
16   persons who feel aggrieved today seem, as the CCO has stated,
17   to have a greater comfort level in asserting their grievances.
18   That in and of itself is a positive.  Even though it has led to
19   increased complaints, so be it; but it's qualified, to the
20   extent that I have said, as relates to the issues for this
21   case.
22        I'm also encouraged, as I believe all parties
23   acknowledge, by the current administration's sensitivity and
24   need to address cultural diversity issues, equity among system
25   participants, discipline, and adherence to defined core values,

again an approach that is both fresh, an approach that is based upon best evidence practices from other jurisdictions or districts, one that we should all rally behind for the betterment of the system as a whole and all stakeholders.

I cannot underemphasize the reality of this system's overstretched, limited financial resources.  We all realize that several nearby parishes have significantly higher property tax rates, which in turn provides those school systems more revenue and funding.  The system has not been able to raise additional funds, through a tax proposal to voters or otherwise, that would enable it to increase teacher pay consistent with nearby parishes, improve and build new facilities, and address some of the inherent complaints that the general public has in the system's operation.  When you compete with nearby parishes in the hiring of teachers, it's no surprise that you're not in a position to hire as many teachers that would help the system as a whole in achieving its goals not just for unitary status, but for a quality education for its students.

Teachers and staff are commended for staying the course even though their financial rewards are not as great as their neighbors.  That shows dedication, in my mind, to the teachers, and that dedication should be rewarded.  People should not complain about the quality of education when there's not enough good teachers to go around due in large measure to a

11:26

1    lack of good facilities to house them and their students, but
2    to pay them just rewards for their labors.
3            The school board and this administration has
4    been candid in acknowledging that there are teacher assignment
5    issues.  I am encouraged by convincing evidence that the
6    system, through its current administration, are taking steps
7    and measures of an innovative kind to improve teacher
8    assignment metrics.  In that regard, I reference Exhibit 21,
9    page 5, of Rec. Doc. 1580, the teacher assignment strategy to
10   balance the ratio in black/white teachers at the schools.
11           The school system has 33 schools in its system.
12   Again, I'm referring to the report from September of 2019,
13   Rec. Doc. 1580.  There was a total of approximately 19,481
14   students enrolled as of October 2018.  Of the total students
15   enrolled in that date, 9,476 were black, representing
16   48.6 percent of the total student population.  10,015 were
17   nonblack, representing 51.4 of the remaining student
18   population.
19           We know that's changed for the 2019-2020 school
20   year.  We know also that the student population, as a result of
21   more people with their children coming into the parish, will be
22   larger in the new school year, and the growth will likely be in
23   the south and southeast geographic areas of the parish.
24           During the 2018-2019 school year, 11 schools or
25   one-third of the total fell outside of the +/- 15 percent

11:29

1    metric that's been utilized here for student assignment.  See
2    Rec. Doc. 1264, Section D, page 10, and Rec. Doc. 876, page 6,
3    Section 1(G).
4             Comparatively, during the 2017-2018 school year,
5    13 of the system's schools fell outside of that metric.  During
6    the previous year, the 2016-2017 school year, 16 schools were
7    outside of that metric.  Further, when the interim student
8    assignment plan was implemented for the school year 2015-2016,
9    there were 18 schools that fell outside the +/- 15 percent
10   metric.  Notably, two schools, Independence Middle and Loranger
11   High, improved enough to move within the +/- 15 percent range
12   over the last school year.
13            Teachers and administrators report improvement
14   and satisfaction with student assignment issues, and there's
15   been progress seen at other schools.  There's still a need to
16   address modifications last year, in student assignment, at
17   Woodland Park and Greenville Park regarding significant
18   planning and effort.
19            I am encouraged by the administration's monthly
20   meetings to plan, coordinate, and implement changes required.
21   Planning and logistical challenges are being addressed, but
22   again we cannot ignore the fact that dwindling resources will
23   compound existing problems in addressing critical needs.
24            I am, however, encouraged by the work by the CCO
25   and the CDIO in reviewing and confirming the system's

explanations concerning classroom assignments for pre-K classes
specifically at the Hammond Westside Montessori as well as
Hammond Eastside Magnet.  I'm convinced from the evidence
presented that they contain no improper element of racial
animus or motivation and are compliant as practicable with the
standing orders and decrees in this case.

