**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **M. C. MOORE, ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER: 65-15556** |
| **TANGIPAHOA PARISH SCHOOL BOARD, ET AL** | **SECTION: "B"(1)** |

## OPINION

When this case began in 1965, race-based separation of students, teachers and facilities was the result of a *de jure* system of racial segregation. The groundbreaking unanimous decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and its progeny supplied the framework for rooting out racial isolation and the accompanying pernicious effects it has on children, parents, educators, and the at-large society.

The significant and sensitive issues in the pending motion for provisional unitary status, viewed as a proposed modification of existing desegregation decrees, are clearly and adequately addressed by movants and opponents. Rec. Doc. 1630.

1

We proceed and join in remembrance with Circuit Judge Carl Stewart's cautionary observations in a concurring opinion in *Anderson v. Sch. Bd. of Madison Cty.*, 517 F.3d 292, 305 (5th Cir. 2008).

> While the record **[as here]** provides a detailed account of the many obstacles that prevent the existence of fully integrated schools—such as the confluence of the geography and demography in the district—the cruel irony is that racial isolation, albeit not as the product of *de jure* segregation, largely remains as foreboding and potentially deleterious as it was when federal court supervision began. Of course, this case is only the latest indication that despite the societal progress that has been made in dismantling systems of segregation, many of the concerns highlighted in *Brown* still remain as viable today as when that opinion was first authored.

*Id*. at 306 (emphasis added)

The ultimate inquiry in determining whether a school district is unitary is whether (1) the school district has complied in good faith with desegregation orders for a reasonable amount of time, and (2) the school district has eliminated the vestiges of prior *de jure* segregation to the extent practicable. *Hull v. Quitman County Bd. of Educ.,* 1 F.3d 1450, 1454 (5th Cir.1993); see also

*Freeman v. Pitts,* 503 U.S. 467, 492, 498, 112 S.Ct. 1430 (1992). This standard applies in assessing whether the school district is unitary in the remaining areas relative to employment practices, student assignment, and facilities. Unitary status was previously declared in other areas.

In evaluating unitary status, "a court should give particular attention to the school system's record of compliance." The record of good faith compliance must be "consistent". See *Fletcher v. Miss., et al,* CA#16-60722 (5th Cir. 02/06/2018). For at least three years, the district court should retain jurisdiction and require the school board to file reports with the court. The court then must hold a hearing to consider whether the district should be considered unitary; plaintiffs must receive notice of the hearing and an opportunity to show why the system is not unitary and why continued judicial supervision is necessary. Only after these procedures are followed may a district court be sufficiently certain that a school system is unitary and dismiss the case. *See*

*Monteilh v. St. Landry Par. Sch. Bd.,* 848 F.2d 625, 629 (5th Cir. 1988). It must be emphasized that a provisional declaration of unitary status will neither vacate prior decrees nor dismiss this action. It would set forth modifications that credit current successes arising from relevant good faith actions of parties over a reasonable period of time. Moreover, additional circumstances as discussed *infra* must be weighed in determining present and future conditions within the Tangipahoa Parish School System ("TPSS").

In *Freeman v. Pitts*, 503 U.S. 467, 491-492, 498 (1992), the Supreme Court stated: "Among the factors which must inform the sound discretion of the court . . . are the following: whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the

parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance."

Federal courts have broad equitable powers to fashion remedial measures designed to eliminate school segregation. *Milliken v. Bradley*, 433 U.S. 267, 279–80, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). The district court may "adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action." *Freeman v. Pitts*, 503 U.S. 467, 487, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). If injunctive relief is "to be enforced with fairness and precision," it must be flexible. *Id.*

Accordingly, "sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *Pasadena City Bd. of Educ. v. Spangler,*

427 U.S. 424, 437, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976).
A school district, though, is "entitled to a rather
precise statement of its obligations under a
desegregation decree." *Board of Educ. of Oklahoma City
Pub. Schs. v. Dowell*, 498 U.S. 237, 246, 111 S.Ct. 630,
112 L.Ed.2d 715 (1991); *Moore v. Tangipahoa Par. Sch.
Bd.*, 864 F.3d 401, 406 (5th Cir. 2017).

First, consent decrees are contractual in nature, so
parties may fairly expect such orders to be enforced as
both a contract and a judicial decree. *Frew ex rel. Frew
v. Hawkins*, 540 U.S. 431, 437, 124 S.Ct. 899, 157 L.Ed.2d
855 (2004). As a judicial decree, such injunctions are
"subject to the rules generally applicable to other
judgments and decrees," including modification. *See id*.
540 U.S. at 441. Further, individuals and entities
subject to injunctions must have fair notice of the terms
of the injunction and any modifications that take place.
See *W. Water Mgmt., Inc. v. Brown*, 40 F.3d 105, 109 (5th
Cir. 1994); *Alabama Nursing Home Ass'n v. Harris,* 617
F.2d 385, 387–88 (5th Cir. 1980). Upon proper notice, the

6

district court may modify the terms of an injunction *sua sponte*. *W. Water Mgmt.*, 40 F.3d at 109.

Litigation Counsel for plaintiffs filed on December 5, 2019 an opposition memorandum which concluded at page 8 that "The motion for unitary status and approval of the proposed settlement agreement (found at Rec. Doc. 1581 - filed on Sept. 26, 2019) should be dismissed without prejudice, subject to re-submission after addressing the concerns expressed by the court at the November 20, 2019 hearing." Rec. Doc. 1609 (Emphasis added)

The court's primary concerns during the November 2019 hearing expressly dealt with the need for additional information showing how the proposed settlement and modification of existing decrees impacted a determination of unitary status. See Rec. Docs. 1606 and 1612 (Transcript). Thereafter, a revision to the original settlement and proposed modification was filed by all parties' Settlement Counsel. See Rec. Doc. 1615, including memorandum and exhibits. Litigation Counsel for plaintiffs filed an opposition to the re-submitted plan,

Rec. Doc. 1619, reciting among other things the long history of this case and how it came to the forefront once again when this court granted relief on an employment matter in March 2008. See Rec. Doc. 661 (*In re* Coach Foster). That 2008 matter effectively revitalized an intermittent monitoring process in all areas. Since then and to establish better pathways to unitary status, the undersigned conducted a series of conferences, hearings, issued various orders, injunctions, plan modifications, and conducted on-site visits to various schools within the noted system. At all stages, we have been ably assisted and/or received involvement by all parties' counsel, leading community members and civic groups, school officials, staff, the Chief Desegregation Implementation Officer ("CDIO") and Court Compliance Officer ("CCO") – all of whom presented, *inter alia*, perspectives from relevant constituents or stakeholders, e.g. parents, educators, students, administrators, residents, various organizations, etc.