We had some discussion here about transfers.
There has been a modest increase in the past 2018-2019 school
year in total transfers, from 2,100 transfers in 2017-2018,
11.2 percent of the student population, to close to 2,600
transfers in the 2018-2019 school year, representing
13.1 percent of the student body.  The most significant area of
increase was in M-to-M transfers, which increased from 350 to
751.  Again, I'm convinced with the evidence presented to me,
the various exhibits and reports, including the CCO's report,
that the system has been diligent in its efforts to notify
students' families of the multiple transfer and school
selection options available.

One of the very first visits that I made to the
Tangipahoa Parish School System on a tour with counsel for both
sides, we had discussions not only with counsel, but also with
teachers and staff, and visited schools that either dealt with
or involved a higher than average number of student discipline
issues.  That issue of student discipline, as I mentioned
earlier -- which I believe everyone agrees with -- is

interwoven throughout the complaints and concerns that the public has had with the system.

While there's evidence that indicates that few of the discipline complaints or allegations have actually risen to the level of noncompliance with orders and decrees entered in this case, it is still an issue that needs to be addressed. When and how to effect discipline, an assessment on whether an approach that's being deployed actually furthers the system's mission and goals, and improving communications between and among families and the system is critical to working through the mistrust and perceived lack of transparency and accountability that the public may have in that regard.

I'm convinced through the testimony of Superintendent Stilley, the records that I have before me, the exhibits, as well as the CCO's report, that the system is engaged in productive efforts to address those issues.  It has instituted a process, which I stated earlier, that dealt with the need to help train and address cultural diversity and sensitivity issues, as well as hiring of a third-party vendor, which again is not going to be in existence forever because of dwindling resources.  There's a good faith effort to address those issues even more so than before.

I'm also convinced by credible and convincing evidence that the system, in addition to enhancing its recruiting efforts, has undertaken proactive measures to retain

11:39

teachers, to provide, as the system puts it, in-house pathways to teacher certification.  Certification programs cost money, and this pathway often appears out of reach to new uncertified teachers.

To mitigate or address this problem, the system has received the BESEE board's approval for an in-house certification of its teachers, again another innovative approach that should help with the recruitment not only of teachers, but also to compete in a highly competitive market to obtain qualified teachers, albeit uncertified, with a plan designed to help them achieve certification.

The system's recruiting retention efforts, in my opinion, are indeed aggressive and are further evidence of the system's good faith.  I expect, based upon the plans that I have seen and the evidence presented, that positive results are being achieved and should be further anticipated.

As has been stated here today and which we all realize, the system was granted provisional unitary status in facilities on July 21, 2017.  See Rec. Doc. 1472.  While the school board and the class of plaintiffs appealed that order, the class appeal was dismissed for failure to prosecute.  The school board's appeal was rejected by the Fifth Circuit when it affirmed this Court's order granting provisional unitary status.  The school board wanted unqualified unitary status.  Under the order, as affirmed by the Fifth Circuit, the court

11:41

1    compliance officer was authorized to take reasonable measures

2    to enforce compliance as necessary.  See Rec. Doc. 1577-1.

3                    Again, however, as you could gather from my

4    questions of counsel during argument here today as well as in

5    my recitation thus far, this school system faces significant

6    funding challenges.  One of the greatest, in addition to the

7    issue of teacher recruitment and retention, in bettering the

8    education that students receive is also in the area of its

9    buildings, its facilities, a need for new buildings and

10   improvements to existing ones, and elimination of those

11   portable units.

12                   Those funding challenges are compounded by the

13   fact, as stated earlier, that Tangipahoa Parish is growing.

14   That's a good thing, but that good thing needs to be

15   accompanied by a realization of its citizenry -- current, new,

16   prospective -- that with growth, costs increase.

17                   Implementing the student assignment plan has

18   again presented the system with facilities challenges.  Again,

19   the system is to be commended, through the efforts of its

20   current superintendent, for a serious analysis of its building

21   needs and how that impacts the areas that I just mentioned.

22                   It has retained an architectural firm, CSRS, who

23   through its representative testified and explained their

24   role -- I hope I'm not mispronouncing his name, Mr. Rutledge --

25   for the purposes of long-range facilities needs planning and

11:44   1   developing a master plan.

2            As has been brought out in this hearing, we have

3   had building plans before.  876 is an example of that.  I

4   think, more importantly, the plans that are currently in the

5   process of being done, including the hiring of a demographer

6   for showing where the greatest needs are as well as the

7   commitment of that representative to work with the system to

8   ensure compliance with unitary status issues and overall

9   improvement of facilities, are in my opinion sufficient to

10   address all those needs.