Subsequently, a hearing was held on the latter proposal on February 11, 2020. See Rec. Docs. 1626 and 1627 (Transcript). While indicating provisional approval of the modified proposal at that hearing and to further clarify certain aspects of the modification, we gave parties further opportunity to address certain aspects of the proposal. Implicit again in our consideration is having a plan that could better maintain and promote unitary status, along with consideration of the existing plans and orders found at Record Documents 866-876 and others.

Thereafter on March 23, 2020 Settlement Counsel for all parties filed the instant motion to declare provisional unitary status, suspend existing injunctions and orders, and acknowledge and approve final settlement. See Rec. Doc. 1630 and related exhibits. A hearing was held on July 30, 2020. After hearing from all parties' counsel, parties were given further opportunity to file additional information/data and motions on remaining disputed issues. Rec. Doc. 1638.

On August 18, 2020 Litigation Counsel moved to conduct discovery relevant to the recently submitted documents and inquiries made by the court concerning academic performance of black students. Rec. Doc. 1642. That motion was granted on September 3, 2020 to allow movant focused discovery via Federal Rule of Civil Procedure 31.[1] That same procedure was previously used in a similar request by Litigation Counsel for plaintiffs on related issues in preparation for the earlier-mentioned November 2019 hearing. See Rec. Docs. 1599 and 1648.

Even though parties might jointly agree to the initial terms, the court may exercise its flexible authority to modify the decree when faced with changed circumstances. See *Spangler*, 427 U.S. at 437, 96 S.Ct. 2697. *Moore v. Tangipahoa Par. Sch. Bd.*, 864 F.3d 401, 407 (5th Cir. 2017). Parties and the at-large public were on notice of work being done on the instant plan before its initial filing in 2019, and through the court's

---

[1] The record does not show that plaintiff's Litigation counsel proceeded with the authorized Rule 31 discovery or ever moved for reconsideration or an extension for doing so.

pronouncements at the first hearing of the original plan in November 2019, and also evidenced by parties' subsequent submissions in response to the court's order at Record Document 1613, and the transcript of same at Record Document 1612.[2] Credible information received from the school superintendent, the former CCO[3], and others at hearings on TPSS' strategic plan that essentially forms the foundation and substance for proposed modification also convinces that due process was given to stakeholders for comment.[4] Parties were not unprepared to present and defend their respective positions. Modification of the proposed plan is an exercise of due and reasonable discretion. There would still be periodic reporting, hearings, etc. as currently required throughout a three-year provisionary term and an ultimate fairness hearing on whether to grant permanent unitary status thereafter.

---

[2] See also Rec. Doc. 1615-1, pp. 5-8 evidencing detailed meetings, etc. by the superintendent and others.

[3] Ms. Arlene Knighten, a minister and attorney in Tangipahoa Parish, served as CCO for about twenty years before becoming Executive Counsel to a state agency: https://cardinalchange.com/our-team

[4] Examples included meetings with community/civic groups and Litigation Counsel: Rec. Doc. 1612, pp. 35-37, 57-64; Id. at pp. 102-4 (The Superintendent also had a citizens advisory committee, that included among other leaders Mr. Mack McCraney: native of Hammond, La., reverend, and first African American Attorney to practice in Tangipahoa Parish: http://nurturingourroots.blogspot.com/2019/05/mack-h-mccraney-became-first-african.html

A key element amongst others is whether the TPSS has shown through convincing evidence that it is acting in good faith. The fact that contradictory evidence might exist in opposition to the proposed plan does not compel us to credit that evidence over other more compelling and convincing evidence instead. Further, while factored into our consideration of the instant motion, disagreements over the proposed plan between plaintiffs' Litigation and Settlement Counsels and between various stakeholders do not, *per se*, invalidate provisional unitary status review. Cf. *Parker v. Anderson*, 667 F.2d 1204 (5th Cir. 1982) (Class action settlement approved over the objection of all but one of the eleven named plaintiffs as well as over the objections of a number of class plaintiffs. *Id.* at 1207).

## EMPLOYMENT PRACTICES

The school system and various stakeholders have generally worked in good faith to address employment challenges, especially those regarding educators, administrators, supervisors, and staff. In response to

a motion that had no opposing memorandum, the court granted in June 2015 provisional unitary status in staff assignments because "the Board as a whole over the past 10 years has progressively worked in good faith to attain the 40-60 diversity goal set forth in Record Document 866 with respect to staff assignments for a three-year period in that area." *See Green v. County of School Bd. Of New Kent Cnty.*, 391 U.S. 430, 435-42, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968).[5]

Considering a subsequent motion that came again without record opposition memorandum, the court in 2016 found "school-based staff demographics show that school site administrative personnel have not been assigned in a manner that tends to show that any school is intended only for black or white students."[6] Compare Rec. Doc. 1410-1 with Rec. Docs. 1412-5 and 1412-6. The undersigned further found that "personnel policies continue to support non-discriminatory hiring practices and that

---

[5] See Rec. Doc. 1278, p. 3; Rec. Doc. 1241-1 at 8; Rec. Doc. No. 1241-3 at 11-26.

[6] See Rec. Doc. 1425, p. 5.