11            The modular structures or T-buildings have, in

12   my opinion, outlived their usages.  Perceptions can be

13   realities.  If you put students in these so-called T-buildings

14   as opposed to the main campus buildings, I could see where that

15   could foster a feeling of inferiority or neglect.  The system

16   is in good faith trying to address those issues, and I am

17   confident that a workable master plan will be achieved in that

18   regard.

19            I do realize, as has been pointed out, that the

20   existing contract with that architectural firm may exclude

21   involvement in achieving a unitary system, but again that's

22   where the Court's monitoring comes in.  That's where the role

23   of the CDIO or CEO, CCO, and all stakeholders, public,

24   community, come in to not only monitor, but bring to the

25   Court's attention anything that needs to be addressed to

11:47

1    facilitate the improvements that we are all know are necessary.

2                    I keep mentioning the CCO and the CDIO because

3    they have done remarkable things.  They have personally visited

4    each school at least once, sometimes more.  They have viewed

5    the T-buildings and other facilities.

6                    I was pleased to see in their reports, which

7    again is a matter of public record and has been cited to in

8    Rec. Doc. 1580, that the system has reduced the T-building room

9    usage by 70 percent, the majority of which was a reduction of

10   classrooms in T-buildings.  However, considering the lack of

11   funding for new structures, that level of reduction appears to

12   be a demonstration again of what I consider to be clear and

13   convincing evidence of the school system's good faith and

14   determination to maximize its utilization of permanent

15   structures for classroom instruction.

16                   I have stated in these proceedings, as well as

17   before, that hiring issues have been one of the contentious

18   areas of controversy in this case and has sometimes overwhelmed

19   discussions of others in how to advance this case.  Again, I

20   find by clear and convincing evidence that the school system,

21   particularly under this new administration, has assumed

22   responsibility by filling multiple staff positions, and

23   interviews have been commenced and hiring was accomplished with

24   a single finding of a lack of compliance in those hiring

25   decisions.  See Rec. Doc. 1573 for further details in that

11:50

1     regard.

2                  Additionally, the new administration has

3     stringently avoided earlier improper practices of placing

4     persons in interim positions without following the mandates of

5     this Court's orders.  They have been collaborative,

6     deliberative, and compliant in placing persons in interim

7     positions and rarely sought an interim appointment and, when

8     used, the system communicated properly and was transparent in

9     its practices.

10                 In my opinion, significant progress in the area

11    of staff hiring has been shown by clear and convincing evidence

12    despite setbacks that occurred primarily in previous years.

13    There has been, in my opinion, a significant shift with

14    processes which evidence an intent to comply with the hiring

15    practices set out in Rec. Doc. 866 and this Court's recent

16    order limiting interim hiring practices.  See Rec. Doc. 1549.

17    The CDIO has been fully engaged in that process.

18                 Inevitably, there will always be complaints and

19    honest differences of opinion over hiring decisions.  It could

20    be a highly political and socially charged process.  No matter

21    what the decision will be, there will be detractors.

22    Disagreement, however, is not equivalent to lack of compliance

23    or the number of disagreements with the orders and decrees in

24    this case.  There's clear and convincing evidence to show that

25    the school system has been in good faith and generally

11:53

1   determined to make the best hiring decisions possible that are

2   in compliance with orders and decrees in this case.

3           I have spoken a lot about facilities, facilities

4   planning, employment practices, community concerns in various

5   areas, some of which have common themes.  One of those I have

6   mentioned has been in the area of student discipline.  In

7   another new, bold, and innovative approach with limited

8   funding, this system, during the fall of 2018, began working

9   with the Discipline Revolution Project, otherwise known as DRP,

10   a very impressive, nationally renowned coalition of education

11   leaders and advocates committed to a better way forward on

12   school discipline.  As their mantra states, it's time to

13   rethink school discipline.  In that regard, the system has

14   also, as I mentioned earlier, made good faith efforts to

15   address equity and cultural awareness.

16           The relationship between discipline and

17   so-called at-risk children is well-established, and they are

18   not and have not been caused primarily by the school system.

19   The solutions, the causes are complex.  The current

20   administration's intentions and policies and practices do not

21   appear to be discriminatory on its face.  However, the system

22   recognizes that a disproportionate number of students who are

23   caught up in the disciplinary process have been the so-called

24   at-risk kids and predominantly African American.