(TPSS) has a system in place for filing any complaints or grievances concerning discriminatory hiring, assignment, promotion, pay, demotion or dismissal of staff members. Rec. Doc. 1410-2."[7] (Emphasis added). Unitary status in staff assignments would have been declared then but for lack of documentation about two or three unresolved grievances.[8]

Later, when this court dismissed without prejudice another motion for unconditional unitary status in July 2017, there was an open question on whether the TPSS Board's use of interim staff appointments violates orders relative to staff assignment or impacts the provisional grant of unitary status.[9] Following a report[10] from the CCO, prepared with assistance from the CDIO along with Settlement Counsel, and to Superintendent Stilley's credit, the Superintendent found interim staff

---

[7] Rec. Doc. 1425, pp. 6-7.

[8] Id., pp. 8-10.

[9] Rec. Doc. 1471 at 24-25.

[10] Rec. Doc. 1548.

appointments were not in the best interest of the school system; and decided to discontinue it except under exigent circumstances following approved procedures.[11]

While again recognizing evidence of good-faith compliance with the 40-60 diversity goal, the court determined in April 2019 that further court supervision was necessary to allow the TPSS Board to show consistent compliance in its hiring and promotion decisions.[12] We further invited reconsideration of staff assignment unitary status in six months provided there are no findings of compliance issues in that area during that period.[13] There have been no administrative or court findings of noncompliance on employment issues since that April 2019 ruling.

General opposition to the instant motion for provisional unitary status has focused on complaints, primarily about employment practices. However, those

---

[11] Rec. Doc. 1568-5 at 3.

[12] Rec. Doc. 1576.

[13] Rec. Doc. 1576.

complaints were mostly resolved and involved matters unrelated to compliance with desegregation orders.

Complaints are not unusual in most cases involving decrees under court supervision. Importantly, no credible evidence has been shown of bad faith noncompliance relative to employment practices within the immediate previous 24 months, including most of the 2019-20 academic term. For example, only about two of Litigation Counsel's seven (7) complaints filed through November 1, 2020 touched on employment issues. During the prior reporting period for 2018-19, twelve (12) complaints out of twenty-eight (28) involved employment issues. During that latter term, only two complaints led to court ordered reversals in February 2019 of TPSS employment decisions - but without any findings of bad faith noncompliance.[14] The vast majority of the employment-related complaints for above noted academic terms were resolved without a finding of noncompliance with existing

---

[14] See Rec. Docs. 1572 and 1573.

decrees.[15] While TPSS' conduct is not perfect, the record as a whole for the current and immediate prior terms show credible evidence of good faith compliance with court orders relative to race-based employee grievances **"for a reasonable period and to the extent practicable."** *Hull v. Quitman County Bd. of Educ.,* 1 F.3d at 1454; see also *Freeman v. Pitts,* 503 U.S. at 492, 498. (Emphasis added).

The proposed plan allows the superintendent to meet with an unsuccessful job or promotional applicant who feels aggrieved based on race where she explains her reasons for recommending an applicant of a different race. If the unsuccessful applicant is not satisfied with the superintendent's explanation, they can seek further consideration by a review committee. Two members of the review committee would be chosen by parties' Settlement Counsel and a third person. Until that process is completed, the position at issue remains open.

There is a credible concern in the proposed plan for the role of the system's Chief Equity Officer ("CEO"),

---

[15] Rec. Doc. 1653, pp. 5, 7-13.

currently called CDIO. While acknowledging the plan's retention and expansion of his duties in certain areas, the CEO/CDIO's role in hiring, promotion, and transfer decisions regarding teachers, administrators, supervisors, and staff under the proposed plan needs clarification. Given the CDIO's critical involvement in the implementation of desegregation plans, the CCO's related functions, and the recognition of highly laudable services by both, the proposed plan is modified by this court in Attachment A to this order to specifically set forth their respective duties.

The Chief Equity Officer is still envisioned to be part of the superintendent's team or committee that reviews employee hiring and promotion grievances that allege a race-based violation of the court approved plan or order. The CCO's services shall continue in accordance with the range of duties assigned at the time of his appointment, as modified by Attachment A, including notifications to and related processes the CCO can

implement when necessary to reasonably assure compliance with court orders and the modified plan.

Credible evidence, essentially from Superintendent Stilly and former CCO Arlene Knighten[16], convincingly shows that the proposed plan will further notable advancements to attract and retain educators, especially African American educators. Despite the ongoing COVID-19 pandemic and its adverse impact in the foregoing regards, the school system has devised an approved internal teacher certification and mentoring program that addresses a state-wide racial disparity amongst certified teachers.[17]

Additionally, despite teacher shortages nationally and state-wide, along with competition from adjoining parish school systems with better compensation opportunities, the TPSS managed to show an increase in

---

[16] CCO for 20 years, followed by service as Executive Counsel to a state agency, and longtime practitioner, minister, and resident in Tangipahoa Parish: https://cardinalchange.com/our-team

[17] Rec. Doc. 1612, pp. 19-24.

the hiring of African American educators.[18]  The superintendent showed that under her administration the number of African American educators in the Tangipahoa Parish public school district is above many of the surrounding Parish's school districts.[19]  Further, principal and assistant principal hiring continue to meet or exceed the 40-60 diversity goal.[20]  To address lagging hiring trends of central office staff and administrators for the 2019-2020 academic year, the school system's record trends for the 2020-21 period show meaningful positive adjustment and diligence.

As shown *supra*, TPSS made prior advancements in the overall distribution of educators to schools that approached the 40-60 diversity goal.  However, recent trends mandate reversing teacher assignments that could adversely impact that important aspirational goal. A disproportionate number of schools appear to have a

---

[18] Relatively small millage rate adjustments to property taxes were previously proposed by the TPSS Board to help fund needed improvements, teacher salaries, etc., but rejected by the electorate. The Board has subsequently explored alternative funding measures to satisfy vital services, including matters of interest in this action.

[19] Rec. Doc. 1612, p. 23.