25           The system's participation with DRP is a

thoughtful approach to address that and many other issues
surrounding discipline and in the creation of a student
services department action plan to address those many issues,
with well-defined goals and key performance indicators.  See
Exhibit 19 at Rec. Doc. 1580.

The school system is focused on aligning itself
to core values regarding truancy reduction, discipline
disparity, diversity and equity in the student services that it
provides.  Its approach has demonstrated and resulted in a
significant reduction in truancy, projected to be a 50 percent
reduction.

The school system is also redefining its use of
suspensions and referrals to the Tangipahoa Parish Alternative
School (TPAS), which I have also visited.  In rethinking
discipline, this system has shown good faith in the process of
remaking TPAS.  A major move in that regard was the hiring of a
new principal at that school.  Mr. Perry has a well-deserved
reputation as a strong teacher, creative thinker, a
results-driven personal ability, again evidence of faith that
in my opinion is already showing constructive, demonstrable
improvements.

We all know that communication is important in
no matter what industry or what realm of social, political,
economic, judicial, educational world we may live in.
Communication here has been imperfect at times, but it is

11:59

1    better than what participants experienced, in my opinion, in

2    the past.

3            One of the ongoing problems that families have

4    with the system is its process for addressing disciplinary

5    complaints.  Again, the nature of the school system's legal and

6    other obligations surrounding its interactions with employees

7    is complex.  When discipline occurs of an employee in response

8    to a family complaint, the system is characteristically

9    reluctant and will likely contend that silence is legally

10   required of it, based upon advice of counsel, to provide any

11   information about employee discipline.

12           Thus, those who justly complain about employees'

13   inappropriate conduct sometimes learn nothing about the

14   resolution of that complaint.  The process lacks transparency

15   and a commonsense way to effectively communicate and resolve

16   rightful complaints.  Concerns in that regard generate, in my

17   opinion, a need for and a demonstrated concern over the

18   system's actions or inactions in a confusing, complex area of

19   state and federal programs and laws that inhibit the type of

20   transparency we would normally want.

21           In that regard, the CCO, working with the school

22   system, has proposed a family advocate to work with families

23   going through the complaint process to better help them

24   understand the process and services that would hopefully create

25   an environment where enhanced trust, confidence, and mutual

12:01

1    respect can grow and flourish.  Again, however, that requires

2    money in a system that barely can meet its own needs in an

3    increasing, increasing cost situation due to population

4    increases within the parish.

5              I don't believe the CCO has told any of you of

6    this, but when he first approached me with this idea of a

7    family advocate, he not only had a good idea in that regard,

8    but he also offered to do something to help families have such

9    an advocate to assist and understand and work through the

10   disciplinary process, whether it's an employee or whatever.

11   I'm talking about -- and I hope I'm not embarrassing him -- a

12   financial commitment on his part in that regard.  As you-all

13   know, just like many of you here, he has a stake in Tangipahoa

14   Parish too.

15             Despite what may be the challenges that I say

16   this system faces, particularly in the area of financing, I

17   think all of you, after having lived through decades of court

18   supervision, you still evidence hope.  You evidence that hope

19   because you still believe that the children of your parish

20   deserve better facilities, deserve more teachers, the best

21   teachers, still deserve an opportunity to learn together.  All

22   races still deserve being the best that they can be.

23             For the foregoing reasons, the Court finds that

24   in the three areas at issue, there is convincing evidence that

25   provisional unitary status would be in order, provided that

12:07

1  there is good faith implementation of the proposed final decree
2  as modified along the lines that I have mentioned earlier.  The
3  modifications will include those parts of prior orders that set
4  goals for student assignment metrics as well as teacher hiring
5  metrics.  The system is in substantial compliance, based on
6  convincing evidence that I have stated earlier, with the
7  staffing issues, but there is room to grow on teacher hiring.
8  There's also an approach on facilities that I believe is
9  important to give a chance based upon the definable metrics
10  that I have seen here and good faith efforts to achieve better
11  facilities.  There's provisional unitary status on all areas
12  outstanding, but with modifications.
13            Another modification would be concerning the
14  role of the CCO and the CDIO or the new term, CEO, under the
15  proposed agreement, to include their role in the grievance
16  process as relates to staff, teacher, and student assignments.
17  I think the plan envisions that, but I believe that needs to be
18  better clarified and specified.
19            I am not, however, vacating any prior order, any
20  injunction, any decree, or ruling that I have issued.  I am
21  suspending them to the extent not inconsistent with those parts
22  that I believe need to be incorporated to clarify the existing
23  agreement's terms.  I would like to see better clarity along
24  the lines of the reporting that needs to continue with the CDIO
25  and the CCO.  We are not vacating their appointments.  They

12:11

1    continue.  In that regard, the Court envisions that not in

2    three years, but periodically the Court expects to receive

3    reports concerning the implementation of the plan as modified.