[20] Id. at pp. 26-27.

predominance of both students and teachers of the same race. Many of those schools reportedly have lower academic performances. For instance, the only TPSS schools for the 2019-20 term that received a grade of "F" from the Louisiana Department of Education were four schools with a predominately African American student population, and mostly teachers of the same race – many without teacher certification yet.[21]

However, that evidence does not appear to be the result of bad faith decision-making by the superintendent or her staff.  Instead, several factors discussed *supra* have affected the foregoing data, e.g. pandemic, funding, competition, etc. TPSS through its superintendent has implemented vast changes that are reasonably expected to produce positive improvements in the diversity of distribution of teachers and performance scores, e.g. internal teacher certification, mentoring, diversity awareness and equity initiatives, recruitment by offering contracts at job fairs, targeting social media and

---

[21] Rec. Doc. 1653, pp. 21-22.

relevant websites, and working through black churches. TPSS implementation of plans to provide cultural sensitivity training, positive school cultures, and addressing parental advocacy should also enhance inclusion, equity, and diversity awareness internally and externally.[22]

Additional measures are needed to supplement TPSS' ongoing work to achieve the retained 40-60 goal for distribution of educators to schools. Example measures to consider in that regards include making assignments that prioritize distribution of new hires and promotions to schools that are below the goal, providing incentives that encourage transfers to such schools by educators who are currently at schools that exceed the goal, and requiring applicants for school principal to provide in their assessment of the relevant school a plan to achieve that goal. **Therefore, within twenty days of this opinion,** parties shall exchange with the CDIO/CEO and the

---

[22] See for example: Rec. Doc. 1630-2, pp. 73-111; Rec. Doc. 1580, pp. 37-39 [Discipline Revolution Project ("DRP")]; Rec. Doc. 1653, Ex. 16 ("Tangipahoa Parish School System Framework for Building a Culture of Student Success"); Id., Ex. 27.

CCO their responses and/or additions to above additional considerations. Thereafter, if requested or determined to be necessary by the court, a conference will be convened further address noted teacher assignment matter.

Educators do not exist in a vacuum. As hard as they might try to educate their students, the inevitability of education will only come through conscientious support from the entire community. The plan as herein modified, along with the existing plans, seek in our opinion to supplement the work of all educators and the goal of true and equitable education.

## STUDENT ASSIGNMENT

TPSS' student population is about 49% black and 51% non-black, and its principal and assistant principal makeups practically mirror those percentages. Having school leadership that meets and exceeds the 40-60 diversity goal is reasonably contemplated to positively impact the quality of instruction by teachers and educational performances of their students. For example, the proposed plan has two features that the existing plan

does not regarding the interview process for principalships. Under the proposed plan, the principal or supervisor of the principal-applicant would be added to the team with other educators and the principal-applicant would be required to present data about the school they're applying for with a plan to change that school around to improve compliance, including academic performance of students.[23] Using their plans and data for achieving equitable results, e.g. test scores, principals and educators they supervise should thereby be more accountable for demonstrating their achievements and under-achievements.

   Additionally, facility improvements and expansions proposed by the plan are also reasonably expected to contribute to more measurable positive results for students, educators, and the Tangipahoa Parish community. They have suffered too long in portable trailers, tight quarters, and undeserving conditions. If education is

---

[23] Rec. Doc. 1612, pp. 29, 32.

indeed the key to success, the means for providing it must be a top priority of the entire Parish.

Regarding student assignment, TPSS went from having 11 schools in compliance to about 20 schools recently, thereby exceeding the goal set by the existing plan.[24] A factor in the latter regard has been the transfer student assignment directives set forth in the existing plan.[25] Subject to later revision, those directives will stay in place under the proposed plan.

The COVID-19 pandemic caused world-wide shutdowns of in-person education, etc., and a paradigm shift into virtual learning. In response and through funding provided by The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, the TPSS provided students with Chromebook computers and as-needed free Wi-Fi access.

In the 2018-19 academic term, TPSS experienced chronic absences[26] of students at a 27% rate. For the following 2019-20 academic term, it was reduced to 18%.

---

[24] Rec. Doc. 1580, p. 16 and Rec. Doc. 1612, pp. 40-41.

[25] Id.

[26] Chronic absences by a student basically involve 15 absences or more in a school year.

While the 2020-21 data as of November 2020 show an alarming truancy increase, credible evidence shows the data reporting process is more likely impacted by pandemic-related concerns, e.g. virtual learning, and expectantly leading to inaccurate measurements. However, we will continue to monitor future reports and make adjustments where necessary.

In the 2018-19 term, the Pre-Kindergarten through 4th grades had a 5% suspension rate. TPSS reduced that rate to 4% in the 2019-20 term. For grades 5 through 12, TPSS had a 33% suspension rate in the 2018-19 term. In the 2019-20 term TPSS reduced the suspension rate to 16%. The superintendent further explained in comparison to state-wide data, TPSS is reducing the gap in student suspensions and, moreover, its expulsions rate has dropped down below the state level. That downward trend continues to occur based on the last reported 2020-21 period. With many students in a virtual learning setting during the 2021-21 pandemic period, it is reasonable to

also deduce a decrease in suspensions and expulsions. Monitoring continues.

Recognizing improvements in above areas do not mean more is needed to assure more equitable results. Of particular concern is the impact of disciplinary actions upon affected students and the entire educational system. That concern arises because many of the non-employment-based complaints involve issues of student discipline. While few of those complaints led to findings of non-compliance with existing court orders and decrees, the CCO and CDIO working together with all concerned are addressing this important matter.

For instance, using his own funds, on his own time, without anyone's request, but with appreciation from the undersigned for doing so beyond the call of specified functions as CCO, Attorney Don Massey is pursuing additional innovative endeavors which, in my opinion, further unitary status in education within Tangipahoa Parish. The CCO has worked to establish the Loyola Family Advocacy initiative to support parental involvement and

new approaches to address educational challenges, e.g. truancy, discipline, etc. Working with the CDIO, superintendent, and the Loyola College of Law, that initiative has become operational.[27] TPSS continues to work with DRP on discipline matters as the result of TPSS' extensive strategic planning along with impressive efforts by the Alternate Education ("AE") Operations Leader, Terran Perry. Through collaborative efforts with DRP and the LDOE, TPSS has repurposed from a designated alternative school approach to a more effective and inclusive AE program. Mr. Perry has several members of the AE team who assist him with offsite efforts to students, families, and schools that refer students to AE.