4    That needs to be specified, again, in the agreement.

5              The Court retains jurisdiction over all aspects

6    of this case on outstanding issues.  This is not a final

7    declaration of unitary status.  It is, however, a significant

8    step in that regard towards achieving that result, similar to

9    the provisional unitary status findings that have already been

10   entered in the past.  Hopefully with the work of everyone,

11   including the citizens of Tangipahoa Parish, the needs that

12   everyone realizes in this case, for the resources to obtain a

13   better education for its students, among other things -- needs

14   to be demonstrated by the citizens.  We envisioned years ago a

15   better educational system through the order of 876 and others.

16   Those aspirational goals cannot be achieved without all people

17   coming together.

18             As I mentioned earlier, as practical as everyone

19   has been in trying to achieve unitary status, in getting to a

20   successful point, right now you have provisional unitary

21   status.  This is a new beginning -- again, a new beginning --

22   that is contingent upon many, many factors, including what some

23   may be afraid to discuss, but including -- as I have said many,

24   many times and I say it again, it needs the support of the

25   citizens of Tangipahoa Parish to provide the system with the

12:14

1    critical resources to educate its future leaders.

2                    I will give the parties 30 days to submit to me

3    the modifications that I believe are necessary to improve upon

4    what I believe to be a good plan to become a better plan.

5                    Upon receipt of the parties' proposals in that

6    regard, which will require you-all to meet, I will address

7    those modifications accordingly.  Again, these are the

8    modifications that I think necessary to improve upon the plan.

9    I've been as specific as I can be while trying to give a little

10   leeway for everyone for some tweaking of my thoughts in that

11   regard.  I expect the collaboration that I have seen at least

12   improve today -- and acknowledgments from both sides today --

13   to continue.

14                    I know that I've given more details about the

15   modifications than I gave at the last hearings that we have

16   had.  This is now, what, the third hearing, I believe, on this,

17   as well as multiple conferences on this issue with counsel.

18                    Within that 30-day period, if the parties need

19   to confer with me together, to either seek further

20   clarification or help resolve some modifications along the

21   lines of what I have stated needs to occur, I will be glad to

22   meet with you.  Again, I would rather, first, that you have the

23   opportunity to meet and provide the clarification to the plan

24   that I think needs clarification.

25                    Again, this is a bold, innovative plan that I

12:17

1    think will help, with modifications, along the lines that I
2    have indicated.  I think the plan probably contemplated those
3    matters because I think they are implicit, but they need to be
4    explicit so there's no misunderstanding later.
5             With that, 30 days will be when, Ms. County?
6    **THE DEPUTY CLERK:**  March 12.
7    **THE COURT:**  What day of the week is that?
8    **THE DEPUTY CLERK:**  That's a Thursday.
9    **THE COURT:**  That's fine.
10            March 12, Counsel, is your deadline to submit a
11   proposal concerning modifications to the plan along the lines
12   of what I have indicated.  However, as I mentioned earlier, I
13   will make myself available to everyone to jointly consider any
14   clarifications that you-all might think you need.
15            Remember that while this plan is approved
16   provisionally, as I indicated, and the motion is approved
17   provisionally, the actual order is not going to be issued until
18   I have the modifications that I think need to be explicit in
19   this plan.  I don't want any confusion in that regard.  There's
20   still more work to be done.  As I said before, it's another new
21   beginning.  Good luck.
22            Court is adjourned.
23   **THE DEPUTY CLERK:**  All rise.
24            (Proceedings adjourned.)
25                              * * *

1     <u>**CERTIFICATE**</u>

2          I, Toni Doyle Tusa, CCR, FCRR, Official Court

3     Reporter for the United States District Court, Eastern District

4     of Louisiana, certify that the foregoing is a true and correct

5     transcript, to the best of my ability and understanding, from

6     the record of proceedings in the above-entitled matter.

7

8

9                         */s/ Toni Doyle Tusa*
                          Toni Doyle Tusa, CCR, FCRR
10                         Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25