   While the pandemic and virtual learning experiences are complicated challenges, the cumulative effect of above-described multi-faceted programs shows consistency towards achieving unitary status through very practical, reasonable and good-faith means.

---

[27] Rec. Doc. 1653, p. 53-55.

Further, plaintiffs Litigation Counsel's suggestion for bringing in an independent expert to evaluate and suggest improvements to TPSS' work in addressing teacher allocation and student or school performance grades, especially at the so-called "D and F" levels, merits further action. **Therefore, within 20-days of this opinion** parties shall exchange information about educational experts who are qualified to perform that evaluation and submit to the undersigned information on at least 2 such experts. A conference will be convened thereafter with the court.

As they are and should be aware, parents, guardians, students, and the entire community of Tangipahoa Parish are essential components in the educational process. Without them, even well-intentioned workings by current and future TPSS educators, administrators, staff, and board would be doomed for failure.

## FACILITIES[28]

In addition to cited precedent and applicable subjects discussed *supra*, the remedial responsibility of school authorities to eliminate invidious racial distinctions extends to the maintenance of its buildings and the distribution of equipment. *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 18 (1971). "Courts consider 'facilities' synonymous with 'school buildings,' so they assess this factor by comparing the quality of different, racially identifiable schools within the district in question." *United States v. Jefferson Cty. Sch. Dist.*, 63 F. Supp. 3d 1346, 1353 (N.D. Fla. 2014) (citing *Thomas Cty. Branch of N.A.A.C.P. v. City of Thomasville Sch. Dist.*, 299 F. Supp. 2d 1340, 1364 (M.D. Ga. 2004), *aff'd in part, vacated in part, rev'd in part sub nom. Holton v. City of Thomasville Sch.*

---

[28] We rely in part on our prior rulings on this subject in July and December of 2017, Rec. Docs. 1472 and 1498; and the mandate from the Fifth Circuit affirming that ruling, filed on May 13, 2019 at Rec. Doc. 1577-1. See also Rec. Doc. 1552-1, the Fifth Circuit's dismissal of plaintiffs appeal for want of prosecution. See also Rec. Docs. 1654 and 1660.

*Dist.*, 425 F.3d 1325 (11th Cir. 2005); *Valley v. Rapides Par. Sch. Bd.*, 646 F.2d 925, 932, *on reh'g*, 653 F.2d 941 (5th Cir. 1981)).

In granting provisional unitary status in the facilities area, this court previously found in 2017 good faith compliance with several specified orders. A partial listing of those orders included: the construction of O. W. Dillon Elementary School, Rec. Docs. 876-2 and 1455-3 at 2; repairs at various facilities, Rec. Docs. 876, p. 25 and 1455-37 at 2-4; renovation of a Career Education Center at Kentwood High Magnet School, Rec. Docs. 956, pp. 1-2 and 1455-36 at ¶4; and construction of three new schools, modified by Rec. Docs. 956 and 1264. That ruling also found the following: Physical facilities and equipment at schools previously identifiable as majority black schools are largely comparable to the physical facilities and equipment at other schools in the system; only six of the thirty-one schools in TPSS do not use temporary or modular buildings ("T-Buildings"), and five of those were majority black

schools; of the seven schools with ten or more modular buildings, six were majority black schools.

Moreover, the following excerpts from the 2017 ruling are also referenced to provide additional context to present considerations:

As to expenditures, since 2010, the System has spent $9,536,204 in **capital project funds** on the four majority black high schools, or $2,384,051 per school and $4,191 per pupil, and $4,408,810 on the three majority non-black schools, or $1,469,603 per school and $1,737 per pupil. Rec. Doc. 1455-37 at 9. It spent $4,932,628 on the twelve-majority black elementary and middle schools, or $411,052 per school and $760 per pupil, and $4,846,136 at the twelve-majority non-black elementary and middle schools, or $403,845 per school and $718 per pupil. Id. **Thus, over six years, approximately 61% of the (capital project) funds were spent at majority black schools. Id.**

During the same period, the System spent $4,337,960 in **maintenance expenditures** at the four-majority black high schools, or $1,084,490 per school and $1,729 per pupil, and $4,083,835 at the three majority non-black schools, or $1,361,278 per school and $1,144 per pupil. Rec. Doc. 1455-37 at 10. It spent $7,110,218 at the twelve-majority black elementary and middle schools, or $592,518 per school and $1,082 per pupil, and $5,577,800 at the twelve majority non-black elementary and middle schools, or $464,816 per school and $814 per pupil. Id. **Thus, over six years, approximately 54% of the total**

**maintenance funds expended were spent at majority black schools. Id.**

…

**(While evidence was received alleging bad faith remarks by one school board member, it was found that) [t]he Board majority appears in compliance** with standing desegregation orders, and we are unaware of any reason to allow for indefinite judicial control over facilities as a necessary tool here for compliance in other areas; the Board's actions in this context, minimally yet sufficiently, demonstrated a commitment to desegregation. *See Taylor v. Ouachita Par. Sch. Bd.,* No. 66-12171, 2012 WL 4471643, at *8, n.4 (W.D. La. Sept. 27, 2012) (granting unitary status in several areas, including facilities, because, even though "[t]he physical campuses differ in construction, age, and design . . . the facilities provide adequate space for their educational use and are all well maintained. Additionally, the School Board . . . has been able to ensure that classrooms are equally equipped with 'smartboards' and other forms of technology" and "[a]lthough there was some disparity in the amount spent on the schools, the disparity is based upon the natural growth in student populations, not based on any discriminatory reason"); *Williams v. Kimbrough*, No. 65-11329, 2010 WL 1790516, at *5 (W.D.La. May 3, 2010) (granting unitary status in the area of facilities where the elementary school facilities were not new, but were "well-maintained, grade-appropriate facilities"); *United States v. Franklin Par. Sch. Bd.*, No. 70-15632, 2013 WL 4017093, at *5 (W.D. La. Aug. 6, 2013) (declaring the system unitary in the area of facilities where the schools provided reasonably similar

accommodations, had comparable libraries, had the same or similar technology, used the same procedures for acquiring and repairing equipment and requesting maintenance, and were given an equitable amount of funds for maintenance, renovations, and technology).

Rec. Doc. 1472, pp. 12–14. (Emphasis added)

Following the circuit's affirmance of provisional unitary status in the facilities area, and considering the proposed plan at issue regarding facilities, the following subjects have been the focal points in addressing TPSS's current compliance in the facilities area:

1. TPSS' "Phase I" capital expenditures;
2. T-Building usage;
3. TPSS use of resources for student instructional purposes; and
4. TPSS' sales tax proposal.

TPSS based Phase 1's capital outlays of about $22,700,000 on the need for specific changes, shifts and increases in Parish population and facilities' needs. It cited demographics from its consultant on facility

34

planning, CSRS[29], to address the foregoing changes with the following Phase 1 projects:

> 1. The purchase and improvements of presently vacant Harvest Academy campus or so-called Yokum Road school in Hammond, La. for an estimated cost of $6.5 million;
> 2. Adding 10 classrooms and dining capacity at Champ Cooper (PK-8/; Robert, LA area) for estimated cost of $5.3 million;
> 3. Adding 8 classrooms at Ponchatoula High for estimated cost of $2.6 million;
> 4. Adding 8 classrooms and some sitework (badly needed) at DC Reeves (3rd-4th/ Ponchatoula, LA) for estimated cost of $3.1 million;
> 5. Add/Improve Field House, 2 classrooms and Title IX work at Loranger High for estimated cost of $2.7 million;
> 6. Replace/ repair windows, gutters and facia (in very poor condition) at Kentwood High/ Middle School for estimated cost of $1.0 million; and
> 7. Debt retirement for existing Independence High and Sumner High Debt for estimated cost of $1.5 million.

Opponents correctly state that the plan provides Phase I capital expenditures for only one school out of six existing schools with a majority African American student population, i.e. Kentwood School, and only one

---

[29] CSRS is a Louisiana-based architectural firm that specializes in the development of long-range facility master plans for school districts. Rec. Doc. 1602-2, p. 6.

out of seven in that regards upon the planned addition of the Yokum Road school project. Opposition also notes the absence of a "planning study (by TPSS) to consider the impact of the facilities plan on desegregation and elimination of the remnants of the dual school system based on race."[30]  We also note that Phase I's capital outlay for Kentwood Schools also represents only about 5% of the total capital expenditure. Based only upon the foregoing credible facts, this court would not hesitate to reject instant facility plans.  However, there are more facts to consider.  Additional evidence just as credible has also shown that TPSS' facility plan was substantially developed to address current student enrollment, projected growth, prioritized needs at noted facilities, and replacement of temporary classroom buildings.[31] It is important to remember that the scope of the facilities plan includes accommodating for growth and the elimination of existing temporary building,

---

[30] See Rec. Doc. 1602-2, pp. 10.

[31] See for example: Rec. Docs. 1602-2, pp. 6-12; 1602-5, pp. 1-52; and Superintendent Stilley's testimony during prior hearings on the plan, e.g. Id.; Rec. Doc. 1612.

including T-Buildings (trailers), all of which should positively impact desegregation.[32] The overwhelming rationale is found to be based on race-neutral and good faith considerations that are not violative of existing desegregation decrees. Further evidence of good faith actions includes the declining usage of T-Buildings, partially in response to consistent concerns expressed by plaintiffs Litigation and Settlement counsel and others.[33]

The credible concerns from the community and plaintiffs' Litigation Counsel raise equally important matters that will be further addressed by increased involvement in the monitoring of TPSS' facilities plan. To that end, the collaborative team-focused work-ethic of the Superintendent will include meaningful involvement from the CDIO/CEO and CCO as set forth in Appendix A to this opinion. TPSS is further reminded that deviations based on racially motivated reasons, including those that

---

[32] Rec. Doc. 1602-2, p. 10.
[33] Rec. Doc. 1653, p. 41.

cause the under-funding of school facilities in need and subject to this decree will not be tolerated.

------------------------

As stated earlier and during hearings on the pending motion, parties generally presented their evidence and arguments in an orderly and professional manner. Perceptions about the lack of communications or input between counsel have been viewed more as a disagreement about substance than process.  Nothing prevented anyone from sending written suggestions, criticisms, or comments about settlement efforts between this case's inception to modern times.  Between 1965 and now, there have been multiple opportunities to provide changes and objections to existing desegregation plans, decrees, injunctions, etc., including the ones currently at issue.

Based on current compliance successes, parties designated Settlement Counsel and others jointly proposed a plan of action that fosters additional processes that merit consideration of unitary status in remaining noted areas. Litigation Counsel for plaintiffs and other

opponents have shown examples of the school system's prior bad faith and specific needs about the current proposal that we have incorporated into this opinion, as seen *supra*. As noted earlier, historical examples of the system's bad faith have been found and addressed. However, the system's current record of good faith and compliance cannot be ignored. It must be supported, but still with vigilant monitoring and input from all stakeholders. To his credit, plaintiffs Litigation Counsel credits the current TPSS Superintendent for whatever success or possible future ones that might occur due to her open and more inclusive management approaches.

The evidence before the court — including contemporaneous records made regarding each outstanding area — supports the system's explanations for actions that have advanced and should further advance the cause for unitary status in the three remaining areas, as discussed above. Working also in collaboration with the CDIO, CCO, and other stakeholders, including an unprecedented number of meetings with the public, the

Superintendent's team-oriented approach has been vital to TPSS' current successes.

Significantly, we also agree with plaintiffs Litigation Counsel's assessment of the need to retain jurisdiction and active monitoring of the modified plan. We therefore emphasize that provisional unitary status for three years is in order at this time on the remaining areas, i.e. employment practices, student assignment and facilities. Jurisdiction shall be retained during that period, or a reasonable time period, to enforce, modify or vacate terms of the plan as herein modified by the court, and to conduct a final fairness hearing. The existing plan and decrees are temporarily suspended, in part and in the interim, all subject to further orders of the court and consistent with this opinion. Therefore, the motion is granted in part, denied in part, and the subject plan is modified in accordance with this opinion, all as set forth herein. Rec. Doc. 1630.

We continue to follow the Fifth Circuit's incremental approach with imposing a provisional or temporary

probationary period under *Youngblood*. *See Youngblood v. Bd. of Pub. Instruction,* 448 F.2d 770 (5th Cir. 1971)*; also United States v. Overton*, 834 F.2d 1171, 1173–74, 1177 (5th Cir. 1987). The same occurred in *Flax v. Potts*, 915 F.2d 155, 157 (5th Cir. 1990). And in *United States v. Midland Indep. Sch. Dist.,* the Fifth Circuit held that it was not an abuse of discretion to grant unitary status without a final hearing when a district court has otherwise "develop[ed] intimate knowledge of the school district's operations . . . [and] attain[ed] the same substantive goals achievable by using the *Youngblood* procedures." 48 F. App'x 102, *1 (5th Cir. 2002). *Midland* does not prohibit a district court from imposing a probationary period under *Youngblood* before fully releasing a defendant from part of a desegregation order. *See id*. A 3-year probationary period is consistent with Fifth Circuit doctrine. *See Thomas v. Sch. Bd. St. Martin Parish,* 756 F.3d 380, 387 & n.23 (5th Cir. 2014) (holding that the retention of jurisdiction meant that a court order was not a full and final declaration of unitary

status despite a finding that the district had "achieved a unitary school system"); *see also Moore v. Tangipahoa Parish School Board*, No. 18-30115, 921 F.3d 545, 549-50 (5th Cir. 2019) (Affirming this court's grant of a two-year probationary period in the facilities area to allow additional limited oversight before concluding that the school system has "demonstrated, to the public and to the parents of the once disfavored race, its good-faith commitment to the whole of the court's decree." Quotation from *Freeman v. Pitts,* 503 U.S. 467, 491 (1992)).

For the foregoing reasons, we find that TPSS has met its burden of establishing, among other things, that it has demonstrated good faith commitment to complying with the court's existing orders and setting forth a plan, as hereinabove modified, to advance towards unitary status following a three-year probationary or provisional period. *See also Missouri v. Jenkins*, 515 U.S. 70, 88-89 (describing a "good faith commitment to the whole of the court's decree" as part of "the showing that must be made

by a school district . . . for complete or partial relief"
from that decree).

School integration is an enormously complex
enterprise that requires consideration of an enormous
number of factors. *Moore v. Tangipahoa Parish School
Board*, 843 F.3d 198, 202 (5th Cir. 2016)(Quoting *Swann v.
Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 27 n.10,
91 S.Ct. 1267, 28 L.Ed.2d 554 (1971):"There is no
universal answer to complex problems of desegregation;
there is obviously no one plan that will do the job in
every case."). Efforts to achieve unitary status are
bound to have a far-reaching impact and unpredictable
consequences across the school district. *Moore*, 843 F.3d
at 202.

The Board, TPSS, and the people who, in the end,
govern their school system, must be aware that the door
through which they enter and leave the courthouse is not
locked to them. They will undoubtedly find that this is
so especially if they fail to maintain the provisional
grant of a unitary system we conclude exists today.

*NAACP, Jacksonville Branch v. Duval Cty. Sch.*, 273 F.3d 960, 976–77 (11th Cir. 2001).

New Orleans, Louisiana this 30th day of March 2021

_____
SENIOR UNITED STATES DISTRICT JUDGE

## ATTACHMENT A

### I. Role of Desegregation Implementation Officer

The new title for the Desegregation Implementation Officer shall be Chief Equity Officer (CEO).[34]  The CEO shall report directly to the superintendent and shall be tasked with supervision of the Office of Equity personnel involved with implementation of the terms and provisions of this order.  The CEO will serve as a member of the school system's Senior Leadership team.  As a member of the Senior Leadership Team, the CEO shall be included in Senior Leadership Team meetings.

The CEO and superintendent should interact regularly on issues relevant to the effective implementation of this order, including identification of successes and challenges, as well as sharing of information that will enable assessments of the school system experiences

---

[34] The CEO position shall be continued through the duration of this order. The person presently occupying the CEO position shall be continued in that position through the duration of this order. He may be only removed pursuant to an order of this court upon a showing of just cause by the School Board. In the event the person occupying the CEO position should resign, be removed by this court for just cause, or otherwise no longer hold the position, the superintendent shall prepare a job description which shall include the same duties and responsibilities as contained this Agreement, advertise to fill the vacancy, and employ the person selected to fill the vacancy for the remaining duration of this Agreement, subject to court approval beforehand.

implementing this order, especially regarding employment practices, student assignment matters, and facilities planning and implementation.

The CEO will serve as liaison for school system employees, students and families who assert complaints. Regarding complaints, the complaint protocol the school system has proposed, and which the court accepts, will be as follows: Complaints should be first addressed at the school level which includes a meeting with the principal. If not resolved, the district supervisor assigned to the school, who also performs the periodic evaluations of the principal, will become involved to assist in resolving the complaint. The final level for resolution will be the Senior Leadership Team, which will include the CEO. For African American complainants who feel that they have been discriminated against due to race, the CEO, along with other senior leaders, will advise the complaining employee of the court approved grievance process. The CEO will follow up with complaining employees and serve as liaison for process

questions they may have during the grievance process. The CEO shall keep a record of complaints asserted in which a violation of this order is alleged, or in which an African American alleges discrimination based upon the complainant's race, along with the status of each complaint, and if resolved the general nature of the resolution.

As per the Agreement of the parties, the CEO shall be employed on a twelve-month basis with a salary at Grade 23, which is equivalent to the salary grade of assistant superintendents and the chief financial officer. and which is the pay grade at which the position of Desegregation Implementation Office is presently paid.

Performance Responsibilities

• Serve as a member of the school system's Senior Leadership team and attend Senior Leadership Team meetings.

• Serve as a senior leader on the school system's Central Implementation Team (CIT), which shall meet monthly to address systematic trends in discipline across the school system.

- Serve as liaison regarding the complaint and grievance process referenced in this order.

- Maintain a list of all complaints of lack compliance with violations or failure of the school system to comply with this order, and discrimination against an African American complainant based on the complainant's race, including the status of the complaint and, if resolved, the general nature of the resolution.

- Participate in a weekly or bi-weekly meeting with the superintendent, a "check-in," to discuss and collaborate on issues of concern, developments, strategies, challenges and successes implementing this order.

- Among the ongoing discussion items for the superintendent and CEO, prior to hiring of candidates for administrative or staff positions at the level of principal or higher, the superintendent shall advise the CEO of each proposed hire, the names and races of other candidates for the position, and seek any input the CEO may wish to offer. The CEO shall have the opportunity for advisory input to the superintendent. However, the CEO shall not have a vote or veto ability.

- Otherwise, communicate with and assist the superintendent in the solution of concerns which may arise in the areas of his responsibility.

- Attend and contribute to monthly CIT meetings where the leadership team works to engage in problem-solving strategies to address inequities in discipline across the school system, with priority given to UIR schools for discipline.

- At least ten (10) days prior to effecting or improving transfers of students for the following school year, the superintendent or the superintendent's designee shall submit a comprehensive listing of all approved

student transfers, including the race of the transferring student, the proposed transferring and receiving schools, and the basis for the transfer or rejection of it. The CEO shall have the opportunity for advisory input to the superintendent. However, the CEO shall not have a vote or veto ability. For all approved "hardship," extraordinary, administrative or similar transfers, the CEO may request the underlying materials supporting or disputing the request.

• Serve as the school system's chief point of contact to implement a mentoring program for at risk youth in the school system, including serving as a liaison with the community and church leaders, with priority given to UIR schools for discipline.

• Attend and contribute to the school system's quarterly meetings with senior leadership with respect to this order.

• Assist with required reporting to the Court Compliance Officer ("CCO") and plaintiffs' Settlement Counsel.

• Meet and confer freely with the CCO as requested and/or necessary in the view of either the CEO or the CCO.

• Identify division objectives based upon parish goals and objectives of the School Board and the superintendent.

• Identify and initiate the development of performance objectives based upon established school and community goals.

• Recommend to the superintendent specific policies, procedures, plans and programs for attaining current objectives.

• Advise and counsel the superintendent in the area of equity and Agreement implementation during weekly or bi-weekly check-ins with the superintendent and upon the superintendent's request.

• Make presentations to the School Board when required by the superintendent regarding equity and aspects of this order.

• Coordinate with other senior leaders on the organization and presentation of workshops and in-service training relative to sensitivity and terms and provisions of this order.

• Direct and implement strategies to engage families and communities that advances unitary status objectives.

• Stay abreast of trends in the development of diversity and equity in the field of elementary and secondary education.

• Study educational needs of the school community and make recommendations to the superintendent strategies for increasing diversity, equity and opportunities for all students.

• Adhere to established lines of communication through the chain of command, recognizing the ability of the CEO to freely communicate with the CCO as the CEO and CCO deem appropriate.

• Ensure strategies to facilitate diversity and equity and to implement this order are in alignment with state laws and guidelines and this order.

• Adhere to the policies and procedures established by the School Board that comply with this order.

• Implement the policies and procedures established by the School Board that comply with this order.

• Support the District's Strategic Plan, in compliance with this order, to improve the educational system.

• As appropriate, communicate to the community how diversity, equity and opportunities for students impact all children and improve the educational system.

• Complete Professional Growth Plan and Self-Evaluation.

• Perform such other duties as assigned by the superintendent.

• Supervision of school system employees under CEO supervision:

o Designate role responsibility and authority for personnel under his supervision.
o Conduct performance observations and evaluations of immediate staff members according to established procedures with the Parish Personnel Evaluation Plan.
o Ensure the appropriate approval or denial of request for leave (annual or personal) for staff members under his supervision.

• Evaluation: Criteria established by School Board policy.

_____

**II. ROLE OF COURT COMPLIANCE OFFICER**

The Court Compliance Officer's ("CCO") appointment as set forth in Rec. Doc. 1204 shall continue until the court orders otherwise. Until further notice, the court

suspends the provisions of Rec. Doc. 876-4, page 29, beginning at the first full paragraph and continuing through the second paragraph.

The provisions of Rec. Doc. 876-4, page 29, paragraph 4, are modified to provide that the CCO's annual report shall be filed within thirty (30) days of the annual student population reporting provided each October by the school system to the Louisiana Department of Education ("LDOE"). Upon providing the final beginning of school year student population figures to the LDOE each school year, the school system shall immediately provide to the CCO and all lead counsel the student population figures that it provides to the LDOE.

In addition, and consistent with this order, the CCO shall (a) receive the reports provided for in this order; (b) monitor the school system's compliance with the terms and provisions of this order, including information provided in the reports submitted by the defendant's Settlement Counsel, and any other relevant facts or circumstances; (c) interact with the court as the court

shall designate; (d) make inquiries of the school system where deemed necessary to evaluate compliance with the terms and provisions of this order; (e) communicate with counsel for the parties, the superintendent and/or the Chief Equity Officer as deemed necessary; and (f) include in the CCO's annual report information regarding the school system's compliance with the terms and provisions of this order.  Particular attention shall be given by the CCO to compliance issues arising in employment practices, student assignment matters, and facilities planning and implementation.

The provisions of Rec. Doc. 1326 regarding the CCO's compensation shall continue to apply unless and until modified by the court and said compensation shall be paid by the School Board.

SO ORDERED this 30th day of March 2021

/s/ Senior Judge Ivan L. R. Lemelle